# No. 22-13412-B

# In the United States Court of Appeals
# for the Eleventh Circuit

———————

ELEANOR FISHER AND TAMMY FU, IN THEIR CAPACITY AS FOREIGN
REPRESENTATIVES OF RELIEF DEFENDANT, TCA GLOBAL CREDIT
FUND, LTD. (IN OFFICIAL LIQUIDATION)

*Petitioners/Appellants*

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Appellee*

———————

On Appeal from the United States District Court
for the Southern District of Florida

———————

**INITIAL BRIEF OF APPELLANTS, ELEANOR FISHER AND TAMMY FU, IN THEIR
CAPACITY AS FOREIGN REPRESENTATIVES OF RELIEF DEFENDANT, TCA GLOBAL
CREDIT FUND, LTD. (IN OFFICIAL LIQUIDATION)**

———————

Mark D. Bloom
John R. Dodd
Baker & McKenzie LLP
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
mark.bloom@bakermckenzie.com
john.dodd@bakermckenzie.com
Telephone: 305-789-8900
Counsel for Appellants

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1, the following is a list of all persons and entities known to Appellants, Eleanor Fisher and Tammy Fu, in their capacity as Foreign Representatives of Relief Defendant, TCA Global Credit Fund**,** Ltd. (in Official Liquidation), to have an interest in the outcome of this appeal:

Altonaga, Cecilia M., United States District Judge

Avila, Rodriguez, Hernandez, Mena & Ferri, Attorneys for Respondent, Ocean Bank

AW Exports Pty Ltd, Claimant

Baker & McKenzie LLP, Attorneys for Appellant

Banque Pictet & CIE S.A., Petitioner in Cayman Islands Winding Up Proceeding

Bast Amron LLP, Attorneys for Armand Zohari, Tritium Fund, Hsueh-Feng Tseng, and Fide Funds Growth

Bast, Jeffrey P., Attorney for Armand Zohari, Tritium Fund, Hsueh-Feng Tseng, and Fide Funds Growth

Batista, Paul J., Attorney for Jonathan E. Perlman, Receiver

Benjamin, Todd, Claimant

Bloom, Mark D., Attorney for Appellants

Blum, W. Barry, Attorney for Jonathan E. Perlman, Receiver

Bradylyons, Morgan, Attorney for Securities and Exchange Commission

Broxom, Warwick, Claimant

Cahill Gordon & Reindel LLP, Attorneys for Credit Suisse

Claritas Legal Limited, Cayman Islands Counsel for Appellants

Clearstream Banking S.A., Limited Objector

Credit Suisse, Limited Objector

Cuccia II, Richard A., Attorney for Paycation Travel, Inc., Xstream Travel, Inc. and David Manning

Cuccia Wilson, PLLC, Attorneys for Paycation Travel, Inc., Xstream Travel, Inc. and David Manning

Dodd, John R., Attorney for Appellant

Dorchak, Joshua, Attorney for Clearstream Banking S.A.

EY Cayman Ltd.

Fide Funds Growth

Fisher, Eleanor, Foreign Representative of Relief Defendant TCA Global Credit Fund, Ltd.

Fu, Tammy, Foreign Representative of Relief Defendant TCA Global Credit Fund, Ltd.

Fulton, Andrew, IV, Attorney for Lease Corporation of America

Garno, Gregory M., Attorney for Jonathan E. Perlman, Receiver

Genovese, Joblove & Battista, P.A. Attorneys for Jonathan E. Perlman, Receiver

Genovese, John H., Attorney for Jonathan E. Perlman, Receiver

Hall, Jason, Attorney for Credit Suisse

Harneys, Cayman Islands Counsel for Appellants

Hill, Ezekiel, Attorney for Securities and Exchange Commission

Kaplan Saunders Valente & Beninati, LLP, Attorneys for AW Exports Pty Ltd, Warwick Broxom, and Jonathan James Kaufman

Kaufman, Jonathan James, Claimant

Kellogg, Jason Kenneth, Attorney for Todd Benjamin International, Ltd. and Todd Benjamin

Kelley & Fulton, P.A., Attorneys for Claimant, Lease Corporation of America

Lease Corporation of America, Claimant

Leggett, Jaime B., Attorney for Armand Zohari, Tritium Fund, Hsueh-Feng Tseng, and Fide Funds Growth

Levine Kellogg Lehman Schneider & Grossman, Counsel for Todd Benjamin International, Ltd. and Todd Benjamin

McIntosh, Elizabeth G., Attorney for Jonathan E. Perlman, Receiver

Moot, Stephanie N., Attorney for Securities and Exchange Commission

Mora, Martha Rose, Attorney for Respondent, Ocean Bank

Morgan, Lewis & Bockius LLP, Attorneys for Clearstream Banking S.A.

Ocean Bank, Non-Party Respondent

Paycation Travel, Inc., Claimant

Pearson, Katharine Lucy Bladen, Cayman Islands Attorney for Appellants

Perlman, Jonathan, E., Receiver

Roldan Cora, Javier A., Attorney for Clearstream Banking S.A.

TCA Fund Management Group Corp., Defendant, Receivership Entity

TCA Global Credit Fund GP, Ltd., Defendant, Receivership Entity

TCA Global Credit Fund, L.P., Defendant, Receivership Entity

TCA Global Credit Fund, Ltd., Defendant

TCA Global Credit Master Fund, L.P., Defendant

TCA Global Lending Corp.

Tritium Fund, Claimant

Tseng, Hsueh-Feng, Claimant

Todd Benjamin International, Ltd., Claimant

U.S. Securities and Exchange Commission, Plaintiff

Valente, Charles A., Attorney for AW Exports Pty Ltd, Warwick Broxom, and Jonathan James Kaufman

van de Linde, Peter, Claimant

Verges, Teresa, Attorney for Securities and Exchange Commission

Xstream Travel, Inc., Claimant

Zohari, Armand, Claimant

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellants state that there is no parent corporation or any publicly held corporation that owns 10% or more of the stock of TCA Global Credit Fund, Ltd.

# STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2) and Eleventh Circuit Rule 28-1(c), Appellants respectfully submit that oral argument is necessary to the just resolution of this appeal and will significantly aid the decision-making process.

This appeal presents important questions of first impression, never before actually litigated in this or any other Circuit, concerning whether a district court in a cross-border insolvency case may apply U.S. principles of equity and federal common law to deny comity to a foreign representative and override a statutory scheme adopted by a foreign sovereign, when that same district court has granted recognition to the debtor's foreign liquidation proceeding in that country under Title 11, U.S. Code, Chapter 15. This is an important legal issue that implicates principles of international comity enshrined in over a century of federal case law and as a "central tenet" of Chapter 15, as well as untold millions of dollars of indirect foreign investment in United States companies through thousands of offshore feeder funds. Oral argument would afford the Court an opportunity to clarify its understanding of the facts and explore the Appellants' legal contentions in greater detail.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................C-1

CORPORATE DISCLOSURE STATEMENT ...................................................C-5

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS....................................................................................... ii

TABLE OF CITATIONS...................................................................................... iv

JURISDICTIONAL STATEMENT ................................................................... viii

STATEMENT OF THE ISSUE ............................................................................1

STATEMENT OF THE CASE ..............................................................................2

    I.   Statement of Facts, Course of Proceedings and Disposition Below................2

       A.  History of Related Cases...........................................................................2

       B.  Motion for Approval of Distribution Plan and Entry of Distribution Order.4

    II.  Standard of Review ......................................................................................6

SUMMARY OF THE ARGUMENT ....................................................................8

ARGUMENT.......................................................................................................10

    I.   THIS APPEAL PRESENTS AN IMPORTANT ISSUE OF FIRST
       IMPRESSION WITH WIDE-RANGING IMPLICATIONS. ............................10

    II.  CHAPTER 15, CONSISTENT WITH A LONG LINE OF PRIOR CASES,
       REQUIRES THAT THE DISTRICT COURT GRANT COMITY TO THE
       FOREIGN REPRESENTATIVES AND FOREIGN INSOLVENCY
       PROCEEDINGS..............................................................................................12

       A.  Congress Adopted the Model Law to Ensure Predictability and Uniformity
         in Cross-Border Insolvency Proceedings by Mandating Comity to Foreign
         Representatives and Foreign Insolvency Proceedings. .....................................13

          1.  Chapter 15's comprehensive scheme dictates granting comity to foreign
            representatives and foreign insolvency law upon recognition. .....................13

          2.  The grant of comity to foreign insolvency laws and proceedings predates
            the enactment of Chapter 15 by more than a century, and remains the law
            today........................................................................................................16

          3.  Through the Enactment of Chapter 15, Congress Intended to Establish
            Uniformity by Mandating Comity to Recognized Foreign Proceedings. ......23

B.   The Plain Language of Chapter 15 Required the District Court to Grant Comity and Apply Cayman Islands Insolvency Law. ......................................25

C.   The District Court Erred in Each Element of its Rationale for Declining to Grant Comity and Apply Cayman Islands Law to the Distribution to Stakeholders of the Feeder Fund Ltd. ................................................................28

   1.   The limitations on comity imposed by the District Court are inimical to, rather than "consistent with," the policies of Chapter 15. .............................28

   2.   The Cayman Islands distribution priorities do not need to be "comparable" to those under U.S. law or equity to be applied and given effect in the Receivership Action. .................................................................31

   3.   Recognition of the Winding Up Proceeding as a foreign nonmain proceeding is irrelevant to the grant of comity under Section 1509(b)(3). .....34

III.   THE DISTRICT COURT ERRED AS A MATTER OF LAW IN APPLYING U.S. PRINCIPLES OF EQUITY AND FEDERAL COMMON LAW TO DENY COMITY AND APPROVE THE DISTRIBUTION PLAN IN DEROGATION OF CAYMAN ISLANDS  LAW. ...........................................35

A.   Principles of Equity Cannot Vary the Right to Comity Under Chapter 15 and the Distribution Priorities of the Cayman Island Companies Act Made Applicable Thereby. .....................................................................................36

B.   The District Court Erred in Creating and Relying on Federal Common Law as a Rule of Decision to Authorize Direct Distributions to the Stakeholders of a Foreign Company in Liquidation and Avoid Application of the Distribution Priority Scheme Mandated by Foreign Law. ...................................................38

IV.   EVEN IF THE DISTRICT COURT HAD THE DISCRETION TO REFUSE COMITY TO THE FOREIGN REPRESENTATIVES, IN DOING SO THE COURT ABUSED THAT DISCRETION. .................................................43

V.   THIS IS A CASE OF FIRST IMPRESSION ONLY BECAUSE THE SEC AND RECEIVER HAVE TAKEN A STANCE THAT IS CONTRARY TO THE DISTRIBUTION SCHEMES APPROVED AND EMPLOYED IN OTHER CROSS-BORDER INSOLVENCY CASES AND SITUATIONS. .....................49

CONCLUSION ...................................................................................................53

# TABLE OF CITATIONS

**Cases**                                                          **Page(s)**

*Acheron Cap., Ltd. v. Mukamal*,
    22 F.4th 979 (11th Cir. 2022) ........................................................ viii

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
    994 F.2d 996 (2d Cir. 1993) ........................................... 20, 23, 46, 48

*In re Ascot Fund Ltd.*,
    603 B.R. 271 (Bankr. S.D.N.Y. 2019) ................................. 48, 49, 51

*Atherton v. FDIC*,
    519 U.S. 213 (1997) .......................................................... 38, 41, 43

*In re Atlas Shipping A/S*,
    404 B.R. 726 (Bankr. S.D.N.Y. 2009) .......................................... 25

*Badalament, Inc. v. Mel-O-Ripe Banana Brands, Ltd.*,
    265 B.R. 732 (E.D. Mich 2001) .................................................... 20

*In re Bd. of Dirs. of Telecom Argentina, S.A.*,
    528 F.3d 162 (2d Cir. 2008) ................................. 21, 22, 27, 32, 43

*Bendall v. Lancer Mgmt. Grp., LLC*,
    523 F. App'x 554 (11th Cir. 2013) ................................................. 6

*British Am. Ins. Co. v. Fullerton* (*In re British Am. Ins. Co.*),
    488 B.R. 205 (Bankr. S.D. Fla. 2013) .......................................... 15

*Canada S. Ry. Co. v. Gebhard*,
    109 U.S. 527 (1883) ............................................................. *passim*

*CFTC v. Walsh*,
    712 F.3d 735 (2d Cir. 2013) ........................................................ 10

*Cooper v. Meridian Yachts, Ltd.*,
    575 F.3d 1151 (11th Cir. 2009) ..................................................... 6

*Digit. Media Sols., LLC v. S. Univ. of Ohio, LLC*,
    No. 21-4014, 2023 U.S. App. LEXIS 2966 (6th Cir. Feb. 7, 2023) ................... 6

*EMA Garp Fund, L.P. v. Banro Corp.*,
  783 F. App'x 82 (2d Cir. 2019) ..................................................... 20, 21, 27, 48

*First Mercury Ins. Co. v. Excellent Computing Distribs.*,
  648 F. App'x 861 (11th Cir. 2016) ............................................. 7, 44

*In re Goerg*,
  844 F.2d 1562 (11th Cir. 1988) .................................................... 17

*Hedges v. Dixon Cnty.*,
  150 U.S. 182 (1893) ........................................................................ 36

*Hilton v. Guyot*
  *159 U.S. 113, 164 (1895)* ............................................................. 17, 26

*In re Income Collecting 1-3 Months T-Bills Mut. Fund*,
  No. 21-11601(DSJ) (Bankr. S.D.N.Y. Feb. 17, 2022) ................... 11, 50, 51, 52

*JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de CV*,
  412 F.3d 418 (2d Cir. 2005) ......................................................... 29

*Law v. Siegel*,
  571 U.S. 415 (2014) ..................................................................... 37, 43

*Loucks v. Standard Oil Co.*,
  120 N.E. 198 (1918) ..................................................................... 37

*Magniac v. Thomson*,
  56 U.S. 281 (1853) ....................................................................... 9, 36

*In re Mandalay Shores Coop. Hous. Assoc.*,
  53 B.R. 609 (Bankr. M.D. Fla. 1985) ........................................... 34

*Miss. Band of Choctaw Indians v. Holyfield*,
  490 U.S. 30 (1989) ....................................................................... 41

*In re Nat'l Warranty Ins. Risk Retention Grp.*,
  384 F.3d 959 (8th Cir. 2004) ........................................................ 20

*In re OneTRADEx, Ltd.*,
  645 B.R. 184 (Bankr. S.D.N.Y. 2022) .......................................... 11, 51

*Oui Fin. v. Dellar & Oui Mgmt.*,
   No. 12-civ-7744, 2013 WL 5568732 (S.D.N.Y. 2013) .....................................20

*Philadelphia Gear Corp. v. Philadelphia Gear, S.A.*,
   44 F.3d 187 (3d Cir. 1994) ..............................................................................20

*Rodriguez v. FDIC*,
   589 U.S. ___, 140 S. Ct. 713 (2020) ...................................................38, 39, 43

*S.E.C. v. Elliot*,
   953 F.2d 1560 (11th Cir. 1992) .......................................................................10

*S.E.C. v. Wang*,
   944 F.2d 80 (2d Cir. 1991) ..............................................................................10

*SEC v. Direct Lending Invs., LLC*,
   No. 2:10-cv-02188 (C.D. Cal. Nov. 20, 2020) ...................................27, 49, 51

*SEC v. Founding Partners Stable-Value Fund, LP et al.*,
   No. 2:09-cv-229-JESNPM (M.D. Fla. Jan. 4, 2022)..................................50, 51

*SEC v. Safety Fin. Serv., Inc.*,
   674 F.2d 368 (5th Cir. 1982)............................................................................41

*SEC v. Torchia*,
   922 F.3d 1307 (11th Cir. 2019)..................................................................... viii

*SEC v. Wencke*,
   622 F.3d 1363 (9th Cir. 1980)..........................................................................39

*Seguros del Estado, S.A. v. Sci. Games, Inc.*,
   262 F.3d 1164 (11th Cir. 2001)..........................................................................6

*Showan v. Pressdee*,
   922 F.3d 1211 (11th Cir. 2019).......................................................................25

*In re Sivec SRL*,
   476 B.R. 310 (Bankr. E.D. Okla. 2012) ...........................................................32

*Tacon v. Petroquest Res. Inc. (In re Condor Ins. Ltd.)*,
   601 F.3d 319 (5th Cir. 2010)............................................................................13

*Tex. Indus. v. Radcliff Materials*,
    451 U.S. 630 (1981)........................................................42

*Trikona Advisors v. Chugh*,
    846 F. 3d 22 (2d Cir. 2017)........................................20

*Truesdell v. Thomas*,
    889 F.3d 719 (11th Cir. 2018)......................................6

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)........................................................26

*Ungaro-Benages v. Dresdner Bank AG*,
    379 F.3d 1227 (11th Cir. 2004)....................................23

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*,
    825 F.2d 709 (2d Cir. 1987)........................................21

*In re Vitro S.A.B. de CV*,
    701 F.3d 1031 (5th Cir. 2012)..............................*passim*

**Statutes**

11 U.S.C. § 101(24) ........................................................15

11 U.S.C. § 1501(a) ..................................................*passim*

11 U.S.C. § 1506........................................................24

11 U.S.C. §1509(b) ..................................................*passim*

15 U.S.C. §§ 77t(b), 77t(d)(1), 77v(a), and 77v(c) .............. viii

15 U.S.C. § 78u ........................................................*passim*

15 U.S.C. §§ 78u(d), 78aa(a), and 78aa(b) ...................... viii

15 U.S.C. §§ 80b-9(d), 80b-14(a), and 80b-14(b) ................ viii

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the Chapter 15 case pursuant to 28 U.S.C. § 1334(b) and over the SEC enforcement action pursuant to 15 U.S.C. §§ 77t(b), 77t(d)(1), 77v(a), and 77v(c); 15 U.S.C. §§ 78u(d), 78aa(a), and 78aa(b); and 15 U.S.C. §§ 80b-9(d), 80b-14(a), and 80b-14(b). This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and the collateral order doctrine. *SEC v. Torchia*, 922 F.3d 1307 (11th Cir. 2019); *Acheron Cap., Ltd. v. Mukamal*, 22 F.4th 979, 989 (11th Cir. 2022).

Following entry of the order on appeal, as amended by the September 2, 2022 order granting the Foreign Representatives' Rule 59(e) Motion, the Foreign Representatives timely filed their Notice of Appeal on October 12, 2022.[1]

---

[1] Appellants have submitted extensive jurisdictional briefing, in response to both the Court's jurisdictional question and the Receiver's Motion to Dismiss. *See* App. ECF Nos. 19, 24.

**STATEMENT OF THE ISSUE**

I.    Whether the District Court erred in applying U.S. principles of equity and federal common law in derogation of Cayman Islands statutory law governing the distribution to stakeholders in the liquidation of a feeder fund entity organized under and governed by Cayman Islands law, in disregard of the Congressionally-mandated application of comity under Chapter 15 of the Bankruptcy Code and more than a century of U.S. Supreme Court precedent, thereby upsetting the contractual expectations of investors in the fund?

## STATEMENT OF THE CASE

### I. Statement of Facts, Course of Proceedings and Disposition Below

#### A. History of Related Cases

In 2020, a creditor of the TCA Global Credit Fund, Ltd., a Cayman Islands limited company  (the "Feeder Fund Ltd." or "Foreign Debtor"), filed a liquidation/winding up proceeding against the Foreign Debtor (the "Winding Up Proceeding") in the Grand Court of the Cayman Islands (the "Cayman Court").  On May 13, 2020, the Cayman Court ordered that the Foreign Debtor be wound up in that Proceeding in accordance with the Cayman Islands Companies Act, and appointed Appellants as the Joint Official Liquidators ("JOLs" or "Foreign Representatives") to liquidate the Foreign Debtor.

After the Winding Up Proceeding was commenced, but before the petition was heard by the Cayman Court, on May 11, 2020, the Securities and Exchange Commission filed its enforcement action (the "Enforcement Action") against the Master Fund, TCA Global Credit Master Fund, LP (the "Master Fund") and the persons in control, naming the Foreign Debtor as a relief defendant.  The Enforcement Action stemmed from the SEC's investigation into the revenue recognition operation of TCA Fund Management Group Corp. and TCA Global Credit Fund GP, which employed a master-feeder investment scheme involving the Master Fund, the Foreign Debtor, TCA Global Credit Fund, LP (together with the

Foreign Debtor, the "Feeder Funds"), and TCA Global Lending Corp.[2] The SEC's

Complaint alleged that certain of the Defendants were knowingly causing the Master

Fund to report inflated revenue numbers to investors. ECF No. 1 at ¶¶ 2–3. That

same day, the District Court appointed the Receiver, Jonathan E. Perlman (the

"Receivership Action").[3] ECF No. 5.

In February of 2021, the JOLs filed a Chapter 15 petition in the United States

Bankruptcy Court for the Southern District of Florida. In that case, the Foreign

Debtor and the Receiver filed a joint motion to withdraw the reference from

bankruptcy court to the District Court, and for recognition of the Winding Up

Proceeding as a foreign proceeding. *See* ECF No. 22 (No. 21-11513). The District

Court granted that motion, recognizing the JOLs as foreign representatives of the

Foreign Debtor and, by agreement of the JOLs and the Receiver without objection

---

[2] The Master Fund and Feeder Fund LP are Cayman Islands limited partnerships. The Feeder Fund Ltd. is a Cayman Islands company.

[3] Notwithstanding the separate defined terms "Enforcement Action" and "Receivership Action," there is a single action before the District Court under case No. 21-21905. The two defined terms merely separately signify the action's two phases: an enforcement phase and a receivership phase.

by the SEC, recognizing the Winding Up Proceeding as a foreign nonmain proceeding.[4] ECF No. 8.[5]

### B. Motion for Approval of Distribution Plan and Entry of Distribution Order

On February 28, 2022, the Receiver filed a Motion for Approval of Distribution Plan and First Interim Distribution (the " Distribution Motion"). *See* ECF No. 208. The Distribution Motion proposed a single distribution from the assets of the Master Fund directly to the stakeholders of the Feeder Funds[6]—rather than from the Master Fund to the Feeder Funds for further distribution to each investor (the "Distribution Plan"). *Id.* at 20–21.

Several parties in interest objected to the Receiver's Distribution Plan. In their capacity as Foreign Representatives of the Feeder Fund Ltd., Appellants objected to the Distribution Plan, contending that the equitable "rising tide" methodology proposed by the Receiver conflicts with the statutory requirements of Cayman

---

[4] Although the Winding Up Proceeding was recognized as a nonmain rather than main proceeding, the parties agreed and the District Court's Order states that this distinction would hold no legal significance. *See* § II.B.3, *infra*.

[5] The District Court then ordered that the Chapter 15 case be "transferred to [its] calendar," and that "all further proceedings" in or relating to that Chapter 15 case be litigated as part of the Receivership Action. *See* ECF No. 6 (No. 21-21905) at 1.

[6] While Appellants relay certain facts applicable to both of the Feeder Funds, they are appointed as JOLs and Foreign Representatives only in respect of the Feeder Fund Ltd. and accordingly assert standing in this appeal only on behalf of that Fund.

Islands law that govern the liquidation of the Feeder Fund Ltd., and with the long-established principle that "equity must follow the law." ECF No. 240.

On August 4, 2022, the District Court entered an order partially granting the Distribution Motion (the "Order"), thus overruling the Foreign Representatives' objections and approving the Receiver's Distribution Plan.

The District Court stayed the Order until September 6, 2022, "to allow the filing of an interlocutory appeal." ECF No. 284 at 34. On September 1, 2022, the Foreign Representatives filed a motion to alter or amend the Order pursuant to Federal Rule of Civil Procedure 59(e). That motion suggested that the District Court had intended to grant a stay that was coextensive with the appeal period, and so requested that the stay be extended through October 13, 2022, because Federal Rule of Appellate Procedure 4 provides 60 days, rather than 30, within which to file an appeal where one of the parties is a United States agency. ECF No. 298. On September 2, 2022, the District Court granted the Rule 59(e) Motion, extending the stay through October 13, 2022. ECF No. 299 at 1.

On October 12, 2022, the Foreign Representatives filed a Notice of Appeal, of the August 4, 2022 Order granting in part the Receiver's Distribution Motion, as amended by the September 2, 2022 Order.

## II.  Standard of Review

The threshold issue presented in this appeal is a question of choice of law, as to which the standard of review is *de novo. See, e.g.*, *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009).  While questions of comity typically are reviewed for an abuse of discretion, *see, e.g.*, *Seguros del Estado, S.A. v. Sci. Games, Inc.*, 262 F.3d 1164, 1169 (11th Cir. 2001), the issue of whether the District Court erred in declining to grant comity to the foreign representatives as required under Chapter 15 (and established by decades of controlling precedent) is a question of law reviewable *de novo.  See Truesdell v. Thomas*, 889 F.3d 719, 723 (11th Cir. 2018) ("The interpretation of a statute is a question of law subject to de novo review." (citation omitted)).

Finally, while the District Court noted that "any 'action by a trial court in supervising an equity receivership is committed to [her] sound discretion and will not be disturbed unless there is a clear showing of abuse,' *Bendall v. Lancer Mgmt. Grp., LLC,* 523 F. App'x 554, 557 (11th Cir. 2013)," ECF No. 284 at 12–13, "a district court unquestionably abuses its discretion if its decision rests on a legal mistake." *Digit. Media Sols., LLC v. S. Univ. of Ohio, LLC*, No. 21-4014, 2023 U.S. App. LEXIS 2966, at *11 (6th Cir. Feb. 7, 2023) (citing *Koon v. United States*, 518 U.S. 81, 100 (1996)).  A district court also abuses its discretion where the court (1) "considers and gives significant weight to an irrelevant or improper factor" or

(2) "fails to consider a relevant factor that should have been given significant weight[.]" *First Mercury Ins. Co. v. Excellent Computing Distribs.*, 648 F. App'x 861, 865 (11th Cir. 2016) (quoting *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494 (1942)).

## SUMMARY OF THE ARGUMENT

The District Court's decision stands for the proposition that a U.S. court may, in the interests of maximizing the recoveries of a minority of U.S.-based, non-taxpayer investors, invoke subjective principles of equity and federal common law never previously applied in the context of a cross-border insolvency situation, as a rule of decision to disregard (1) domestic law and Supreme Court precedent requiring it to grant comity to foreign laws, (2) the foreign laws themselves, (3) foreign liquidation proceedings, and (4) the expectations and contractual rights of investors—all in a proceeding commenced, without notice or a hearing, to impose a receivership over a U.S.-based investment manager and include the foreign feeder funds as a relief defendant.[7]

While properly recognizing that it had to resolve the choice of law issue before determining whether to accept the Receiver's proposed "rising tide" equitable scheme in lieu of other distribution schemes, the District Court ignored the

---

[7] "The Investment Manager [of the Feeder Fund Ltd.] is also the investment manager of TCA Global Credit Fund, LP, a Cayman Islands exempted limited partnership ("U.S. Taxable Investor Fund") that employs an identical investment strategy to the [Feeder Fund Ltd.] and invests all of its assets in the Master Fund. Whereas, the U.S. Taxable Investor Fund was formed for investment by U.S. taxable investors, the [Feeder Fund Ltd.] was formed for investment by non-U.S. investors and U.S. tax-exempt investors." *See* ECF No. 241-2 at 70 (Private Placement Memorandum for Foreign Debtor).

mandatory language of Chapter 15[8] and long-standing Supreme Court precedent regarding the grant of comity to foreign insolvency proceedings, *Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 537 (1883), and the fundamental principle of American jurisprudence that "equity must follow . . . the law." *Magniac v. Thomson*, 56 U.S. 281, 302 (1853). Instead, the District Court invoked and relied on equitable considerations commonly applied in purely domestic receiverships as a basis to decide pure legal questions regarding choice of law. In so doing, the District Court purported to ground its grant of equitable relief on 15 U.S.C. § 78u, which cannot be construed to empower the Court to approve the Receiver's Distribution Plan.

Moreover, despite having granted recognition to the Foreign Debtor's Cayman Court Winding Up Proceeding in the related Chapter 15 case, the District Court failed to grant comity to the laws of the Cayman Islands as mandated by that statute. The District Court also cast aside considerations of foreign law, improperly supplanting both the sovereign laws of the Cayman Islands and the reasonable expectations of investors that their rights would be governed by those laws.

For all of these reasons, the Distribution Order must be reversed and the case remanded with instructions to apply the law in accordance with the opinion of this Court.

---

[8] *See* § 1509(b)(3).

# ARGUMENT

## I. THIS APPEAL PRESENTS AN IMPORTANT ISSUE OF FIRST IMPRESSION WITH WIDE-RANGING IMPLICATIONS.

This case presents an issue of first impression on a matter of great importance—both to the administration of cross-border insolvency cases as consistent with the policies underlying Chapter 15 of the United States Bankruptcy Code and to foreign investment in U.S. companies by foreign citizens through offshore investment funds. It involves the proper interpretation of the entire framework applicable to cross-border insolvency and liquidation cases, and implicates principles of choice of law and comity that underlie Chapter 15. This Circuit has not addressed how a district court should analyze and decide an issue of choice of law in a cross-border receivership context, which necessarily involves the principle of comity.

The principal cases relied upon by the District Court (and the Receiver) arise in the context of *purely* domestic federal equity receiverships. *See, e.g.*, *S.E.C. v. Elliot*, 953 F.2d 1560 (11th Cir. 1992); *CFTC v. Walsh*, 712 F.3d 735 (2d Cir. 2013); *S.E.C. v. Wang*, 944 F.2d 80 (2d Cir. 1991), and unlike the instant case do not in any way address issues of international comity or choice of law.

Accordingly, *reversal of the District Court's decision would not require this Court to reconsider or overrule any of its existing precedent.* Furthermore, ruling in favor of Appellants would not even require this Court to limit its precedent with

respect to domestic equity receiverships, because this case presents a completely different and separate issue from each and every prior case.

As discussed more fully in section V, several recent cases illustrate that U.S. fiduciaries—and the SEC itself—can and do make distributions to the liquidators or fiduciaries of Cayman Islands investment funds, for further distribution to investors in accordance with Cayman law. Most recently, the SEC released approximately US$76.9 million from a fair fund recovery to the Cayman liquidators of a Cayman investment fund for distribution to stakeholders in a Cayman liquidation proceeding, and earned the plaudits of the Cayman presiding judge for its cooperative approach. *See In re Income Collecting 1-3 Months T-Bills Mut. Fund*, No. 21-11601(DSJ) (Bankr. S.D.N.Y. Feb. 17, 2022). These and other cases[9] described in section V, *infra*, illustrate the enlightened view adopted by the receivers and the SEC of permitting distribution to stakeholders in Cayman entities to be made in accordance with principles and priorities of applicable Cayman law.

The issues presented in this case have significant consequences for thousands of investment funds registered in the Cayman Islands,[10] and for investors around the

---

[9] *See, e.g.*, *In re OneTRADEx, Ltd.*, 645 B.R. 184, 187 (Bankr. S.D.N.Y. 2022) (issuing order closing Chapter 15 case and noting prior order releasing U.S. assets to foreign representatives for administration through Cayman liquidation proceeding and distribution in accordance with orders of the Cayman court).

[10] "The Cayman Islands is one of the world's leading offshore jurisdictions for the establishment of investment funds. As at 30 June 2022, there were 12,935 open-ended investment funds (predominantly hedge funds) registered with the Cayman

world who invest in those funds with the belief and expectation that their rights will be governed by the laws of the Cayman Islands. As more fully discussed below, *see* § IV, *infra*, in applying equitable principles in this case the District Court upset investor expectations and significantly eroded the predictability to which investors are entitled in choosing to invest in offshore feeder funds that then invest in U.S. assets.

## II. CHAPTER 15, CONSISTENT WITH A LONG LINE OF PRIOR CASES, REQUIRES THAT THE DISTRICT COURT GRANT COMITY TO THE FOREIGN REPRESENTATIVES AND FOREIGN INSOLVENCY PROCEEDINGS.

The District Court erred as a matter of law in declining to grant comity to the Foreign Representatives and to the sovereign laws of the Cayman Islands as required by 11 U.S.C. § 1509(b)(3), construing the mandate of that statute as a mere grant to the Foreign Representatives of the right to appear and be heard in the Receivership Action. This narrow construction disregarded the history, structure, and language of Chapter 15, and 140 years of case law granting comity and applying foreign

---

Islands Monetary Authority (CIMA) under the Mutual Funds Act (2021 Revision) (the Mutual Funds Act). There were also 15,343 private equity and other closed-ended funds registered in the Cayman Islands under the Private Funds Act (2021 Revision)." Mourant, *Mutual Funds in the Cayman Islands* 1 (2022), https://www.mourant.com/file-library/media---2022/mourant---mutual-funds-in-the-cayman-islands.pdf.

insolvency law as a rule of decisions in U.S. cross-border insolvency proceedings for entities organized and governed by the sovereign laws of foreign nations.

### A. Congress Adopted the Model Law to Ensure Predictability and Uniformity in Cross-Border Insolvency Proceedings by Mandating Comity to Foreign Representatives and Foreign Insolvency Proceedings.

#### 1. Chapter 15's comprehensive scheme dictates granting comity to foreign representatives and foreign insolvency law upon recognition.

Chapter 15, entitled "Ancillary and Other Cross-Border Cases," governs the recognition of foreign insolvency proceedings in the United States and the relief available to foreign representatives upon such recognition.[11] Adopted in 2005, it replaced former section 304 of the Code, with the intention "that case law under section 304 apply unless contradicted by Chapter 15." *Tacon v. Petroquest Res. Inc. (In re Condor Ins. Ltd.)*, 601 F.3d 319, 328 (5th Cir. 2010) (citing H.R. Rep. 109-31, 109th Cong., 1st Sess. (2005)). Chapter 15 "incorporates the [UNCITRAL] Model Law on Cross-Border Insolvency" to encourage cooperation between the United States and foreign countries with respect to transnational insolvency cases.[12] As implied by its title, "[c]ases brought under chapter 15 are intended to be ancillary

---

[11] Chapter 15 was adopted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). House Judiciary Committee Report 109-31 accompanied S.256, the legislation embodying BAPCPA in both the House and the Senate. H.R. Rep. No. 109-31, 1 et seq., 109th Cong., 1st Sess. (2005), reprinted in 2005 U.S.C.C.A.N. 88.

[12] 11 U.S.C. § 1501(a).

to cases brought in a debtor's home country, unless a full United States bankruptcy case is brought under another chapter."[13]

Like the Model Law, Chapter 15 is designed to facilitate the procedure by which a "receiving court" will recognize and give assistance to a foreign insolvency proceeding. Chapter 15 thus governs the extent to which bankruptcy courts in the United States will recognize foreign proceedings[14] and, upon the grant of such recognition, assist foreign trustees, administrators or other designated representatives of foreign insolvency proceedings in discharging their duties.[15]

Chapter 15 contains a mandate in section 1508 to interpret the chapter in light of its international origin.[16] Consistent with the Model Law, Congress set forth the policies and objectives of Chapter 15 in the lead section of that Chapter:

> The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of—
> (1) cooperation between—

---

[13] H.R. Rep. No. 109-31, at 105–19. 9 H.R. Rep. Title VIII and § 801. The House Report serves as the legislative history for Chapter 15 and recurrently refers to the Model Law on Cross-Border Insolvency adopted by the UNCITRAL (the "Model Law") and the Guide to Enactment and Interpretation (the "Guide") to further explain the provisions of Chapter 15.

[14] *See* §§ 1515–1517.

[15] *See* §§ 1520–1522 (relief available to foreign representative), 1507 (additional assistance available to foreign representative).

[16] *See* § 1508.

(A) courts of the United States, United States trustees, trustees, examiners, debtors and debtors in possession; and
(B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
(2) greater legal certainty for trade and investment; [and]
(3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; . . .[17]

Recognition of a foreign proceeding as either a foreign main or foreign nonmain proceeding[18] is the key that opens the door for the foreign representative[19] to the bankruptcy court and, critical to this appeal, *to other state and federal courts as well*:

[Section 1509] imposes recognition of the foreign proceeding as a condition to further rights and duties of the foreign representative. If recognition is granted, the foreign representative . . . may request such relief *in a state or Federal court other than the bankruptcy court.*[20]

---

[17] *See* § 1501(a)(1)–(3). While there are additional subsections of section 1501(a) as well as many other aspects to Chapter 15, this Initial Brief discusses only those portions that are directly relevant to the issues presented in the instant appeal.

[18] *See* §§ 1502(4)–(5).

[19] "The term 'foreign representative' means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

[20] H.R. Rep. No. 109-31, at 110–11 (2005) (emphasis added). This history and interpretation are consistent with the plain language of section 1509(b) that refers repeatedly to "a court in the United States," which phrase has been interpreted to mean any state or federal court in the United States. *See, e.g., British Am. Ins. Co.*

It is of central importance to this appeal that upon recognition of a foreign proceeding in the bankruptcy court, the foreign representatives are entitled to seek relief and appear and be heard in cases and proceedings in other federal and state courts in the United States, and be granted comity by those courts. Specifically, section 1509 of the Bankruptcy Code provides that:

> If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter—
> (1) the foreign representative has the capacity to sue and be sued in a court in the United States;
> (2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and
> (3) a court in the United States *shall grant comity or cooperation to the foreign representative.*[21]

Thus, upon recognition of a foreign proceeding[22] a foreign representative is entitled to "comity" from any court in the United States as a matter of statutory right.

### 2. The grant of comity to foreign insolvency laws and proceedings predates the enactment of Chapter 15 by more than a century, and remains the law today.

For over a century before the enactment of Chapter 15, U.S. courts have

---

*v. Fullerton* (*In re British Am. Ins. Co.*), 488 B.R. 205, 227 n.18 (Bankr. S.D. Fla. 2013).

[21] § 1509(b) (emphasis added).

[22] Section 1517 references both foreign nonmain and foreign nonmain proceedings. Thus, where recognition is granted as a foreign nonmain proceeding rather than a foreign main proceeding, the right to comity is undiminished.

recognized and enforced the legislative and judicial acts of foreign nations as an exercise in "comity." *See In re Goerg*, 844 F.2d 1562, 1567 n.12 (11th Cir. 1988). The classic statement of this legal principle is articulated in *Hilton v. Guyot*, in which the Supreme Court explained that "comity" is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." 159 U.S. 113, 164 (1895).[23]

Over a decade before the Court expounded on the principle of comity in *Hilton*, it recognized and applied that concept in the context of a foreign insolvency proceeding. In *Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527 (1883), the Supreme Court explained how U.S. courts should apply the legal principle of comity to recognize and give effect to foreign insolvency law. The issue in *Gebhard* was whether the U.S. owners of Canadian railway bonds should be bound by the reorganization scheme of the company that was effected in Canada in accordance

---

[23] While the *Hilton* Court pointed out that comity "is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other," the Court in that case did not have a Congressional mandate to "grant comity" as now exists under section 1509(b)(3), nor the additional 100 years of pre-Chapter 15 case law in which comity routinely has been granted to foreign insolvency laws and proceedings. *Hilton*, 159 U.S. at 163–64.

with Canadian law. *Id.* at 532. The Court held that the adjustment of the debts of the U.S. noteholders would be governed by Canadian law. *Id.* at 539–40.

Importantly, each of the three reasons that persuaded the Supreme Court to extend comity to the Canadian reorganization and subject the dissenting U.S. bondholders to Canadian insolvency law applies here:

- First, having dealt voluntarily with the Canadian corporation, the U.S. bondholders had subjected themselves to Canadian law: "every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes." *Id.* at 537. The same is true for all of the investors in this case.

- Second, the applicable Canadian insolvency law affected both Canadian and U.S. bondholders equally and did not discriminate between them based on citizenship.[24] The Cayman Islands statutory distribution scheme for companies in liquidation is similar, affording no greater protection or right to investors based on their citizenship.

---

[24] *See id.* at 538 ("[W]hatever is done by that government in furtherance of that policy, which binds those in like situation with himself, who are subjects of the government, in respect to the operation and effect of their contracts with the corporation, will necessarily bind him.").

- Third, U.S. bondholders who challenged the applicability of Canadian insolvency law to their bonds should have appreciated the risks of forced modification under that law, and if they considered the law "unjust" they could have protected themselves by investing elsewhere.[25] Undoubtedly the same is true for investors in the Feeder Fund Ltd., who were provided with offering and subscription documents that made absolutely clear they were investing in a Cayman Islands fund.[26]

Having concluded that Canadian insolvency law was entitled to comity,[27] the Supreme Court then turned to whether recognition and effect should be given to that law so as to bind the dissenting U.S. bondholders to the scheme that compromised their rights as creditors. Answering in the affirmative, the Court reasoned:

> Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad.

---

[25] *See id.* at 538–39 ("The [Canadian] parliament had the legislative power to legalize the plan of adjustment as it had been agreed on by the majority of those interested, and to bind the resident minority creditors by it terms. This power was known and recognized throughout the dominion when the corporation was created, and when all its bonds were executed and put on the market and sold."); *id.* at 539 ("[E]very citizen of a country, other than that in which the corporation is located, may protect himself against all unjust legislation of the foreign government by refusing to deal with its corporations[.]").

[26] *See* ECF No. 241-2.

[27] *Id.* at 538 ("[A]nything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere[.]").

> *Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries.*

*Id.* at 539 (emphasis added). Thus, having found it appropriate to extend comity to the Canadian restructuring scheme, the Supreme Court gave effect to that grant of comity effect by enforcing Canadian insolvency law against U.S. bondholders.

The *Gebhard* decision lays the foundation for how foreign insolvency laws are applied in the United States. It sets the foundational principle that U.S. courts give effect to foreign insolvency laws arising from a foreign insolvency proceeding of a foreign company—*even to the detriment of U.S. citizens*—*so long as it was reasonable for the U.S. citizens to expect the application of foreign insolvency law* and such law does not discriminate between its citizens and those of the U.S. or other nations. In accordance with this principle, U.S. courts repeatedly have granted comity to foreign insolvency proceedings and given effect to foreign insolvency law.[28]

The strength of this principle is such that U.S. courts treat foreign insolvency law as a special category of cases for which recognition and enforcement, and the

---

[28] *See, e.g., EMA Garp Fund, L.P. v. Banro Corp.*, 783 F. App'x 82, 84 (2d Cir. 2019); *Trikona Advisors v. Chugh*, 846 F. 3d 22 (2d Cir. 2017); *In re Nat'l Warranty Ins. Risk Retention Grp.*, 384 F.3d 959, 963 (8th Cir. 2004); *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1000 (2d Cir. 1993); *Philadelphia Gear Corp. v. Philadelphia Gear, S.A.*, 44 F.3d 187 (3d Cir. 1994); *Oui Fin. v. Dellar & Oui Mgmt.*, No. 12-civ-7744, 2013 WL 5568732 (S.D.N.Y. 2013); *Badalament, Inc. v. Mel-O-Ripe Banana Brands, Ltd.*, 265 B.R. 732 (E.D. Mich 2001).

extension of comity, are particularly appropriate. *See*, *e.g.*, *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) ("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings."); *see also EMA Garp Fund, L.P. v. Banro Corp.*, 783 F. App'x 82, 84 (2d Cir. 2019) ("[F]oreign bankruptcy proceedings are a discrete category of foreign litigation for which comity is particularly appropriate.") (internal citations, quotations, and alterations omitted).

This special category of comity has been applied even to the situation presented here, where the distribution scheme applicable under foreign law offered a different result than that which would obtain under U.S. law. In *In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 173 (2d Cir. 2008), then-Judge Sotomayor explained that comity "does not require that the amount of a distribution in a foreign insolvency proceeding be equal to the hypothetical amount the creditor would have received in a proceeding under U.S. law."[29] Aligning with that rule of law, the Fifth Circuit stated even more simply in a case arising since the enactment of Chapter 15 that "*[t]he fact that priority rules and treatment of claims may not be*

---

[29] Consistent with this principle, the Second Circuit has "explained that granting comity to foreign bankruptcy proceedings 'means that creditors of an insolvent foreign corporation may be required to assert their claims against a foreign bankrupt before a duly convened foreign bankruptcy tribunal.'" *EMA Garp Fund*, 783 F. App'x at 84 (quoting *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 459 (2d Cir. 1985) (internal alterations omitted)).

*identical is insufficient to deny a request for comity*." *In re Vitro S.A.B. de CV*, 701

F.3d 1031, 1044 (5th Cir. 2012) (quoting *In re Sivec SRL*, 476 B.R. 310, 324 (Bankr.

E.D. Okla. 2012)) (emphasis added).

More generally, recognizing that differences in law will invariably exist from

country to country, then-Judge Sotomayor emphasized that, so long as principles of

due process and nondiscrimination are met, "our longstanding recognition that

foreign courts have an interest in conducting insolvency proceedings concerning

their own domestic business entities" mandates that substantive fairness be left to

the determination of the foreign court, and that comity be extended to foreign

insolvency proceedings. *Telecom Argentina*, 528 F.3d at 173 n.13. Indeed, comity

should not be refused to the foreign insolvency law so long as it is not "plainly

repugnant" to U.S. law and policies. *See id.* at 175 (citing *Gebhard*, 109 U.S. at

537). Again, the Fifth Circuit agrees: "foreign laws need not be identical to their

counterparts under the laws of the United States; they merely must not be repugnant

to our laws and policies." *Vitro*, 701 F.3d at 1044 (quoting *Schimmelpenninck v.

Byrne* (*In re Schimmelpenninck*), 183 F.3d 347, 365 (5th Cir. 1999)).

Thus, for 140 years *Gebhard* and its many progeny have stood as a forceful

statement of the deference due to sovereign nations in the operation of their

insolvency law over their entities—even where the claims of investors may be treated differently than under U.S. law.[30]

### 3. Through the Enactment of Chapter 15, Congress Intended to Establish Uniformity by Mandating Comity to Recognized Foreign Proceedings.

Chapter 15 stands on the foundation established by *Gebhard*, and builds further on the grant and application of how comity applies to foreign insolvency laws. As the Fifth Circuit noted in *Vitro*, "[a] central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings." 701 F.3d at 1053 (*citing In re Cozumel Caribe, S.A. de C.V.,* 482 B.R. 96 (Bankr. S.D.N.Y. 2012)).

Prior to the enactment of Chapter 15, U.S. courts analyzed comity under multi-factor tests. *See*, *e.g.*, *Linter Grp. Ltd.*, 994 F.2d at 999 (applying an eight-factor test). As recognized by the Guide, these tests analyzing comity could lead U.S. courts improperly to consider parochial interests and therefore to unpredictable results in the comity analysis. *See* Guide at ¶ 16 ("Approaches based purely on the doctrine of comity or on *exequatur* do not provide the same degree of predictability and reliability as can be provided by specific legislation, such as the one contained in the Model Law[.]") Congress desired to avoid these inconsistencies, and therefore provided that the initial step of recognition of a foreign proceeding would

---

[30] *Gebhard*'s continuing vitality even outside the insolvency context was confirmed by this Court in *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004).

be accomplished upon the satisfaction of relatively mechanical elements set forth in sections 1515-1517. *See* § II.A.1., *supra*. If these elements are met, then recognition is granted and all U.S. courts "shall grant comity," subject only to limitations that are consistent with the policies of Chapter 15. *See* § 1509(b)(3).

To be sure, when recognition is granted under Chapter 15, the mandatory grant of comity is not a blank check to a foreign representative or foreign insolvency law. Much as pre-Chapter 15 authorities permitted a court to decline or limit comity if foreign law was "repugnant" to U.S. law or policy, Chapter 15 permits a court to refuse to grant recognition or relief if either would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.

As its use of the word "manifestly" implies, Section 1506 "was intended to be read narrowly," and "invoked only under exceptional circumstances concerning matters of fundamental importance to the United States." *Vitro*, 701 F.3d at 1069 (quoting *In re Ran*, 607 F.3d 1017, 1021 (5th Cir. 2010)). In this case, there can be no colorable argument that it would be "manifestly contrary to the public policy of the United States" for the District Court to have recognized and applied Cayman Islands law to the portion of the Receiver's distribution payable in respect of the Feeder Fund Ltd.'s interest in the recoveries for the Master Fund. Indeed, precisely the opposite is true. From a policy perspective, as reflected by sections 1501(a)(1)–

(3), the interests are strongly in favor of applying Cayman Islands law rather than subjective principles of equity and U.S. federal common law.

### B. The Plain Language of Chapter 15 Required the District Court to Grant Comity and Apply Cayman Islands Insolvency Law.

Section 1509(b)(3) provides, "If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter— . . . a court in the United States *shall* grant comity or cooperation to the foreign representative"; this is distinctive from other provisions of 1509, which use "may." *Id.* (emphasis added). In other words, the plain language of section 1509(b)(3) makes the grant of comity mandatory. *See Showan v. Pressdee*, 922 F.3d 1211, 1227 (11th Cir. 2019) ("The word 'shall' is ordinarily 'The language of command'. And when the same Rule uses both 'may' and 'shall', the normal inference is that each is used in its usual sense—the one act being permissive, the other mandatory.") (quoting *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947))). In sum, "§ 1509 specifically requires that if the court grants recognition under § 1517, it 'shall grant comity or cooperation to the foreign representative[.]'" *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009) (quoting § 1509(b)(3)).

In its Order, the District Court properly acknowledged that section 1509(b)(3) applies to this case. ECF No. 284 at 16. The Court held, however, that section 1509(b)(3) required no more than giving "the JOLs ample opportunity to voice their concerns," ECF No. 284 at 19, thus strangling the concept of comity as granting no

more than the right to appear and be heard rather than "recognition . . . to the legislative, executive or judicial acts of another nation" as comity is defined in *Hilton,* 159 U.S. at 163–64.

The District Court's minimalist construction of comity not only defies the 140 years of precedent cited above, *see* § II.A.2., *supra*, but also construes and applies section 1509(b) in a manner that reduces critical subsection (3) to "mere surplusage." *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."). The preceding subsections of Section 1509(b) grant the Foreign Representatives "the capacity to sue and be sued in a court in the United States" and to "apply directly to a court in the United States for appropriate relief[.]" §§ 1509(b)(1), (2). These provisions grant the Foreign Representatives the right to appear and be heard, without reference to the separate and additional grant of comity set forth in subsection (b)(3). In the face of these provisions, the mandatory grant of comity under Section 1509(b)(3) must mean more than merely the right to appear and be heard.

As recognized in the long line of cases beginning with *Gebhard* and culminating in the enactment of Chapter 15, the effect of granting comity in respect of an insolvency proceeding is for the U.S. court to recognize and give effect to the

legislative or judicial acts of the foreign insolvency law or court. *See Gebhard*, 109 U.S. at 539; *see also* § II.A.2., *supra*. The decisions of the Second Circuit in *Telecom Argentina and EMA Garp* and the Fifth Circuit in *Vitro*, respectively, foreclosed the notion that comity in this context means anything less than giving effect to the distributional priorities of Cayman Islands insolvency law and requiring the Foreign Debtor's stakeholders to assert their claims in the Winding Up Proceeding. *See* § II.A.2., *supra*. These authorities make clear that differences between Cayman Islands and U.S. priority rules governing distributions to stakeholders of companies in liquidation are no reason to deny comity. *See id*.

In light of these decisional authorities and the plain language of Chapter 15, it was error for the District Court to refuse to grant comity to and apply the statutory distribution scheme under Cayman Islands law to stakeholders in the Feeder Fund Ltd. The Court was free to approve "rising tide" or other equitable schemes of distribution for stakeholders of the other TCA entities in receivership, but not the Feeder Fund Ltd. *See Direct Lending Invs., LLC*, No. 2:10-cv-02188 (C.D. Cal. Nov. 20, 2020) (approving "rising tide" distribution for other creditors and carving out separate distribution for stakeholders of Cayman feeder fund in accordance with priorities established under Cayman law).

## C. The District Court Erred in Each Element of its Rationale for Declining to Grant Comity and Apply Cayman Islands Law to the Distribution to Stakeholders of the Feeder Fund Ltd.

The District Court articulated three reasons for declining to extend comity to the Foreign Representatives under section 1509(b)(3): (1) that section allows for the imposition of "any limitations" that are consistent with Chapter 15's policy objectives, ECF No. 284 at 16–17; (2) the distribution priorities that would be applied under Cayman Islands insolvency law upon grant of comity are not "comparable" to those under U.S. law, *id.* at 17; and (3) the Winding Up Proceeding was recognized only as a foreign nonmain proceeding, *id* at 19, rather than a foreign main proceeding.  Each of these reasons fails as a matter of law and constitutes reversible error, as discussed sequentially below.

### 1. The limitations on comity imposed by the District Court are inimical to, rather than "consistent with," the policies of Chapter 15.

Although the District Court correctly stated that it may "impose" "any limitations" under section 1509(b), the plain language of the statute requires that such limitations be "consistent with the policy" of Chapter 15.  The Court expressly grounded its analysis of Chapter 15's policy objectives in the perceived unfairness that under Cayman Islands law one subset of investors would receive a greater

distribution than another, ECF No. 284 at 17, and in the parochial interest of maximizing distributions to U.S.-based investors, *id.* at 17–18.[31]

Chapter 15's three relevant policy objectives are set forth in subsections (1) through (3) of section 1501(a). As a threshold matter, the District Court failed even to consider the first two relevant objectives. As to subsection (3), the District Court gave great weight to considerations inimical to that policy objective.

The District Court's analysis addressed only the policy objective under section 1501(a)(3), regarding "fair and efficient administration," and did so erroneously, citing only to the latter portion of this policy consideration, emphasizing "the interests of *all* creditors." ECF No. 284 at 16. In its consideration of section 1501(a)(3), the District Court omitted the critical phrase "fair and efficient administration of cross-border insolvencies[.]" *Id.* A plain reading of that section's complete language makes clear the policy objective is to ensure sufficient *procedural* fairness and efficiency of system for cross-border insolvency, not to ensure *substantive* outcomes in particular cases.[32] This plain reading is supported

---

[31] The focus on U.S.-based investors also was error in that U.S. taxpayers were precluded from investing in the Feeder Fund Ltd. and the overwhelming majority of investors were foreign persons and entities. *See* § IV, *infra.*

[32] *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de CV*, 412 F.3d 418, 424 (2d Cir. 2005) ("[The Second Circuit has] repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding. . . . In such cases, deference to the foreign court is

by the Guide, which clearly states this provision of the Model Law is not intended to create substantive rights. *See* Guide at ¶ 46. It is also supported by the principle of comity in insolvency matters as applied by U.S. courts and the history and structure of Chapter 15. *See* §§ II.A.–B., *supra*.

The limited portion of Section 1501(a)(3) that the District Court did consider also fails as a matter of plain language analysis and insolvency law. The District Court construed section 1501(a)(3) as a "protection of 'the interests of *all* creditors, and other interested entities, including the debtor[,]" ECF No. 284 at 16 (emphasis in original), such that it could limit comity to prevent the "sacrifice" of "the interests of the whole in service of the few," *id.* at 17.

By its very nature, the distribution of assets from any company in liquidation necessarily is a zero-sum game—every distribution scheme makes choices between and among stakeholders as to who receives priority in payments necessarily advantaging some of those parties at the expense of others. In this context, it is impossible to protect "all" stakeholders—the interests of priority stakeholders are no less "sacrificed" when their priority is erased to increase distributions to general stakeholders.

---

appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States.").

The District Court compounded its error by seeking to advance the parochial interest of U.S. investors in maximizing their distributions. ECF No. 248 at 17–18 (stating that "foreign law is *particularly* inappropriate when it would cause undue injury to American citizens" (emphasis in original)). Leaving aside whether it was offensive to principles of comity to describe the application of a statutory priority scheme as "injury," this openly parochial analysis is inimical to all three of the relevant policy objectives of Chapter 15.

### 2. The Cayman Islands distribution priorities do not need to be "comparable" to those under U.S. law or equity to be applied and given effect in the Receivership Action.

The District Court committed further legal error in its purported reliance on the Fifth Circuit's decision in *Vitro*, 701 F.3d 1031, as authority to deny comity to the Cayman Islands statutory distribution scheme on the basis that it is "not 'comparable'" to U.S. law. ECF No. 284 at 17 (quoting *Vitro*, at 1044). As discussed above, nothing in the plain language, policy objectives or history of Chapter 15 permits a court of the United States to refuse or limit the grant of comity under section 1509(b)(3) following recognition.

Nor does *Vitro* itself support the District Court's proposition that the application of foreign law is not required "when doing so would compel a result not 'comparable' to that reached by federal law." ECF No. 284 at 17 (citing *Vitro*, 701 F.3d at 1044). Instead, *Vitro* supports the position of the Foreign Representatives

that only the narrowest exceptions permit a U.S. court from refusing to apply foreign insolvency law. The full text of *Vitro* on this point bears repeating:

> In considering whether to grant relief, it is not necessary that the result achieved in the foreign bankruptcy proceeding be identical to that which would be had in the United States. It is sufficient if the result is "comparable." "[T]he foreign laws need not be identical to their counterparts under the laws of the United States; *they merely must not be repugnant to our laws and policies.*"

*Id.* (emphasis added) (internal citations omitted).

In its interpretation of *Vitro*, the District Court conflated "comparable" with "repugnant," and in so doing misapplied the Fifth Circuit's decision. These are vastly different standards, and in rejecting the Foreign Representatives' position on the basis that distribution priorities under the laws of the Cayman Islands are not "comparable" to those available in a U.S. equity receivership, the District Court applied *the wrong test*. In so doing, the District Court overlooked or ignored the *Sivec* standard adopted by the Fifth Circuit in *Vitro* that is directly on point here: "*The fact that priority rules and treatment of claims may not be identical is insufficient to deny a request for comity.*" *Id.* (emphasis added); *see also Telecom Argentina*, 528 F.3d at 170 n.9 (In granting comity, "[c]ourts have repeatedly recognized that . . . 'the priority rules of a foreign jurisdiction need not be identical to those of the United States.'").

Returning to the point of comity later in the *Vitro* decision, the Fifth Circuit left no doubt about its position on the issue:

> Given Chapter 15's heavy emphasis on comity, it is not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law. *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) ("The relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical."); *see also Artimm*, 335 B.R. at 160 n. 11. *We have previously cautioned that the mere fact that a foreign representative requests relief that would be available under the law of the foreign proceeding, but not in the United States, is not grounds for denying comity. See In re Condor,* 601 F.3d at 327.

*Vitro*, 701 F.3d at 1053–54 (emphasis added).

The Foreign Representatives respectfully submit that the District Court committed reversible error in misinterpreting and misapplying the holding and rationale of *Vitro* to reach a result that is contrary to the result that should flow from a proper reading of that case. Under the principles adopted by the Fifth Circuit in *Vitro*, the District Court should have granted comity to the Foreign Representatives and determined that the distribution to stakeholders in the Feeder Fund Ltd. be governed by the laws of the Cayman Islands.

### 3. Recognition of the Winding Up Proceeding as a foreign nonmain proceeding is irrelevant to the grant of comity under Section 1509(b)(3).

The final basis relied upon by the District Court to decline to grant comity and refuse to apply Cayman Islands insolvency law was that the Winding Up Proceeding was recognized only as a foreign nonmain proceeding, rather than a foreign main proceeding. ECF No. 284 at 18–19. However, the District Court's own final and unappealed Recognition Order entered in the Chapter 15 Case forecloses this argument. *See In re Mandalay Shores Coop. Hous. Assoc.*, 53 B.R. 609, 614 (Bankr. M.D. Fla. 1985) (stating that a decision that was not appealed "remains the law of the case").

Specifically, the Recognition Order provides that "nothing contained . . . in the grant of foreign nonmain recognition . . . shall in any way enlarge or improve the entitlement or argument for relief of either the JOLs or the Receiver in respect of the Court's consideration of any matter based on the grant of foreign nonmain recognition rather than foreign main recognition." ECF No. 8 (No. 21-21905) at 12. Thus, by its plain terms the Recognition Order provides that recognition of the Winding Up Proceeding as a foreign nonmain rather than a foreign main proceeding

has no bearing on comity or the application of Cayman Islands insolvency law in the Receivership Action.[33]

## III. THE DISTRICT COURT ERRED AS A MATTER OF LAW IN APPLYING U.S. PRINCIPLES OF EQUITY AND FEDERAL COMMON LAW TO DENY COMITY AND APPROVE THE DISTRIBUTION PLAN IN DEROGATION OF CAYMAN ISLANDS LAW.

In addition to its erroneous construction of the provisions of Chapter 15, the District Court grounded its refusal to grant comity in a choice-of-law analysis between the law of domestic federal equity receiverships and the Companies Law of the Cayman Islands, which governs the scheme of distributions to a company in liquidation and applies under Chapter 15. *See, e.g.*, ECF No. 284 at 13, 17, 23. The District Court's reliance on its authority to approve distributions in purely domestic receiverships based on general U.S. principles of equity, *id*. at 17, and federal common law, *id*. at 23, was error because: (a) general U.S. principles of equity cannot undermine the plain language of Chapter 15 or the Cayman Islands Companies Act, and (b) there is no basis to create a novel rule of decision permitting a direct distribution to stakeholders of a foreign company that is in liquidation in a

---

[33] Furthermore, the rights the Foreign Representatives assert under section 1509(b) arise "[i]f the court grants recognition under 1517." As section 1517 provides for recognition of both foreign main and foreign nonmain proceedings, there is nothing about the language of section 1509(b) to suggest or support a conclusion that the rights of the Foreign Representatives are somehow diminished by the agreed, consensual grant of foreign nonmain rather than foreign main recognition to the Winding Up Proceeding.

foreign insolvency proceeding governed by foreign law, over the objection of that company's fiduciaries appointed by the foreign court.

### A. Principles of Equity Cannot Vary the Right to Comity Under Chapter 15 and the Distribution Priorities of the Cayman Island Companies Act Made Applicable Thereby.

It is a fundamental principle of American jurisprudence—one of the "postulates or legal truisms, admitting of no dispute"—"[t]hat wherever the rights or the situation of parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim *equitas sequitur legem* is strictly applicable." *Magniac*, 56 U.S. at 299 (rejecting equitable argument surrounding fraud allegations upon creditors for marriage settlement). The simple meaning of this revered axiom is that "equity must follow, or in other words, be subordinate to the law." *Id.* at 302.

"Equity may be invoked to aid in the completion of a just but imperfect legal title, or to prevent the successful assertion of an unconscientious and incomplete legal advantage; but to abrogate or to assail a perfect and independent legal right, it can have no pretension." *Id.* In other words, where there is a complete, independent legal right, equity does not write on a clean slate. "Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Hedges v. Dixon Cnty.*, 150 U.S. 182, 192 (1893) (rejecting argument that a court of equity can declare valid bonds that are otherwise void by law).

Perhaps the clearest and most unequivocal expressions of this principle can be found in decisions authored by two of the most revered Supreme Court justices of the past century. In *Loucks v. Standard Oil Co.*, 120 N.E. 198, 201 (1918), an opinion by then-Judge Benjamin Cardozo, the New York Court of Appeals held that "[i]f a foreign statute gives the right, the mere fact that we do not give a like right is no reason for refusing to help the plaintiff in getting what belongs to him."

Almost 100 years later, Justice Scalia wrote in similar fashion for a unanimous Court, "it is not for courts to alter the balance struck by the statute." *Law v. Siegel*, 571 U.S. 415, 427 (2014) (citation omitted). In so doing, the Court recognized that an inequitable result—even a "heavy financial burden"—imposed upon fiduciaries and their insolvency estates is no basis for departing from this rule or varying from the statute. *Id.* at 426–27. As these decisions confirm, courts cannot invoke principles of equity to avoid results perceived as inequitable in derogation of an applicable statute.

Standing this bedrock principle on its head, the District Court invoked general principles of equity to avoid the mandatory grant of comity and other key provisions in Chapter 15, and the Cayman Islands Companies Act. Specifically, the District Court invoked federal "equity's lodestar" and its "principal goal"—"equality" and "fair relief to as many investors as possible," respectively—to support its conclusion that applying the distribution scheme mandated by Cayman Islands law caused

inequitable results as it "would leave most investors in a far worse position than if the Court applies federal equity principles." ECF No. 284 at 17.

Respectfully, it was not for the District Court to determine that distributions in accordance with Cayman Islands law are "inequitable," as principles of equity offer no basis to depart from the requirements of statutory law. Rather, the District Court was required to grant comity to the Cayman Islands distribution scheme and not override that statutory scheme based on its own subjective principles of equity.

### B. The District Court Erred in Creating and Relying on Federal Common Law as a Rule of Decision to Authorize Direct Distributions to the Stakeholders of a Foreign Company in Liquidation and Avoid Application of the Distribution Priority Scheme Mandated by Foreign Law.

In *Rodriguez v. FDIC*, 589 U.S. ___, 140 S. Ct. 713, 716 (2020), Justice Gorsuch writing for a unanimous Supreme Court observed that "[t]he cases in which federal courts may engage in common lawmaking are few and far between." Federal common law is "a rule of decision that amounts, not simply to an interpretation of a federal statute or properly promulgated administrative rule, but, rather, to the judicial 'creation' of a special federal rule of decision." *Atherton v. FDIC*, 519 U.S. 213, 218 (1997).

"[O]nly limited areas exist in which federal judges may appropriately craft the rule of decision." *Rodriguez*, 589 U.S. at ___, 140 S. Ct. at 717 (citing *Sosa v. Alvarez-Machain*, 542 U. S. 692, 729 (2004)). These limited areas include (1) where

there is "'express congressional authorization'" to engage in federal common-law making, ECF No. 284 at 22 (quoting *Al-Bihani v. Obama*, 619 F.3d 1, 18 n.6 (D.C. Cir. 2010)), and (2) traditional areas of federal common law, like "admiralty disputes and certain controversies between States," *id.* (quoting *Rodriguez*, 589 U.S. at ___, 140 S. Ct. at 716–17).[34]

The District Court implicitly determined that a novel federal rule of decision was required to make direct distributions to the Foreign Debtor's stakeholders despite the existence of the Winding Up Proceeding, the contrary provision of the Cayman Islands Companies Act, and the objection of the Foreign Representatives. It reasoned that that this exercise in federal common-law making was permitted on two grounds: that (a) pursuant to section 78u(d)(5), Congress permitted the SEC to "seek" and the Court to "grant" "any equitable relief that may be appropriate or necessary for the benefit of investors, and (b) matters concerning "international disputes implicating our relations with foreign nations" are a traditional area of federal common-law making. ECF No. 284 at 22–23.

---

[34] In a footnote, the District Court also invoked "a strong federal interest insuring effective relief in SEC actions brought to enforce the securities laws" as a basis for creating federal common law. ECF No. 284 at 24 n.18 (citing *SEC v. Wencke*, 622 F.2d 1363, 1372 (9th Cir. 1980)). The District Court's reliance on *Wencke* is misplaced. Nothing in *Wencke* extends to the question of how the assets of the receivership are distributed to creditors. *See Rodriguez*, 589 U.S. ___, 140 S. Ct. at 717–18 ("what unique interest could the federal government have in determining how a consolidated corporate tax refund, once paid to a designated agent, is *distributed* among group members") (emphasis in original).

The District Court's invocation and reliance on section 78u(d)(5) was misplaced, as that statute does not authorize the court to engage in federal common-law making. As the District Court correctly noted, any such authorization must be "express." ECF No. 284 at 22 (quoting *Al-Bihani*, 619 F.3d at 18 n.6); *see also Sosa*, 542 U.S. at 726. But by its plain terms and place within the larger section 78u framework, section 78u(d)(5) specifically and exclusively applies to actions brought *by the SEC* and relief sought *by the SEC*—not by a court-appointed receiver.

The chapter in which section 78u appears applies only to "securities exchanges." By its own terms, section 78u applies to "investigations and actions" of the SEC. Next, subsection (d) applies only to "injunction proceedings" commenced by the SEC. Finally, and most importantly, sub-subsection (5) states:

> (5) Equitable relief. In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, *the Commission may seek*, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.

§ 78u(d)(5) (emphasis added).

Pursuant to its plain language, section 78u(d)(5) applies only to (1) "action[s] or proceeding[s] brought or instituted by the [SEC] under . . . securities laws," (2) where the SEC "seek[s]" relief. The statute clearly states that under section 78u district courts only have the authority to grant equitable relief sought *by the SEC*.

Here, it was the Receiver, and not the SEC, that filed the Distribution Motion. Receivers are separate and distinct from the SEC, as officers or "creatures" of the court that appoints them. *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982) ("The receiver is but the creature of the court[.]").  As section 78u provides authority only for "the Commission [to] seek" equitable relief, it cannot be read as an express Congressional grant of equitable authority to a district court in respect of such relief as sought by a receiver.[35]  Had Congress intended for section 78u to empower district courts to consider and grant any equitable relief that came before it—not just relief sought by the SEC—it would have stated as much. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47 n.22 (1989) ("[H]ad Congress intended a state-law definition of domicile, it would have said so. Where Congress did intend that . . . terms be defined by reference to other than federal law, it stated this explicitly.").

For all of these reasons, section 78u(d)(5) falls far short of the "express" grant of authority that is required in a statute in order for a court to engage in federal common-law making in respect of a request by the Receiver.[36]  As noted in *Atherton*,

---

[35] While the Receiver was appointed and empowered to administer the receivership, the SEC maintains control over the enforcement portion of the action, and may invoke section 78u to obtain equitable relief against the defendants in that enforcement action.

[36]  Tellingly, none of the cases cited in the Order approving a "rising tide" or similar "equitable" distribution scheme rely on section 78u(d)(5).

"[n]or does the existence of related federal statutes automatically show that Congress intended courts to create federal common-law rules." 519 U.S. at 218. Section 78u(d)(5) is merely related to SEC enforcement actions, and falls far short of an "express" grant of authority to engage in federal common-law making in respect of distributions to stakeholders in a foreign entity placed in a U.S. receivership.

The District Court's second basis for invoking federal common law as a rule of decision—that the distribution arises from an international dispute which is in the traditional purview of federal common law—also fails because this case in no way presents an "international dispute[] implicating . . . [the U.S.'s] relations with foreign nations." ECF No. 284 at 22 (citing *Tex. Indus. v. Radcliff Materials*, 451 U.S. 630, 641 (1981)). As *Texas Industries* itself explains, matters that implicate relations with foreign sovereigns are those in which "the authority and duties of the United States as sovereign are intimately involved." *Id.*[37]

---

[37] Writing for a unanimous Court, Chief Justice Burger held in *Texas Industries* that federal courts are not empowered to fashion a federal common law rule of contribution among antitrust wrongdoers as no "'uniquely federal interests' of the kind that oblige courts to formulate federal common law" are implicated, and that even though "Congress . . . did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application[,] . . . [i]t does not necessarily follow . . . that Congress intended to give courts as wide discretion in formulating remedies to enforce the provisions of the Sherman Act or the kind of relief sought through contribution." 451 U.S. at 643. This analysis is entirely applicable to the situation presented here.

In comparison to such cases, this matter does not implicate U.S. relations with the Cayman Islands nor involve anything related to the U.S. as a sovereign entity. This case arises in a purely commercial setting and presents the question of what law governs distributions to stakeholders of a foreign entity that is the subject of both a federal equity receivership and a liquidation proceeding in its country of organization.  While presenting issues of great importance to the primary policy objectives of Chapter 15, *see* §§ 1501(a)(1)–(3),[38] in no way does this case implicate foreign relations between the U.S. and the Cayman Islands as sovereign nations. Thus, the District Court's reliance on the exception noted in *Texas Industries* to the prohibition against creating federal common law as a rule of decision is misplaced.

The relevant or controlling legal precedent here is found in *Gebhard* and its progeny—*Vitro*, *Telecom Argentina*, and *Law v. Siegel*—not in a strained exercise in federal common-law making based on a misreading of section 78u that cannot be reconciled with *Atherton* and *Rodriguez*, and that has no application whatsoever to cross-border insolvency situations.

## IV. EVEN IF THE DISTRICT COURT HAD THE DISCRETION TO REFUSE COMITY TO THE FOREIGN REPRESENTATIVES, IN DOING SO THE COURT ABUSED THAT DISCRETION.

The District Court identified three interests to weigh in analyzing whether to grant comity: "the interests of the United States, the interests of the foreign state or

---

[38] *See* § II.A.1., *supra*.

states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." ECF No. 284 at 16 (citing *Vitro* at 1053). In analyzing and then weighing these factors, the District Court abused its discretion by making a legal mistake, failing to consider multiple relevant factors that should have been given significant weight, and considering and giving significant weight to an irrelevant or improper factor. *See, e.g.*, *Excellent Computing*, 648 F. App'x at 865.

With respect to the "interests of the United States," the District Court considered the effect on U.S. investors if Cayman Islands insolvency law were applied to their distributions instead of U.S. law. This exercise violated the principle of international insolvency law that U.S. investors dealing with a foreign corporation or entity must "recognize[] and submit[] to" the entity's home laws. *Gebhard*, 109 U.S. at 537; *see also* § II.A.2., *supra* (discussing the applicability of *Gebhard* to this case). Further, such investors deal with the foreign company appreciating the risk that their rights are defined by and subject to foreign law, and in the knowledge that they may protect themselves by electing to do business elsewhere instead. *See Gebhard*, 109 U.S. at 538–39.

Consistent with *Gebhard*, U.S. courts routinely require U.S. citizens to submit their claims in foreign insolvency proceedings so long as the foreign insolvency law is not repugnant to U.S. policies. *See* § II.A.2., *supra*. In doing so, U.S. courts do

"not require that the amount of a distribution in a foreign insolvency proceeding be equal to the hypothetical amount the creditor would have received in a proceeding under U.S. law." *See id.*

Thus, having voluntarily contracted with the Feeder Funds known and disclosed to them to be Cayman Islands entities, all of the investors subjected themselves to the laws of the Cayman Islands. Accordingly, courts in the U.S., including the District Court here, can and should enforce and give effect to both the drawbacks and benefits under Cayman Islands law, even where the application of foreign insolvency law causes investors—whether U.S. or foreign—to receive a lesser distribution than they would receive under U.S. principles of equity had they invested in a U.S. entity. In giving significant—indeed, dispositive —weight to this factor, the District Court abused its discretion, whether as a legal error or as giving outsize weight to an irrelevant or improper factor.

The District Court erroneously applied the law and thereby abused its discretion in addressing this first *Vitro* interest, and then never proceeded to balance the "interests of the Cayman Islands" and "mutual interests of the family of nations in just and efficiently functioning rules of international law," against those of the United States  In failing to give any consideration to these other two factors, the District Court further abused its discretion and committed legal error.

There is no question that the District Court should have considered and given significant weight to these two interests, along with the further interests addressed below. As the sovereign nation in which the Foreign Debtor—not to mention thousands of other investment funds—was organized and regulated, the Cayman Islands has a significant interest in the liquidation of that Fund (that is the subject of the Winding Up Proceeding in its courts), and in the treatment of investors in that Fund based on the Cayman Islands law to which its corporate documents repeatedly referred. [39] *See Linter Grp. Ltd.*, 994 F.2d at 1000 ("American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.").

Similarly, the "mutual interests of the family of nations in just and efficiently functioning rules of international law" are better advanced by focusing on objective, readily ascertainable facts such as where the insolvent company is organized and regulated, rather than subjective case-by-case judgments of the equities. This focus

---

[39] The Articles of the Foreign Debtor reflect its organization under Cayman Islands law, and the winding-up provisions call for a Cayman distribution process. ECF No. 241-1 at 2, 35. The Offering Memorandum notes that the Foreign Debtor and the Master Fund are subject to the laws and regulations of the Cayman Islands. ECF No. 241-2 at 156. Lastly, the Subscription Agreement states that it is to "be governed by and construed in accordance with the laws of the Cayman Islands, without regard to conflicts of laws principles." *Id.* at 18. Further, subscribers explicitly agreed that they "submit[ted] to the exclusive jurisdiction of the Cayman Islands courts with respect to any actions against the Fund, the Investment Manager, the Administrator or the Fund's board of directors." *Id.*

leads to greater predictability in judicial decisions concerning the circumstances in which foreign law should apply in local jurisdictions, making negotiated solutions more likely and deterring costly and inefficient litigation, as parties can anticipate legal outcomes without resort to courts. The attendant rise in "legal certainty"—a key policy objective of Chapter 15 under section 1501(a)(2)—provides comfort to investors seeking to deploy investment capital across borders that their reasonable expectations concerning which law will govern their conduct and their investments will be met. All this to say that predictability and certainty in whether and when foreign law will apply in U.S. courts fosters international law and cooperation and international trade and investment.

Further, it advances all three of the relevant interests (those of the United States, the Cayman Islands, and the international system) to realize and vindicate the reasonable expectations of Feeder Fund Ltd. investors that the law of the Cayman Islands would govern their investments. The District Court made mention of this factor, but dismissed it as not relevant in an "equity receivership" as opposed to a "contract dispute[]," or to the Receiver who the District Court held was not bound by the choice-of-law provisions in the relevant corporate documents. ECF No. 248 at 25.

Respectfully, the District Court missed the forest for the trees. The point is not that the choice-of-law provisions were controlling, but that they underscore the

investors' reasonable expectations that having invested in a Cayman Islands fund their rights would be governed by Cayman Islands law. Indeed, U.S. courts have recognized that to be the law since *Gebhard*.[40]

The District Court further abused its discretion in its decision to "defer to [the] [R]eceiver's expertise" on issues of law rather than business judgment, and to find it "significant that the Receiver adamantly oppose[d] applying Cayman law here." *See* ECF No. 284 at 15 n.11. It is the function of the Court—not the Receiver—to determine what the law is, and not defer to the Receiver on controlling matters of law.

Finally, the District Court gave no consideration to the fact that U.S. courts treat foreign insolvency proceedings as a "discrete category" for which comity is "particularly appropriate," *see, e.g., EMA Garp Fund*, 783 F. App'x at 84, nor to any of the eight factors routinely examined by U.S. courts in analyzing whether to grant comity to foreign insolvency proceedings, all of which are present here, *Linter Grp. Ltd.*, 994 F.2d at 999.[41]

---

[40] *See In re Ascot Fund Ltd.*, 603 B.R. 271, 283–84 (Bankr. S.D.N.Y. 2019) (analyzing the foreign debtor's corporate documents and concluding that from "investors' point of view, and as a matter of fact and law, they invested in a Cayman fund and their rights were to be determined under Cayman law").

[41] These eight factors are met as demonstrated by the Pearson Declaration, ECF No. 241; the Cayman Islands Companies Act; and the Cayman Islands Winding Up Rules.

In failing to consider any of these significant factors in weighing whether to grant comity to the Foreign Representatives, the Cayman Winding Up Proceeding and the statutory distribution scheme applicable to companies in liquidation under Cayman Islands law, the District Court abused its discretion. On this basis as well, the Order must be reversed.

**V.    THIS IS A CASE OF FIRST IMPRESSION ONLY BECAUSE THE SEC AND RECEIVER HAVE TAKEN A STANCE THAT IS CONTRARY TO THE DISTRIBUTION SCHEMES APPROVED AND EMPLOYED IN OTHER CROSS-BORDER INSOLVENCY CASES AND SITUATIONS.**

As recognized in *Ascot Fund*, 603 B.R. at 284, the correct procedure for distribution in a master-feeder fund structure actually involves two distributions— the first from the master fund to the feeder fund, and the second from the feeder fund to the investors.   In this case, District Court conflated those two separate distributions into a single direct distribution from the master fund to the investors— a process contrary to that employed in other receiverships with parallel cross-border proceedings.

In *SEC v. Direct Lending Investments, LLC*, No. 2:10-cv-02188, ECF No. 321 (C.D. Cal. Nov. 20, 2020), the district court approved a distribution scheme proposed by the receiver that provided for an equitable "rising tide" distribution to stakeholders in the other receivership entities, but carved out the offshore feeder fund in liquidation in the Cayman Islands to permit the distribution to its investors

in accordance with Cayman law.  Similarly, in *SEC v. Founding Partners Stable-Value Fund, LP et al.*, No. 2:09-cv-229-JESNPM, ECF No. 574 (M.D. Fla. Jan. 4, 2022), the receiver made a distribution to the directors of a Cayman Islands feeder fund for distribution to its investors in accordance with Cayman law.  The SEC did not object in either case.

Most recently, in a U.S.-Cayman case hailed as "a significant and progressive step in the constructive cooperation and dealings of both jurisdictions with each other in the best interests of international creditor investor protection,"[42] the courts in both countries approved an agreement between the SEC and Cayman liquidators for the release of funds from an SEC enforcement action to those liquidators for distribution to creditors of the Cayman Islands fund in accordance with Cayman law.

In all three cases, the receivers and the SEC reached agreements with Cayman liquidators to enable the distributions to stakeholders in the Cayman-organized funds to proceed in accordance with Cayman Islands law.

It is precisely because of those agreements that protracted litigation was avoided, and thus the issue presented in this case is one of first impression.  Insofar as the Foreign Representatives are aware, *no U.S. court has approved the effort of a*

---

[42] *In re Income Collecting 1-3 Months T-Bills Mut. Fund*, No. 21-11601(DSJ) (Bankr. S.D.N.Y. Feb. 17, 2022) (Judgment of Grand Court of Cayman Islands, filed by Cayman JOLs as foreign representatives, ECF No. 22-1 (Feb. 4, 2022) (the "*Income* Cayman Judgment")).

*federal equity receiver to make a direct distribution to stakeholders of a foreign entity based on considerations of equity and federal common law, in derogation of principles of international comity and foreign law, over the objection of fiduciaries appointed for that entity by the sovereign court of the foreign jurisdiction under whose laws that entity was organized and regulated.*

The accommodations reached in *Direct Lending* and *Founding Partners* reflect precisely the "distinct distributions" approach in *Ascot Fund*, which the District Court's Order conflated in disregard of the Cayman Islands law that governs Feeder Fund Ltd. The same enlightened approach in those cases, and in *Income Collecting T-Bills* in which there was no U.S. receivership, should apply here as well.[43]

In stark contrast to those examples, the District Court approved, at the SEC's and Receiver's urging, a harsh and inflexible approach in this case that, as explained above, does violence to principles of international comity applicable to cross-border insolvency.  The SEC and Receiver have  failed to articulate any rational basis for this departure from the informal but consistent precedent established by these recent cases.

The unannounced retreat from the prior practice in these other cases, for which the SEC was commended by the presiding justice in the Grand Court of the Cayman

---

[43] *See also OneTRADEx, supra* note 9.

Islands in the *Income Collecting T-Bills* matter,[44] smacks of precisely the "economic imperialism" of which its own former deputy general counsel offered a withering criticism in a recent article:

> The U.S. does not have a monopoly on financial regulation or investor protection and should not police the world. Other countries have well-developed financial and commercial laws and enforce them. . . . *For the global securities and financial markets to work properly and fairly, law enforcement agencies need a dose of international humility. They should stay within the confines of their own laws, respect other countries and act with restraint when examining foreign conduct. U.S. agencies must sometimes defer to others . . . .*[45]

In this case, the SEC demonstrably has acted without such restraint. In similar fashion, the Receiver and SEC have acted without regard for long-established U.S. principles of cross-border insolvency law, international comity and recent

---

[44] As Mr. Justice Doyle took care to say in paragraph 28 of the Cayman Judgment:

> I congratulate the SEC for also seeing the good sense of such compromise. Such a refreshing and pragmatic attitude on their behalf will greatly assist in creditors being properly protected. I would wish to encourage more cooperation between the SEC and Cayman office holders in the future but for present purposes simply wish to thank the SEC for their assistance in this case. Such assistance reflects well upon the international reputation of the SEC and the Cayman Islands.

*Income* Cayman Judgment.

[45] Andrew N. Vollmer, *FTX Probe Does Not Justify US Law Enforcement Imperialism*, December 21, 2022. https://www.law360.com/articles/1559127/ftx-probe-does-not-justify-us-law-enforcement-imperialism (emphasis added).

precedents described above. On the cumulative weight of the legal arguments presented in this Initial Brief, as well as the recent history of the SEC's own practices, the decision of the District Court must be reversed and the case remanded.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court reverse the District Court's Order and remand for further proceedings consistent with the legal arguments and statutory requirements articulated throughout this Initial Brief.

Respectfully submitted this 2nd day of March, 2023.

> BAKER & McKENZIE LLP
> *Attorneys for the Appellants*
> Sabadell Financial Center
> 1111 Brickell Ave., Suite 1700
> Miami, Florida 33131
> Telephone: (305) 789-8900
> Facsimile: (305) 789-8953
>
> By: */s/ Mark D. Bloom*
> Mark D. Bloom (Fla. Bar No. 303836)
> John R. Dodd (Fla. Bar No. 38091)
> Email: mark.bloom@bakermckenzie.com
> john.dodd@bakermckenzie.com

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE, AND TYPE-STYLE REQUIREMENTS**

I certify that this document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) and 11th Cir. R. because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,894 words. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).

*/s/ Mark D. Bloom*
Mark D. Bloom

**CERTIFICATE OF SERVICE**

I certify that on March 2, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, and entered the required information on the web-based CIP system on the Court's website. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Mark D. Bloom*
Mark D. Bloom