No. 22-13412-B

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff-Appellee*,

and

JONATHAN E. PERLMAN,
*Court-Appointed Receiver-Appellee,*

v.

ELEANOR FISHER and TAMMY FU,
*Appellants*.

---

Appeal from the U.S. District Court for
the Southern District of Florida
Hon. Cecilia M. Altonaga
No. 1:20-cv-21964-CMA

---

## BRIEF OF APPELLEE
## SECURITIES AND EXCHANGE COMMISSION

---

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

MORGAN BRADYLYONS
*Bankruptcy Counsel*

EZEKIEL L. HILL
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.7724 (Hill)
hillez@sec.gov

No. 22-13412-B

*Securities and Exchange Commission v. Eleanor Fisher, et al.*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Eleventh Circuit Rule 26.1-1, Appellee Securities and Exchange Commission submits the following list of all persons and entities known to the Commission to have an interest in the outcome of this appeal:

1.  Altonaga, Hon. Cecilia M., U.S. District Court Judge (S.D. Fla.);

2.  Avila Rodriguez Hernandez Mena & Ferri LLP, counsel for non-party respondent Ocean Bank;

3.  AW Exports Pty Ltd., claimant;

4.  Bado, Jean-Pierre, counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

5.  Bailey, Liam, liquidator for claimant Pie Face Pty Ltd.;

6.  Baker & McKenzie LLP, counsel for appellants;

7.  Banque Pictet & Cie, S.A., petitioner in Cayman Islands liquidation proceeding of relief defendant TCA Global Credit Fund, Ltd.;

8.  Barbero, Megan, counsel for appellee Securities and Exchange Commission;

9.  Bast Amrom LLP, counsel for claimants Fide Funds Growth, Tritium Fund, Hsueh-Feng Tseng, and Armand Zohari;

10. Bast, Jeffrey P., counsel for claimants Fide Funds Growth, Tritium Fund, Hsueh-Feng Tseng, and Armand Zohari;

11. Battista, Paul J., counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

12. BEAST Energy Services, claimant;

13. Benjamin, Todd, claimant;

14.   Berger, Evan B., counsel for claimants David Manning, Paycation Travel, Inc., and Xstream Travel, Inc.;

15.   Berger & Poliakoff, P.A., counsel for claimants David Manning, Paycation Travel, Inc., and Xstream Travel, Inc.;

16.   Bloom, Mark D., counsel for appellants;

17.   Blum, W. Barry, counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

18.   Bradylyons, Morgan, counsel for appellee Securities and Exchange Commission;

19.   Broxom, Warwick, claimant;

20.   Caesarea Medical Electronics Holding (2000) Ltd., claimant;

21.   Cahill Gordon & Reindel LLP, counsel for objector Credit Suisse;

22.   Carnegie Fund Services S.A., claimant;

23.   Clearstream Banking S.A., objector;

24.   Claritas, LLC, counsel for appellants;

25.   Conley, Michael A., counsel for appellee Securities and Exchange Commission;

26.   Credit Suisse, objector;

27.   Cuccia II, Richard A., counsel for claimants David Manning, Paycation Travel, Inc., and Xstream Travel, Inc.;

28.   Cuccia Wilson, PLLC, counsel for claimants David Manning, Paycation Travel, Inc., and Xstream Travel, Inc.;

29.   Dodd, John R., counsel for appellants;

30. Dorchak, Joshua, counsel for objector Clearstream Banking S.A.;

31. EdisonLearning, Inc., claimant;

32. EY Cayman Ltd., affiliate of Eleanor Fisher and Tammy Fu, appellants and foreign representatives of relief defendant TCA Global Credit Fund, Ltd.;

33. Fide Funds Growth, claimant;

34. Fisher, Eleanor, appellant and foreign representative of relief defendant TCA Global Credit Fund, Ltd.;

35. Fox Rothschild LLP, claimant;

36. French Gerleman Electric Company, claimant;

37. Friedman, Michael A., counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

38. Fu, Tammy, appellant and foreign representative of relief defendant TCA Global Credit Fund, Ltd.;

39. Fulton, Andrew, IV, counsel for claimant Lease Corporation of America;

40. Garno, Gregory M., counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

41. Genovese, John H., counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

42. Hall, Jason, counsel for objector Credit Suisse;

43. Halsey, Brett M., counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

44. Harmon, Heather L., counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

45. Hill, Ezekiel L., counsel for appellee Securities and Exchange Commission;

46. Jacobs, Eric D., counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

47. Kaplan Saunders Valente & Beninati, LLP, counsel for claimants AW Exports Pty Ltd., Warwick Broxom, and Jonathan J. Kaufman;

48. Kaufman, Jonathan J., claimant;

49. Kellogg, Jason K., counsel for claimants Todd Benjamin and Todd Benjamin International, Ltd.;

50. Kelly & Fulton PA, counsel for claimant Lease Corporation of America;

51. Kleckley, Thaddeus R., counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

52. Leggett, Jaime B., counsel for claimants Fide Funds Growth, Tritium Fund, Hsueh-Feng Tseng, and Armand Zohari;

53. Lease Corporation of America, claimant;

54. Levine Kellogg Lehman Scheider + Grossman LLP, counsel for claimants Todd Benjamin and Todd Benjamin International, Ltd.;

55. Manning, David, claimant;

56. McIntosh, Elizabeth G., counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

57. Moot, Stephanie N., counsel for appellee Securities and Exchange Commission;

58. Mora, Martha R., counsel for non-party respondent Ocean Bank;

59. Morgan, Lewis & Bockius LLP, counsel for objector Clearstream Banking S.A.;

60. O'Brien Palmer, liquidator for claimant Pie Face Pty Ltd.;

61. Ocean Bank, non-party respondent;

62.  Palmer, Christopher, liquidator for claimant Pie Face Pty Ltd.;

63.  Paycation Travel, Inc., claimant;

64.  Pearson, Katherine L.B., counsel for appellants;

65.  Perlman, Jonathan E., appellee and court-appointed receiver for the receivership entities;

66.  Pie Face Pty Ltd., claimant;

67.  Rengstl, Patrick, counsel for claimants Liam Bailey and Christopher Palmer;

68.  Roldán Cora, Javier A., counsel for objector Clearstream Banking S.A.;

69.  Sallah, James, counsel for claimants Liam Bailey and Christopher Palmer;

70.  Sallah Astarita & Cox, LLC, counsel for claimants Liam Bailey and Christopher Palmer;

71.  Scarrott, Richard, claimant;

72.  Securities and Exchange Commission, appellee;

73.  Stig Gjerlaug, claimant;

74.  Taylor David, claimant;

75.  TCA Fund Management Group Corp., defendant and receivership entity;

76.  TCA Global Credit Fund GP, Ltd., defendant and receivership entity;

77.  TCA Global Credit Fund, LP, relief defendant and receivership entity;

78.  TCA Global Credit Fund, Ltd., relief defendant and receivership entity;

79.  TCA Global Credit Master Fund, LP, relief defendant and receivership entity;

80.    Todd Benjamin International, Ltd., claimant;

81.    Tritium Fund, claimant;

82.    Tseng, Hsueh-Feng, claimant;

83.    Underweiser & Underweiser LLP, claimant;

84.    Valente, Charles A., counsel for claimants AW Exports Pty Ltd., Warwick Broxom, and Jonathan J. Kaufman;

85.    van de Linde, Peter, claimant;

86.    Venable LLP, counsel for appellee and court-appointed receiver for the receivership entities Jonathan E. Perlman;

87.    Xstream Travel, Inc., claimant; and

88.    Zohari, Armand, claimant.

This Certificate of Interested Persons does not include all persons and entities who may be claimants in the receivership proceeding.

In accordance with Eleventh Circuit Rule 26.1-3(b), the Securities and Exchange Commission certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

The Securities and Exchange Commission believes that oral argument is unnecessary for this Court's consideration of this appeal because the issues presented are controlled by settled law and adequately presented in the briefs and the record.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ..................................................................... v

COUNTERSTATEMENT OF JURISDICTION .................................................... 1

COUNTERSTATEMENT OF THE ISSUE .................................................... 3

COUNTERSTATEMENT OF THE CASE .......................................................... 4

    A.   The Receivership ............................................................. 4

    B.   The Cayman Liquidation Proceeding ........................................... 5

    C.   The Investors ............................................................... 6

    D.   The Distribution Plan ....................................................... 7

STANDARD OF REVIEW ....................................................................... 14

SUMMARY OF ARGUMENT .................................................................... 15

ARGUMENT ................................................................................... 16

    I.   Chapter 15 does not require the district court to evaluate the proposed distribution plan according to Cayman law. ................................................. 16

        A.   Section 1509(b) provides foreign representatives with court access, not a right to relief. ................................................................. 18

        B.   Whether to grant a foreign representative's request for relief is at the court's discretion and such grant requires that the interests of others are sufficiently protected. ........................................................ 21

C.  Chapter 15 provides that a grant of comity pursuant to Section 1509(b)(3) is subject to court-imposed limitations. ............................25

D.  Section 1506 permits courts to refuse Chapter 15 actions manifestly contrary to United States public policy. ...............................................26

II.  The district court acted within its discretion in evaluating the proposed distribution plan according to federal principles of equity rather than Cayman law. ..............................................................................................28

A.  The district court properly looked to federal principles of equity. ......28

B.  The district court properly exercised its discretion in refusing to apply Cayman law. ..............................................................................31

C.  The JOLs' arguments that the district court abused its discretion in choosing to apply federal principles of equity instead of Cayman law are without merit. ...........................................................................32

1.  The district court properly considered the effect on United States investors of applying Cayman law. ....................................32

2.  The district court considered relevant factors and case law in deciding whether to apply Cayman law. .....................................33

3.  The district court did not defer to the Receiver in deciding whether to apply Cayman law. ....................................................35

4.  The district court did not err in considering that the Cayman liquidation proceeding had been recognized as a nonmain proceeding. ...................................................................................36

5.  The district court properly did not select a two-distribution plan. ...........................................................................................37

III.  The district court's invocation of federal common law was not error. ........39

A.  Congress authorized the district court to rely on federal principles of equity. ...............................................................................................39

    B.    This case implicates established applications of federal common law. ...................................................................................................41

CONCLUSION.......................................................................................................42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**             **Page(s)**

*Bendall v. Lancer Mgmt. Grp., LLC*,
  523 F. App'x 554 (11th Cir. 2013) ....................................................15

*Broadbent v. Advantage Software, Inc.*,
  415 F. App'x 73 (10th Cir. 2011) .....................................................29

*Bryan v. Bartlett*,
  435 F.2d 28 (8th Cir. 1970) .............................................................42

*Canada S. Ry. Co. v. Gebhard*,
  109 U.S. 527 (1883) ........................................................................33

*Cunningham v. Brown*,
  265 U.S. 1 (1924) ..................................................................... 27, 29

*EMA Garp Fund, L.P. v. Banro Corp*,
  783 F. App'x 82 (2d Cir. 2019) .......................................................21

*Hilton v. Guyot*,
  159 U.S. 113 (1895) ................................................................. 33, 35

*In re ABC Learning Centres Ltd.*,
  728 F.3d 301 (3rd Cir. 2013) ...........................................................27

*In re Black Gold S.A.R.L.*,
  635 B.R. 517 (B.A.P. 9th Cir. 2022) ................................................21

*In re Bd. of Directors of Telecom Argentina, S.A.*,
  528 F.3d 162 (2d Cir. 2008) .............................................................21

*In re Cozumel Caribe, S.A. de C.V.*,
  482 B.R. 96 (Bankr. S.D.N.Y. 2012) ......................................... 19, 20

*In re Elpida Memory, Inc.*,
  No. 12-10947 CSS, 2012 WL 6090194 (Bankr. D. Del. Nov. 20, 2012)..... 19, 20

*In re Schimmelpenninck*,
   183 F.3d 347 (5th Cir. 1999) ...............................................24

*In re Vitro S.A.B. de CV*,
   701 F.3d 1031 (5th Cir. 2012) ................................... *passim*

*Jaffe v. Samsung Elecs. Co.*,
   737 F.3d 14 (4th Cir. 2013) ........................................ 22, 26

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
   731 F.2d 909 (D.C. Cir. 1984) ............................................33

*Mills v. Singletary*,
   63 F.3d 999 (11th Cir. 1995) .............................................35

*Quilling v. Trade Partners, Inc.*,
   572 F.3d 293 (6th Cir. 2009) .............................................30

*Rodriguez v. FDIC*,
   140 S. Ct. 713 (2020) ................................................ 39, 42

*SEC v. Complete Bus. Sols. Grp., Inc.*,
   44 F.4th 1326 (11th Cir. 2022) ..................................... 40-41

*SEC v. Direct Lending Investments, LLC*,
   No. 2:19-cv-02188 (C.D. Cal. Dec. 14, 2020)....................38

*SEC v. Elliott*,
   953 F.2d 1560 (11th Cir. 1992) ............................. 14, 28, 29

*SEC v. Kaleta*,
   530 Fed. App'x. 360 (5th Cir. 2013). ...............................38

*SEC v. Pension Fund of Am. L.C.*,
   377 F. App'x 957 (11th Cir. 2010) ...................................28

*SEC v. Quan*,
   870 F.3d 754 (8th Cir. 2017) .............................................30

*SEC v. Quiros*,
   966 F.3d 1195 (11th Cir. 2020)............................................................28

*SEC v. Sunwest Mgmt., Inc.*,
   No. CIV. 09-6056-HO, 2009 WL 3245879 (D. Or. Oct. 2, 2009) ....................38

*\*SEC v. Torchia*,
   922 F.3d 1307 (11th Cir. 2019) ................................................. 28, 29

*\*SEC v. Wealth Mgmt. LLC*,
   628 F.3d 323 (7th Cir. 2010) ..................................................... 29, 30

*SEC v. Wells Fargo Bank, N.A.*,
   848 F.3d 1339 (11th Cir. 2017)............................................................28

*Seguros Del Estado, S.A. v. Sci. Games, Inc.*,
   262 F.3d 1164 (11th Cir. 2001) .........................................................31

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004).........................................................................41

*United States v. Vanguard Inv. Co.*,
   6 F.3d 222 (4th Cir. 1993) ...............................................................29

*Zacarias v. Stanford Int'l Bank, Ltd.*,
   945 F.3d 883 (5th Cir. 2019) ............................................................40

## Statutes                                                    Page(s)

11 U.S.C. § 1501(a) ................................................................. 17, 18

11 U.S.C. § 1501(a)(3).................................................................26

11 U.S.C. § 1501(b)(1)..................................................................17

11 U.S.C. § 1506 ........................................................................26

11 U.S.C. § 1507 ........................................................................22

11 U.S.C. § 1509 ........................................................................19

11 U.S.C. § 1509(b). ........................................................................ 18, 25

11 U.S.C. § 1509(b)(1) ...........................................................................20

11 U.S.C. § 1509(b)(2) ...........................................................................20

*11 U.S.C. § 1509(b)(3) ..........................................................................20

11 U.S.C. § 1521(a) ................................................................................21

11 U.S.C. § 1522(a) ................................................................................22

Securities Act of 1933 (15 U.S.C. § 77a *et seq.*)
    Section 20(b), 15 U.S.C. § 77t(b) ...................................................1
    Section 20(d)(1), 15 U.S.C. § 77t(d)(1) ...........................................1
    Section 22(a), 15 U.S.C. § 77v(a) ..................................................1
    Section 22(c), 15 U.S.C. § 77v(c) ..................................................1

Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*)
    Section 21(d), 15 U.S.C. § 78u(d) ..................................................1
    *Section 21(d)(5), 15 U.S.C. § 78u(d)(5) ............................ 27, 28, 39
    Section 27(a), 15 U.S.C. § 78aa(a) .................................................1
    Section 27(b), 15 U.S.C. § 78aa(b) .................................................1

Investment Advisers Act of 1940 (15 U.S.C. § 80b-1 *et seq.*)
    Section 209(d), 15 U.S.C. § 80b-9(d) ..............................................1
    Section 214(a), 15 U.S.C. § 80b-14(a) .............................................1
    Section 214(b), 15 U.S.C. § 80b-14(b) .............................................1

28 U.S.C. § 1331 ....................................................................................1

## Other Authorities           Page(s)

8 Collier on Bankruptcy ¶ 1509.02 (16th ed. 2023) .............................20

H.R. Rep. No. 109–31 (2005) ........................................................ 19, 22

UNCITRAL, Model Law on Cross–Border Insolvency (1997) ...... 18, 22

# COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction over this Securities and Exchange

Commission civil law enforcement action pursuant to Sections 20(b), 20(d)(1),

22(a), and 22(c) of the Securities Act of 1933, 15 U.S.C. §§ 77t(b), 77t(d)(1),

77v(a), 77v(c); Sections 21(d), 27(a), and 27(b) of the Securities Exchange Act of

1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78aa(a), 78aa(b); Sections 209(d),

214(a), and 214(b) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-9(d),

80b-14(a), 80b-14(b); and 28 U.S.C. § 1331.

On October 12, 2022, appellants Eleanor Fisher and Tammy Fu, Cayman

Islands court-appointed joint official liquidators ("JOLs") of relief defendant TCA

Global Credit Fund, Ltd., filed a notice of appeal from the district court's "August

4, 2022 Order granting in part the Receiver's Motion for Approval of Distribution

Plan and First Interim Distribution . . . , as amended by the September 2, 2022

Order."  Doc. 307.

On November 16, 2022,  the Court posed a jurisdictional question, asking

the parties to address whether each of the district court's August 4, 2022 and

September 2, 2022 orders "is immediately appealable under 28 U.S.C. §

1292(a)(2), the collateral order doctrine, the doctrine of practical finality, or as [a]

final order[] disposing of a discrete postjudgment proceeding."  App. Doc. No. 16-

1.  In their respective responses to the jurisdictional question, the parties agreed

that the August 4, 2022 order was immediately appealable under the collateral order doctrine.  App. Doc. Nos. 18, 19, 20.  The receiver, however, argued that the September 2, 2022 order (1) was not immediately appealable and (2) did not affect the deadline to appeal the August 4, 2022 order.  App. Doc. No. 20.

The receiver also moved to dismiss the appeal for lack of jurisdiction based on the JOLs' allegedly untimely notice of appeal.  App. Doc. No. 21; *see* App. Doc. Nos. 24, 27.  The Court ordered the motion to be carried with the case.  App. Doc. No. 36.

# COUNTERSTATEMENT OF THE ISSUE

Whether the district court abused its discretion in evaluating the receiver's proposed distribution plan under federal principles of equity, resulting in a pro rata, rising tide distribution, rather than Cayman Islands law, which would have resulted in a small number of investors receiving outsized distributions.

# COUNTERSTATEMENT OF THE CASE

## A.     The Receivership

On May 11, 2020, the Commission brought this civil law enforcement action against defendants TCA Fund Management Group Corp. ("TCA"), a Florida corporation, and TCA Global Credit Fund GP, Ltd. ("GP"), a Cayman Islands company, for violations of the federal securities laws.  Doc. 1.

Relief defendants TCA Global Credit Fund, LP ("Feeder Fund LP"), a Cayman Islands limited partnership, and TCA Global Credit Fund, Ltd. ("Feeder Fund Ltd."), a Cayman Islands company, raised money from investors for relief defendant TCA Global Credit Master Fund, LP ("Master Fund"), a Cayman Islands limited partnership, which provided financing and investment banking services. TCA served as an investment advisor to Feeder Fund LP, Feeder Fund Ltd., and Master Fund and was compensated based on their net asset values.  GP served as the general partner of Master Fund and Feeder Fund LP and was compensated based on Master Fund's profitability.  The Commission alleged that TCA and GP violated the federal securities laws by engaging in fraudulent revenue recognition practices to inflate the net asset values of Feeder Fund LP, Feeder Fund Ltd., and Master Fund, and the profitability of Master Fund.  *Id*.

The same day that this action was filed, the Commission moved—without opposition—for entry of a judgment (including a permanent injunction) against the

defendants and for the appointment of a receiver over the defendants and the relief

defendants.  Docs. 3, 6.  The district court entered the judgment and appointed

Jonathan E. Perlman as the receiver ("Receiver").  Docs. 5, 7.

## B.    The Cayman Liquidation Proceeding

On April 1, 2020, a petition seeking the winding up and liquidation of

Feeder Fund Ltd., and the appointment of appellants Eleanor Fisher and Tammy Fu

as Feeder Fund Ltd.'s joint official liquidators, was filed in the Grand Court of the

Cayman Islands.  On May 13, 2020, the Grand Court ordered Feeder Fund Ltd. to

be wound up and liquidated in accordance with the Cayman Islands Companies

Law and appointed Fisher and Fu as Feeder Fund Ltd.'s joint official liquidators.

*See In the Matter of: TCA Global Credit Fund Ltd.*, Case No. 21-cv-21905-CMA

(S.D. Fla.), Doc. 1.

On February 16, 2021, the JOLs filed a petition in the United States

Bankruptcy Court for the Southern District of Florida seeking recognition of the

Cayman liquidation proceeding as a foreign main proceeding, or, alternatively, a

foreign nonmain proceeding, under Chapter 15 of the United States Bankruptcy

Code.  *In re: TCA Global Credit Fund Ltd.*, Case No. 21-11513-RAM (Bankr. S.D.

Fla.).

Thereafter, the Receiver and the JOLs jointly moved the district court to,

among other things, withdraw the reference of the Chapter 15 case from the

bankruptcy court to the district court, recognize the Cayman liquidation proceeding as a foreign nonmain proceeding, and recognize the JOLs as the foreign representatives of Feeder Fund Ltd. Doc. 1 (Case No. 21-cv-21905). On June 4, 2021, the district court granted the motion. Doc. 8 (Case No. 21-cv-21905). The district court's order specified that "the effect of such recognition and the discretionary relief available upon such recognition under section 1521 of the Bankruptcy Code are limited as set forth herein." *Id.* at 5. The order stated:

> [N]othing contained in . . . the grant of foreign nonmain recognition as provided in this Order . . . shall in any way diminish, impair or give greater weight to any of the arguments to be made by the JOLs or the Receiver in respect of the Court's consideration of any matter brought before the Court, whether those arguments are based on the laws and regulations of the United States and/or the Cayman Islands or principles of international comity; or . . . shall in any way enlarge or improve the entitlement or argument for relief of either the JOLs or the Receiver in respect of the Court's consideration of any matter based on the grant of foreign nonmain recognition rather than foreign main recognition, including by reference to principles of international comity or cooperation that might otherwise have been applicable if . . . "COMI" or "establishment" findings had been made and this limited stipulated Order not entered.

*Id.* at 10.

## C.  The Investors

The Receiver identified 1,485 investors in the receivership entities who collectively had invested $1,161,425,343 through the feeder funds. Doc. 208 at 26;

Doc. 281 at 3.  Of those investors, 565 were net winners, meaning that they withdrew more than they invested on an aggregate cash basis.  Doc. 281 at 3; *see* Doc. 208 at 26.

The other 920 investors were net losers, meaning that they invested more than they withdrew on an aggregate cash basis.  Doc. 281 at 3; *see* Doc. 208 at 27.  Collectively, the net losers invested $675,517,494 and withdrew $296,162,750, for an aggregate loss of $379,354,744.  Doc. 208 at 27.  Among the net losers are two sub-classes of foreign investors.  First, there are 31 unpaid subscribers, investors who made subscription payments to Feeder Fund Ltd. but did not receive investment interests ("Unpaid Subscribers").  *Id.* at 31-33.  Second, there are 50 investors who submitted redemption requests (with an aggregate value of $44,201,902) to the feeder funds prior to the feeder funds sending windup-letters to investors ("Redeeming Investors").  *Id.* at 34.

## D.  The Distribution Plan

On February 28, 2022, the Receiver moved the district court for approval of a proposed distribution plan and an initial distribution thereunder.  Doc. 208.  The plan called for funds to be distributed to unsubordinated investors on a pro rata,

rising tide basis in accordance with federal principles of equity.[1]  Specifically, the

plan provided for:

- An initial distribution to each of the 764 unsubordinated net loser investors who had recovered less than 23.05% of their amount invested, with such distribution totaling $55,584,886 and increasing each such investor's recovery to 23.05% of their amount invested;

- No initial distribution to the 108 unsubordinated net loser investors who had recovered at least 23.05% of their amount invested;

- No initial distribution to the 48 subordinated net loser investors; and

- No initial distribution to the 565 net winner investors.  Doc. 281 at 3; Doc. 281 at 27.[2]

The plan does not afford priority to Unpaid Subscribers (except as to about

$400,000 of traceable funds) or Redeeming Investors, who would receive initial

distributions to the extent they are unsubordinated net loser investors who had

recovered less than 23.05% of their amount invested.  *See* Doc. 208 at 33, 34.

The JOLs objected to the proposed distribution plan on the ground that the

distribution should be governed by Cayman law.  Doc. 240; *see also* Doc. 268.

The JOLs explained that "[u]nder Cayman law, investors who have validly issued

---

[1] Subordinated investors invested through intermediary financial institutions that did not provide the Receiver with the information necessary to administer claims. Doc. 208 at 28-31.  Subordinated investors may cure their subordinated status by providing the required information to the Receiver.  Doc. 263 at 20-21.

[2] The proposed $55,854,886 initial distribution represents about 83% of the receivership's cash balance.  Doc. 208 at 4.

notices of the redemption of their equity interests with a redemption date prior to the earlier of the suspension of redemptions or the commencement of liquidation are treated as creditors, and in such capacity hold priority over investors who have not so redeemed and are treated as shareholders." Doc. 240 at 12. The JOLs argued that "the proposed [d]istribution [p]lan ignore[d] this statutory distinction in treating all former and current investors equally under the [r]ising [t]ide method, thereby disregarding Cayman Islands law in the name of 'equity' and depriving [r]edemption [c]reditors of their statutory priority as creditors." *Id.* at 12-13. The JOLs also argued that under Cayman law, distribution priority must be afforded to trade creditors and Unpaid Subscribers. *Id.* Finally, the JOLs argued that under Cayman law they were entitled to a distribution of more than $1 million for "administrative fees and expenses." *Id.* at 13-14.

Both the Receiver and the Commission urged the district court to overrule the JOLs' objection. Docs. 261, 263, 274. The Receiver explained that "[i]f this Court were to adopt the JOLs' request, the most deserving . . . unsubordinated [n]et [l]osers would receive nothing in the distribution. Rather, the $55,854,886 initial distribution would be spent: to pay over $1 million to the JOLs as 'administrative expenses'; fully satisfy the 31 Unpaid Subscribers and other creditor claims; and pay 50 [Redeeming Investors]. Not only would applying Cayman [l]aw eliminate payment to [more than 700] investors, it would create 20 new [n]et [w]inners."

Doc. 263 at 4. Indeed, under Cayman law, the Redeeming Investors, who comprise about 3% of investors, would take about 80% of the distribution. *Id.* at 14.

On July 11, 2022, the district court held a hearing on the Receiver's motion. *See* Doc. 323. On August 4, 2022, the court entered an order rejecting the JOLs' objection and granting the Receiver's motion in part. Doc. 284 ("Distribution Plan Order").

The district court began its 14-page analysis of the JOLs' objection by observing that evaluating the proposed distribution plan under Cayman law rather than under federal principles of equity would "generate substantially different results." *Id.* at 14. Specifically, under Cayman law, "31 Unpaid Subscribers and 50 [Redeeming Investors] would apparently be deemed creditors," which "would give them priority over the other [n]et [l]osers, who would be relegated to splitting whatever scraps remained once the 81 'creditors' were paid in full." *Id.* In "stark contrast," applying federal principles of equity would result in funds being "distribute[d] . . . to all unsubordinated investors on a *pro rata*, rising tide basis." *Id.*

The district court then addressed the JOLs' arguments for the application of Cayman law. First, the court considered international comity, which is "'an abstention doctrine that reflects the extent to which the law of one nation, as put in

force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation.'" *Id.* at 15 (quoting *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1030 (11th Cir. 2014)). "[C]omity is 'not a rule of law, but one of practice, convenience, and expediency.' It may be 'more than mere courtesy and accommodation,' but it 'does not achieve the force of an imperative or obligation.'" *Id.* (quoting *GDG Acquisitions,* 749 F.3d at 1030) (cleaned up).

The district court found that "[w]hether to grant comity [was] soundly within [its] discretion." *Id.* While "Chapter 15 [of the Bankruptcy Code] centers comity as a principal objective[,] it does not require application of foreign law in all instances, especially when doing so would compel a result not comparable to that reached by federal law." *Id.* at 17 (cleaned up). "[T]he JOLs would have the Court elevate a small group of investors to the status of creditors," which "might benefit the 81 investors fortunate enough to be deemed creditors, but . . . would leave most investors in a far worse position than if the Court applie[d] federal equity principles." *Id.* Thus, "the relief the JOLs seek under Cayman law is not 'comparable' to anything required by federal principles of equity," which "militates against application of Cayman law." *Id.* (quoting *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1044 (5th Cir. 2012)) (cleaned up). The court also observed that the "bulk" of the investors who would be harmed by the application of

Cayman law "are based in the United States" and that "foreign law is *particularly* inappropriate when it would cause undue injury to American citizens or hamper domestic public policy." *Id.* at 17-18. Finally, the court stated that it had recognized the Cayman liquidation proceeding as a nonmain, not a main, proceeding and that the recognition order made explicit that recognition did not impair the Receiver's court-imposed obligation "to develop a plan for the fair, reasonable and efficient recovery and liquidation of . . . [r]eceivership [p]roperty." *Id.* at 18-19 (cleaned up).

Second, the district court addressed the internal affairs doctrine, a "conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.'" *Id.* at 19 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)). The court concluded that "invoking the internal affairs doctrine to justify application of foreign law to an equity receiver's proposed distribution plan . . . would extend the doctrine beyond its relatively modest purpose." *Id.* at 20. The court observed that "[f]or the internal affairs doctrine to apply, the [proposed distribution plan] would have to force Feeder Fund Ltd. to do something that might subject it or its directors to conflicting demands under federal law and Cayman

law." *Id.* at 21. But the proposed distribution plan did not require Feeder Fund Ltd. to do anything; rather, it "seeks only to distribute assets that the Court has frozen in a constructive trust." *Id*.

Third, the district court addressed the application of federal common law. The court determined that the application of "equity principles found in federal common law" was appropriate because: (1) the choice of law to apply in evaluating the proposed distribution plan implicated established applications of federal common law; and (2) the court had express congressional authorization to do so. *Id.* at 21-24.

Fourth, the district court considered foreign investors' expectations. The court determined that '[n]either the Receiver nor the Court owes foreign investors strict adherence to [the Feeder Fund Ltd. subscription agreement] choice-of-law provision that binds only the foreign investors" and that "the [p]roposed [d]istribution [p]lan protects foreign *and* domestic interests by treating investors equally." *Id.* at 24-25.

The district court concluded that the JOLs' objection "[did] not persuade [it] to adopt Cayman law," which "would produce a harsh and unequal result without a proper basis." *Id.* at 25. Thus "exercis[ing] its discretion to reject [the JOLs'] arguments," the court "evaluate[d] the [p]roposed [d]istribution [p]lan according to federal principles of equity." *Id.* at 25-26. The court approved "the Receiver's *pro*

*rata*, rising tide distribution scheme," concluding that it was "fair and reasonable." *Id.* at 34 (cleaned up).[3]

The district court stayed the Distribution Plan Order "until September 6, 2022 to allow the filing of an interlocutory appeal." *Id.* (emphasis omitted). On September 1, 2022, the JOLs moved under Federal Rule of Civil Procedure 59(e) for the district court to alter or amend the Distribution Plan Order to extend the stay thereof until October 13, 2022 to permit "the full 60-day period afforded them to perfect their appeal to the Eleventh Circuit under Fed. R. App. P. 4(a)(1)(B)(ii), plus an additional ten (10) days within which to seek a stay pending such appeal pursuant to Fed. R. App. P. 8." Doc. 298 at 4. On September 2, 2022, the district court granted the motion, staying the Distribution Plan Order until October 13, 2022. Doc. 299.

On October 12, 2022, the JOLs filed a notice of appeal from the Distribution Plan Order "as amended by the September 2, 2022 Order." Doc. 307.

## STANDARD OF REVIEW

This Court reviews a district court's exercise of its "broad powers and wide discretion to determine the appropriate relief in an equity receivership" for abuse of discretion. *SEC v. Elliott*, 953 F.2d 1560, 1569–70 (11th Cir. 1992); *see also*

---

[3] The district court deferred determining "how much the Receiver must set aside for future claims until [the proposed distribution plan] has been fully litigated on appeal." Doc. 284 at 34.

*Bendall v. Lancer Mgmt. Grp., LLC*, 523 F. App'x 554, 557 (11th Cir. 2013)

("Any action by a trial court in supervising an equity receivership is committed to [its] sound discretion and will not be disturbed unless there is a clear showing of abuse.") (cleaned up).

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in rejecting the JOLs' request that the distribution proceed under Cayman law, which undisputedly would have resulted in a highly unequal distribution to similarly situated investors, contrary to the principal goal of an equity receivership in a Commission fraud case—granting fair relief to as many investors as possible.

The JOLs' primary argument on appeal is that Chapter 15 requires the district court to apply Cayman law. That argument fails for several reasons. First, Section 1509(b)(3), the provision on which the JOLs rely, provides foreign representatives with court access. It does not require a court to grant a foreign representative the relief sought. A grant of relief is governed by Section 1521 and is at the court's discretion. And a court may exercise its discretion to grant relief under Section 1521 to a foreign representative only if the interests of other affected parties are sufficiently protected. Here, the application of Cayman law would leave most investors much worse off than the application of federal principles of equity. Second, the statute provides that a grant of comity pursuant to Section

15

1509(b)(3) may be subject to court-imposed limitations. The district court reasonably determined that recognition of the Cayman liquidation proceeding as a foreign nonmain proceeding did not afford greater weight to the JOLs' argument for application of Cayman law. Third, Section 1506 permits courts to refuse requests for relief that are contrary to United States public policy. Here, application of Cayman law would be contrary to United States public policy because it would allow a few investors to jump to the head of the line to be made whole while similarly situated investors receive substantially less.

The district court reasonably exercised its discretion in looking to federal principles of equity rather than Cayman law because the application of Cayman law would produce a result entirely at odds with principles of equity. The JOLs fail to identify any way in which that ruling was an abuse of the district court's discretion. Finally, the district court appropriately relied on equity principles found in federal common law because (1) Congress authorized it to do so and (2) this cross-border insolvency receivership case implicates established applications of federal common law.

## ARGUMENT

### I.   Chapter 15 does not require the district court to evaluate the proposed distribution plan according to Cayman law.

The JOLs' principal argument on appeal is that Chapter 15 of the Bankruptcy Code requires the district court to evaluate the proposed distribution

plan under Cayman law. Br. 12-35. But the court did not err in declining to do so because Chapter 15 does not require it.

Chapter 15 is intended "to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of . . . (1) cooperation between . . . (A) courts of the United States . . . and (B) the courts . . . of foreign countries involved in cross-border insolvency cases; (2) greater legal certainty for trade and investment; (3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; (4) protection and maximization of the value of the debtor's assets; and (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment." 11 U.S.C. § 1501(a). It "applies where . . . assistance is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding." *Id.* § 1501(b)(1).

Section 1509(b) provides that:

> [I]f the court grants recognition [to a foreign proceeding], and subject to any limitations that the court may impose consistent with the policy of this chapter—
>
> (1) the foreign representative has the capacity to sue and be sued in a court in the United States;
>
> (2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and
>
> (3) a court in the United States shall grant comity or cooperation to the foreign representative.

*Id.* § 1509(b).

### A. Section 1509(b) provides foreign representatives with court access, not a right to relief.

The JOLs argue that Section 1509(b)(3) requires the district court to evaluate the proposed distribution plan under Cayman law. But the statute's legislative history and text, as well as relevant case law, demonstrate otherwise.

Chapter 15 is based on the Model Law on Cross-Border Insolvency ("Model Law"). *See* 11 U.S.C. § 1501(a) ("The purpose of this chapter is to incorporate the Model Law[.]") Article 9 of the Model Law, which is entitled "Right of direct access" and found in a chapter entitled "Access of foreign representatives and creditors to courts in this state," states that "[a] foreign representative is entitled to apply directly to a court in this State." UNCITRAL, *Model Law on Cross–Border Insolvency,* Part one, Chpt. II*, Art. 9 (1997), available at http://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/insolvency-e.pdf. The guidance promulgated in connection with the Model Law explains that "Article 9 is *limited to expressing the principle of direct access* by the foreign representative to courts of the enacting State, thus freeing the representative from having to meet formal requirements such as licenses or consular action." *Id.* at Part two, Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency ("Model Law Guide") ¶ 93 (emphasis added).

Section 1509, which is entitled "Right of direct access" and addresses the participation of foreign representatives in courts in the United States (*see* 11 U.S.C. § 1509), "implements the purpose of article 9 of the Model Law." H.R. Rep. No. 109–31, at 110 (2005). Thus "the language of the section, its legislative history and its original source in the . . . Model Law, all make clear that section 1509 reflects an 'access' principal." *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); *In re Elpida Memory, Inc.*, No. 12-10947 CSS, 2012 WL 6090194, at *8 (Bankr. D. Del. Nov. 20, 2012) ("The purpose of section 1509, as expressed in the legislative history and case law, is to allow the foreign representative access to, and standing in, courts in the United States other than the chapter 15 court.") (emphasis omitted). "[O]ther than providing access to courts in the United States, section 1509 is not a self-executing relief section of Chapter 15. Relief to a foreign representative must be based on sections 1507, 1519, 1520 and 1521, subject to limitations that may be imposed under section 1522." *Cozumel Caribe*, 482 B.R. at 109. Thus "[w]hile [Section 1509(b)(3)] mandates courtesy and respect for the foreign proceeding, consistent with the statement of purpose of chapter 15 and its international origin, it does not mandate relief. The foreign

representative must still make a case that the relief being sought is warranted." 8 Collier on Bankruptcy ¶ 1509.02 (16th ed. 2023).[4]

Therefore "[g]ranting comity to a *foreign representative* by providing access to courts in the United States is very different from granting *the request* by the foreign representative to extend comity to a foreign law." *Cozumel Caribe*, 482 B.R. at 110; *see Elpida*, 2012 WL 6090194, at *8 ("[S]ection 1509(b)(3) requires only that a court grant comity to the *foreign representative*—not to the foreign court or the orders entered by such court."). Indeed, if "comity is required to be given to any foreign law [under Section 1509(b)(3)], there would be no point in having the foreign representative apply to a U.S. court for discretionary relief." *Cozumel Caribe*, 482 B.R. at 110 (cleaned up). Thus Section 1509(b)(3) cannot "be read as removing the discretion that sections 1507, 1519, 1520 and 1521 expressly provide [a] court in determining whether to grant relief." *Id.* at 110 n.11.[5]

---

[4] The JOLs argue (Br. 26) that interpreting Section 1509(b)(3) as providing "merely the right to appear and be heard" renders it "mere surplusage" in light of Sections 1509(b)(1) and (2). But granting "comity or cooperation to the foreign representative" is not the same as granting the foreign representative the capacity to sue or be sued (11 U.S.C. § 1509(b)(1)) and the right to seek relief (*id*. § 1509(b)(2)). Indeed, it is the JOLs' interpretation that ignores the text of Section 1509(b)(3), which grants "comity or cooperation" not to a foreign proceeding or a foreign law but to "the foreign representative." 11 U.S.C. § 1509(b)(3).

[5] The JOLs argue that "[t]he decisions of the Second Circuit in *Telecom Argentina* and *EMA Garp* and the Fifth Circuit in *Vitro*, respectively, foreclos[e] the

Because Chapter 15 does not mandate that the proposed distribution plan be evaluated under Cayman law, the JOLs' argument that the district court improperly invoked principles of equity to "avoid" Chapter 15's "requirement[]" that the proposed distribution plan be evaluated under Cayman law is without merit.  Br. 36-38.  The district court did not employ principles of equity to "depart from the requirements of statutory law."  *Id*. at 38.

**B.    Whether to grant a foreign representative's request for relief is at the court's discretion and such grant requires that the interests of others are sufficiently protected.**

Section 1521(a) provides in relevant part that "[u]pon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court *may*, at the request of the foreign representative, grant any appropriate relief."  11 U.S.C. § 1521(a) (emphasis added).  Thus "[a]fter a petition for recognition has been granted, the court has a considerable amount of discretion."  *In re Black Gold S.A.R.L.*, 635 B.R. 517, 532 (B.A.P. 9th Cir. 2022); *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012) ("relief under § 1521

_____

possibility that comity in this context means anything less than giving effect to the distributional priorities of Cayman Islands insolvency law." Br. 27 (cleaned up). But none of those cases addresses the nature of the comity granted by Section 1509(b)(3), much less indicates that it required the district court to apply Cayman law. *See EMA Garp Fund, L.P. v. Banro Corp.*, 783 F. App'x 82 (2d Cir. 2019); *In re Vitro S.A.B. de CV*, 701 F.3d 1031 (5th Cir. 2012); *In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162 (2d Cir. 2008).

. . . is largely discretionary"). And a court may exercise its discretion to grant

relief pursuant to Section 1521 "only if the interests of the creditors and other

interested entities, including the debtor, are sufficiently protected." 11 U.S.C. §

1522(a); *see also Jaffe v. Samsung Elecs. Co.*, 737 F.3d 14, 29 (4th Cir. 2013)

(concluding that Section 1522(a) "requir[es] a particularized balancing analysis

that considers the interests of the creditors and other interested entities, including

the debtor, and . . . a weighing of the interests of the foreign representative . . .

against the competing interests of those who would be adversely affected by the

grant of such relief") (cleaned up).[6] Section 1522 "follows article 22 of the Model

Law" (H.R. Rep. No. 109-31, at 116) and "[t]he idea underlying article 22 is that

there should be a balance between relief that may be granted to the foreign

representative and the interests of the persons that may be affected by such relief.

This balance is essential to achieve the objectives of cross-border insolvency

legislation." Model Law Guide ¶ 161.

---

[6] To the extent that the JOLs' request to evaluate the proposed distribution plan
under Cayman law is considered under Section 1507, rather than Section 1521, the
analysis is similar. *See Vitro*, 701 F.3d at 1054-57 (discussing the relationship
between Section 1507 and Section 1521). Section 1507 provides that a court "may
provide additional assistance to a foreign representative" and "[i]n determining
whether to provide additional assistance . . . shall consider whether such additional
assistance, consistent with the principles of comity, will reasonably assure," among
other things, "just treatment of all holders of claims against or interests in the
debtor's property" and "protection of claim holders in the United States against
prejudice . . . in the processing of claims in such foreign proceeding." 11 U.S.C. §
1507.

Here the district court reasonably exercised its discretion to deny the JOLs' request based on its undisputed conclusion that application of Cayman law "would leave most investors in a far worse position than [applying] federal equity principles." Doc. 284 at 17. Indeed, to grant the request would have violated Section 1522(a) because the application of Cayman law would leave most investors without sufficient protection.

Consistent with Sections 1521 and 1522, the district court found that Chapter 15 "does not require application of foreign law in all instances, especially when doing so would compel a result not comparable to that reached by federal law." *Id.* (cleaned up). The JOLs argue that the district court erred in considering whether the result under Cayman law would be comparable to that under federal principles of equity. Br. 31-33.[7] But that is incorrect because, as the Fifth Circuit explained in *Vitro*, "[i]n considering whether to grant relief [under Section 1521 following recognition of the foreign proceeding], it is not necessary that the result achieved in the foreign bankruptcy proceeding be identical to that which would be

_____

[7] The JOLs also argue that "comity 'does not require that the amount of a distribution in a foreign insolvency proceeding be equal to the hypothetical amount the creditor would have received in a proceeding under U.S. law.'" Br. 21 (quoting *In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 173 (2d Cir. 2008)). But the district court refused to apply comity not because the distribution under Cayman law would be unequal to the distribution under federal principles of equity, but because it would be substantially different and entirely unfair. *See supra* at 10-14.

had in the United States. It is sufficient if the result is comparable." 701 F.3d at 1044 (cleaned up). Contrary to the JOLs' claim otherwise (Br. 31-33), "comparable" was the standard endorsed by *Vitro*, which relied on an earlier Fifth Circuit decision stating that "[a]lthough the foreign distribution scheme need not be identical to Title 11, it must be *comparable*." *In re Schimmelpenninck*, 183 F.3d 347, 364 (5th Cir. 1999) (emphasis added).[8]

Moreover, *Vitro* found that relief sought by a foreign representative is precluded by Section 1522 if the relief "fail[s] to provide an adequate balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief." 701 F.3d at 1067 n.42 (cleaned up). And it is because Cayman law fails to strike that balance that the district court declined to apply it. *See* Doc. 284 at 17 ("That shift might benefit the 81 investors fortunate enough to be deemed creditors, but it would leave most investors in a far worse position than if the Court applies federal equity principles.").

---

[8] The JOLs argue that "[i]n its interpretation of *Vitro*, the District Court conflated 'comparable' with 'repugnant.'" Br. 32. But *Vitro* endorsed "comparable" as the standard for evaluating whether "the result achieved in the foreign bankruptcy proceeding" is sufficiently similar "to that which would be had in the United States." 701 F.3d at 1044 (cleaned up). *Vitro* separately explained that a foreign law should not be applied if "repugnant to our laws and policies." *Id.* (cleaned up). In any event, even were "repugnant" the relevant standard, the district court, which cited "undue injury to American citizens" and the "hamper[ing] [of] domestic public policy" (Doc. 284 at 17-18) properly refused to apply Cayman law.

### C. Chapter 15 provides that a grant of comity pursuant to Section 1509(b)(3) is subject to court-imposed limitations.

A grant of comity under Section 1509(b)(3) is "subject to any limitations that the court may impose consistent with the policy of [Chapter 15]." 11 U.S.C. § 1509(b). Here, the limitations imposed by the district court further establish that Section 1509(b)(3) does not require the district court to evaluate the proposed distribution plan under Cayman law.

First, in its order recognizing the Cayman liquidation proceeding, the district court specified that "nothing contained in . . . the grant of foreign nonmain recognition as provided in this Order . . . shall in any way diminish, impair or give greater weight to any of the arguments to be made by the JOLs or the Receiver in respect of the Court's consideration of any matter brought before the Court, whether those arguments are based on the laws and regulations of the United States and/or the Cayman Islands or principles of international comity." Doc. 8 at 10 (Case No. 21-cv-21905). In other words, the recognition order, to which the JOLs and the Receiver agreed, provided that recognition would not affect the weight given to any of the JOLs' arguments.

Second, the district court found (Doc. 284 at 16-17) that limiting the comity afforded the JOLs was consistent with the policies of Chapter 15 because those policies include "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including

the debtor." 11 U.S.C. § 1501(a)(3). The JOLs argue that "procedural," not "substantive," fairness is the focus of Chapter 15. Br. 29 (emphasis omitted). But even if correct, the district court's objection to the application of Cayman law was rooted in part in the procedural unfairness of designating Redeeming Investors and Unpaid Subscribers as "creditors," which would entitle them to priority over other investors. *See* Doc. 284 at 14. The JOLs also argue (Br. 30-31) that refusing to apply Cayman law fails to protect all interested entities because application of federal principles of equity results in a smaller distribution to Redeeming Investors and Unpaid Subscribers than they would receive under Cayman law. But as the JOLs acknowledge, "every distribution scheme makes choices between and among stakeholders." Br. 30. That application of federal principles of equity results in more equal treatment for the majority of net losers while not benefitting every stakeholder does not render it inconsistent with the policies of Chapter 15.

### D. Section 1506 permits courts to refuse Chapter 15 actions manifestly contrary to United States public policy.

Section 1506 provides that "[n]othing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506; *see Jaffe*, 737 F.3d at 29 ("[Section] 1506 is an additional, more general protection of U.S. interests that may be evaluated apart from the particularized analysis of [Section] 1522(a)."). This "public policy exception" applies where "the

procedures used in the foreign proceeding [do not] meet our fundamental standards of fairness." *Vitro*, 701 F.3d at 1069 (cleaned up); *see also In re ABC Learning Centres Ltd.*, 728 F.3d 301, 309 (3rd Cir. 2013) (concluding that Section 1506 "applies where the procedural fairness of the foreign proceeding is in doubt") (cleaned up).

"Efficient, orderly and fair distribution are . . . some of the chief purposes of the bankruptcy laws." *In re ABC*, 728 F.3d at 310 (cleaned up); *see also Cunningham v. Brown*, 265 U.S. 1, 13 (1924) ("[E]quality is equity, and this is the spirit of the bankrupt law. Those who were successful in the race of diligence violated . . . its spirit."). For example, "[United States] policy [is] to provide an orderly liquidation procedure under which all creditors are treated equally" and it would "contravene" that policy to permit "creditors [to] race to the courthouse to collect from a troubled entity, depleting assets and enabling some creditors to collect fully on the debts and others not at all, and with no regard for priority," as the Redeeming Investors attempted to do in this case. *ABC*, 728 F.3d at 310 (cleaned up). While a receivership differs from a bankruptcy proceeding in many ways, a receivership's purpose in a Commission fraud case—to provide for "the benefit of investors"—is similar. 15 U.S.C. § 78u(d)(5). Therefore, applying Cayman law to allow the Redeeming Investors and Unpaid Subscribers to jump to

the head of the line while similarly situated investors receive substantially less

would be manifestly contrary to the public policy of the United States.[9]

## II. The district court acted within its discretion in evaluating the proposed distribution plan according to federal principles of equity rather than Cayman law.

### A. The district court properly looked to federal principles of equity.

Under Section 21(d)(5) of the Exchange Act, "[i]n any action . . . brought

. . . by the Commission under any provision of the securities laws, the Commission

may seek, and any Federal court may grant, any equitable relief that may be

appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). As

this Court has repeatedly recognized, following the appointment of a receiver in a

Commission fraud case, "[a] district court has broad powers and wide discretion to

determine relief." *SEC v. Quiros*, 966 F.3d 1195, 1199 (11th Cir. 2020) (cleaned

up); *see also SEC v. Torchia*, 922 F.3d 1307, 1316 (11th Cir. 2019) (same); *SEC v.

Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1343-44 (11th Cir. 2017) (same); *Elliott*,

953 F.2d at 1566 (same); *see also SEC v. Pension Fund of Am. L.C.*, 377 F. App'x

957, 962 (11th Cir. 2010) ("In approving a distribution plan following

disgorgement in an SEC enforcement action, it remains in the district court's

---

[9] While the district court did not explicitly cite Section 1506, it cited the "hamper[ing] of domestic public policy" in refusing to apply Cayman law. Doc. 284 at 18.

discretion to determine how and to whom the money will be distributed[.]")
(cleaned up).

When a receiver is appointed in a Commission fraud case, "[t]he goal of
[the] receivership[] is to grant fair relief to as many investors as possible."
*Torchia*, 922 F.3d at 1311; *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 332–33 (7th
Cir. 2010) ("In supervising an equitable receivership, the primary job of the district
court is to ensure that the proposed plan of distribution is fair and reasonable.");
*see also Broadbent v. Advantage Software, Inc.*, 415 F. App'x 73, 79 (10th Cir.
2011) ("[T]he district court is authorized and expected to determine claims in an
equity receivership based on equitable, rather than formalistic, principles.");
*United States v. Vanguard Inv. Co.*, 6 F.3d 222, 227 (4th Cir. 1993) (holding that
"a district court in its discretionary supervision of an equitable receivership may
deny remedies like rescission and restitution where the equities of the situation
suggest such a denial would be appropriate").

Fairness is undermined if certain investors are permitted to "benefit from
[their] fortuity," *Elliott*, 953 F.2d at 1570, or their "success[] in the race of
diligence," *Cunningham*, 265 U.S. at 13. For example, in *Wealth Management*, the
Seventh Circuit recognized that in the context of a receivership in a Commission
fraud case, "[e]quitable subordination promotes fairness by preventing a redeeming
investor from jumping to the head of the line and recouping 100 percent of his

investment by claiming creditor status while similarly situated nonredeeming investors receive substantially less." 628 F.3d at 334. The Seventh Circuit concluded that the district court properly "considered the claims of investors who attempted to redeem their equity and determined that the substance of those claims was identical to the claims of nonredeeming equity shareholders" and that "[b]y subordinating the [redeeming investors'] claims and effectuating a pro rata distribution of assets, the district court avoided the inequity of giving some investors preference even though all investors' claims were substantively the same." *Id.*

"[W]here investors' assets are commingled and the recoverable assets in a receivership are insufficient to fully repay the investors, equality is equity. Distribution of assets on a pro rata basis ensures that investors with substantively similar claims to repayment receive proportionately equal distributions. Courts have routinely endorsed pro rata distribution plans as an equitable way to distribute assets held in receivership in this situation." *Id*. at 333 (cleaned up); *see also SEC v. Quan,* 870 F.3d 754, 761-63 (8th Cir. 2017) (approving the district court's pro rata distribution despite contractual liquidation preferences and noting that "[a]ppellants cite no case law requiring a district court to favor one class of investors over another in an equity receivership compensating fraud victims"); *Quilling v. Trade Partners, Inc.*, 572 F.3d 293, 301 (6th Cir. 2009) ("The district

court's approach of pooling the receivership assets and distributing them on a pro rata basis is well-supported, particularly where, as here, [the appellant challenging the distribution plan] was similarly situated to other . . . claimants in his relationship to the defrauders.").

## B. The district court properly exercised its discretion in refusing to apply Cayman law.

Whether to grant comity is within a district court's discretion. *See, e.g.*, *Seguros Del Estado, S.A. v. Sci. Games, Inc.*, 262 F.3d 1164, 1169 (11th Cir. 2001). In deciding whether to grant comity, a court considers "the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *Vitro*, 701 F.3d at 1053 (cleaned up).

After carefully considering the JOLs' objection (*see supra* at 10-14), the district court reasonably concluded that application of Cayman law would "elevate a small group of investors . . . , giving them preference over investors who would otherwise occupy the same legal position and receive equal treatment," and "leave most investors in a far worse position" than that dictated by federal principles of equity. Doc. 284 at 17 (cleaned up). Cayman law would thus produce a result that "disregards equity's lodestar—equality" and "undercuts the principal goal of equity receiverships, which is to grant fair relief to as many investors as possible." *Id.* (cleaned up). In short, application of Cayman law would produce a result that

is not only "harsh" but also "wildly unequal and unfair" and "not comparable to anything required by federal principles of equity." *Id.* at 17, 19, 25 (cleaned up). The district court thus reasonably "exercise[d] its discretion to reject the JOLs' arguments [and] evaluate[d] the [p]roposed [d]istribution [p]lan according to federal principles of equity." *Id.* at 25-26.

### C. The JOLs' arguments that the district court abused its discretion in choosing to apply federal principles of equity instead of Cayman law are without merit.

The JOLs argue that even if the district court had discretion to choose between Cayman law and federal principles of equity, it abused its discretion in selecting federal principles of equity. Br. 43-49. Their arguments are without merit.

### 1. The district court properly considered the effect on United States investors of applying Cayman law.

The JOLs argue that the district court should not have "considered the effect on U.S. investors if Cayman Islands insolvency law were applied to their distributions instead of U.S. law" because "having voluntarily contracted with the [f]eeder [f]unds known and disclosed to them to be Cayman Islands entities, all of the investors subjected themselves to the laws of the Cayman Islands." Br. 44-45. But, as the district court observed (Doc. 284 at 17-18), the Supreme Court has instructed that the application of foreign law is particularly inappropriate when it would cause undue injury to U.S. citizens, supporting the district court's decision

to consider the effect on U.S. investors here. *Hilton v. Guyot*, 159 U.S. 113, 164 (1895) ("[N]o nation will suffer the laws of another to interfere with her own to the injury of her citizens."); *see also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) ("[F]rom the earliest times, authorities have recognized that the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act."). Moreover, the JOLs provide no support for their assertion that investors' supposed submission to Cayman law compels the district court to apply Cayman law in considering the Receiver's proposed distribution plan. The JOLs cite *Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527 (1883), but that case addressed neither a receivership nor circumstances in which the application of foreign law would impose a particular injury to U.S. citizens.

### 2. The district court considered relevant factors and case law in deciding whether to apply Cayman law.

The JOLs argue that the district court failed to "balance the interests of the Cayman Islands and mutual interests of the family of nations in just and efficiently functioning rules of international law against those of the United States." Br. 45 (cleaned up). Not so. Indeed, the court explicitly recognized these considerations, in addition to recognizing comity as a "principal objective." Doc. 284 at 16. The court concluded, however, that these considerations were outweighed by the undisputed harm that application of Cayman law would do to the vast majority of

33

the net loser investors.  That the JOLs wish that the court had concluded otherwise does not demonstrate an abuse of discretion.

The JOLs also argue that "the District Court gave no consideration to the fact that U.S. courts treat foreign insolvency proceedings as a discrete category for which comity is particularly appropriate."  Br. 48 (cleaned up).  But the district court's comity analysis addressed both Chapter 15 and cases involving foreign insolvency proceedings, correctly concluding that comity did not require the application of Cayman law here.  *See* Doc. 284 at 15-19 (citing, *inter alia*, Chapter 15, *In re Vitro S.A.B. de CV*, 701 F.3d 1031 (5th Cir. 2012), and *In re Servicos de Petroleo Constellation S.A.*, 613 B.R. 497 (Bankr. S.D.N.Y. 2020)).

The JOLs also argue that the district court "ignored" *Gebhard*, which "set[] the foundational principle that U.S. courts give effect to foreign insolvency laws arising from a foreign insolvency proceeding of a foreign company—even to the detriment of U.S. citizens—so long as it was reasonable for the U.S. citizens to expect the application of foreign insolvency law and such law does not discriminate between its citizens and those of the U.S. or other nations."  Br. 8-9, 20 (emphasis omitted).  But, as the district court recognized (Doc. 284 at 15, 17-18) and the JOLs acknowledge (Br. 17 n.23), the Supreme Court explained after *Gebhard* that comity is not "a matter of absolute obligation" and that recognition of a foreign nation's laws must provide "due regard . . . to the rights of [domestic]

citizens." *Hilton*, 159 U.S. at 163-64. Thus the instances identified by the JOLs in which "U.S. courts have . . . given effect to foreign insolvency law" (Br. 20) do not demonstrate that the district court was *required* to do so here. Indeed, the JOLs do not claim that "*Gebhard* and its many progeny" (*id.* at 22) require the district court to apply Cayman law. Rather, the JOLs claim that such a requirement is created by Chapter 15. But that is incorrect. *See supra* at 16-28.

Finally, the JOLs argue that "the District Court gave no consideration to . . . the eight factors routinely examined by U.S. courts in analyzing whether to grant comity to foreign insolvency proceedings." Br. 48. But the JOLs did not raise this argument below (*see* Docs. 240, 268) and thus cannot do so on appeal. *See Mills v. Singletary*, 63 F.3d 999, 1008 n.11 (11th Cir. 1995). Moreover, their brief on appeal does not analyze the factors (which it indicates were used "[p]rior to the enactment of Chapter 15"), much less explain why the district court was bound to apply them. *See* Br. 23, 48.

### 3. The district court did not defer to the Receiver in deciding whether to apply Cayman law.

The JOLs argue that the district court erred in "defer[ing] to the Receiver" in determining whether to apply Cayman law. Br. 48. But the court explicitly did not

defer.  *See* Doc. 284 at 15 n.11 ("[T]he Court independently concludes that Cayman law is inapposite.").

> **4.    The district court did not err in considering that the Cayman liquidation proceeding had been recognized as a nonmain proceeding.**

The JOLs argue that it was error for the district court to consider that it had recognized the Cayman liquidation proceeding as a nonmain, not a main, proceeding.  Br. 34-35.  But the district court did not decline to apply Cayman law simply because it had recognized the Cayman liquidation proceeding as a nonmain proceeding.  Indeed, the court observed that "there are cases in which courts award representatives involved in foreign nonmain proceedings similar – or even the same – relief as would be appropriate if they were operating in main proceedings." Doc. 284 at 18.  The court properly concluded, however, that "[in] this instance, . . . only strictly limited, conditional relief is warranted," relief that afforded the JOLs "ample opportunity to voice their concerns about the [p]roposed [d]istribution [p]lan."  *Id.* at 19 (cleaned up).  In any event, the recognition order provided, and the JOLs agreed, that "nothing contained in . . . the grant of foreign nonmain recognition as provided in this Order . . . shall in any way enlarge or improve the entitlement or argument for relief of either the JOLs or the Receiver in respect of the Court's consideration of any matter based on the grant of foreign nonmain recognition rather than foreign main recognition."  Doc. 8 at 10 (Case No. 21-cv-

21905). The JOLs claim that "by its plain terms the [r]ecognition [o]rder provides that recognition of the [Cayman liquidation proceeding] as a foreign nonmain proceeding has no bearing on comity or the application of Cayman Island insolvency law." Br. 34-35. But the recognition order does not preclude the district court from considering the recognition afforded the Cayman liquidation proceeding in deciding whether to grant the JOLs' request for relief.

**5.  The district court properly did not select a two-distribution plan.**

The JOLs argue that "the correct procedure for distribution in a master-feeder fund structure actually involves two distributions—the first from the master fund to the feeder fund, and the second from the feeder fund to the investors." Br. 49-53. But this argument incorrectly assumes the application of Cayman law, which the district court reasonably rejected.

As the district court recognized, if it "ordered parallel distributions – with the Feeder Fund Ltd. half governed by Cayman law and the Feeder Fund LP half governed by federal equity principles – 81 investors would take the entire Feeder Fund Ltd. half, leaving nothing for the other foreign investors and dramatically shrinking the pie for the domestic investors, who would have to split the other half. Under federal equity principles, by contrast, under the [proposed distribution plan], the [r]eceivership [a]ssets are split evenly among *all* similarly situated investors, regardless of nationality." Doc. 284 at 18 n.18. In other words, the

problem caused by the application of Cayman law persists in a dual distribution. *Id.* Moreover, the district court found (and the JOLs do not dispute) that there was a "commingling of funds" (*id*. at 27), which can render treatment of the feeder funds as separate entities inappropriate for receivership distribution purposes. *See, e.g. SEC v. Sunwest Mgmt., Inc.*, No. CIV. 09-6056-HO, 2009 WL 3245879, at *9 (D. Or. Oct. 2, 2009). Indeed, the JOLs do not dispute that a single distribution is consistent with federal principles of equity.

Instead, the JOLs identify instances in which courts approved dual distributions that applied Cayman law (*see* Br. 49-53), but those cases did not address circumstances in which a dual distribution scheme threatened the same violence to equity as the dual distribution scheme sought by the JOLs. For example, in *SEC v. Direct Lending Investments, LLC*, the distribution in the Cayman proceeding pursuant to Cayman law did not unfairly impair the recovery of other investors. No. 2:19-cv-02188, Doc. 337 at 20 (C.D. Cal. Dec. 14, 2020). So too in the other cases cited by the JOLs. *See* Br. 50. That the JOLs identify instances in which receivership distributions were made pursuant to Cayman law (*id.*) does not demonstrate that in this case the district court abused its discretion in approving a different distribution scheme. *See SEC v. Kaleta*, 530 Fed. App'x. 360, 362 (5th Cir. 2013) ("[R]eceivership cases are highly fact-specific.") (cleaned up). Indeed, the JOLs acknowledge that those cases do not address

instances in which a court determined that the application of Cayman law would produce a result entirely at odds with principles of equity. *See* Br. 50 ("the issue presented in this case is one of first impression").

## III. The district court's invocation of federal common law was not error.

The JOLs argue (Br. 38-43) that the district court erred in relying on federal principles of equity because "[i]n the absence of congressional authorization, common lawmaking must be necessary to protect uniquely federal interests." *Rodriguez v. FDIC*, 140 S. Ct. 713, 717 (2020) (cleaned up). In fact, the district court correctly concluded that it had congressional authorization and that, in any event, this case implicates established applications of federal common law.

### A. Congress authorized the district court to rely on federal principles of equity.

As discussed above (*see supra* at 28), under Section 21(d)(5) of the Exchange Act, in a Commission enforcement action "[a] Federal court may grant[] any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). The JOLs argue that "[t]he district court's invocation and reliance on section 78u(d)(5) was misplaced, as that statute does not authorize the court to engage in federal common-law making." Br. 40. Not so. "Equity receiverships are older than this country and were looked to in the aftermath of the 1929 financial crash, when Congress created the SEC to protect investors and financial markets. Drawing upon the explicit provisions of Article

III, . . . Congress conferred jurisdiction on the district courts over SEC enforcement actions, including both suits in equity and actions at law.  In so doing, it granted the SEC access to the courts' full powers, including use of the traditional equity receivership, to coordinate the interests in a troubled entity and to ensure that its assets are fairly distributed to investors." *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 895 (5th Cir. 2019) (cleaned up); *see also SEC v. Complete Bus. Sols. Grp., Inc.*, 44 F.4th 1326, 1334 (11th Cir. 2022) (citing Section 21(d)(5) and recognizing that "[a] district court ha[s] both statutory and residual equitable authority to establish [a] receivership").  The district court correctly found that "Section 78u empowers the Court to grant equitable relief in securities cases," including "the power to make full use of an equity receiver to return funds to investors."  Doc. 284 at 23.

The JOLs are left to argue that Section 21(d)(5) does not constitute express congressional authorization for the district court's application of federal principles of equity because "section 78u(d)(5) specifically and exclusively applies to actions brought *by the SEC* and relief sought *by the SEC*—not by a court-appointed receiver."  Br. 40.  But, even if such authorization were required despite Article III's grant of equitable power, Section 21(d)(5) "expressly allows courts to grant 'any equitable relief that may be appropriate or necessary' when it appears that a person is engaged in acts or practices violative of the securities laws."  *Complete*

*Bus. Sols.*, 44 F.4th at 1334 (quoting 15 U.S.C. § 78u(d)(5)).  Moreover, even if the JOLs were correct that such authorization covers only relief sought by the Commission, the Commission requested that the district court "appoint a receiver . . . so that a court-appointed fiduciary can begin to wind-up the . . . affairs" of the defendants and the relief defendants (Doc. 3 at 1) and authorize the receiver "to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all . . . [r]eceivership [p]roprerty" and "[t]o take such . . . action as may be approved by this Court" (Doc. 3-4 at 4, 15).  And the Commission later specifically "request[ed] that the Court overrule [the JOL's] objections to the Receiver's distribution plan."  Doc. 261 at 11.  Thus the district court had "express congressional authorization to devise a body of law directly," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 726 (2004), and to apply federal principles of equity.

## B. This case implicates established applications of federal common law.

The district court also found that its choice-of-law decision implicated an established application of federal common law because "[f]ederal common law has long applied to international disputes implicating our relations with foreign nations."  Doc. 284 at 22 (citing *Tex. Indus. v. Radcliff Materials*, 451 U.S. 630, 641 (1981)) (cleaned up).  The JOLs argue that this was in error because "in no way does this case implicate the foreign relations between the U.S. and the Cayman Islands as sovereign nations."  Br. 43.  But cross-border insolvency

undisputedly implicates "uniquely federal interests." *Rodriguez*, 140 S. Ct. at 717 (cleaned up). Indeed, one need look no further than the JOLs' brief, which cites a Cayman court opinion discussing Cayman-U.S. relations with regard to cross-border insolvency. Br. 52 n.44. And, in any event, "surely . . . an SEC receivership proceeding . . . is an instance of the post-*Erie* survival of a federal common law (in this case, equity)." *Bryan v. Bartlett*, 435 F.2d 28, 32 (8th Cir. 1970) (cleaned up).

## CONCLUSION

The Distribution Plan Order should be affirmed.

Respectfully submitted,

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

MORGAN BRADYLYONS
*Bankruptcy Counsel*

*/s/ Ezekiel L. Hill*
EZEKIEL L. HILL
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.7724 (Hill)
hillez@sec.gov

May 10, 2023

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,859 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally-spaced, Roman-style, 14-point typeface.

*/s/ Ezekiel L. Hill*
Ezekiel L. Hill

Dated: May 10, 2023

## **CERTIFICATE OF SERVICE**

I certify that on May 10, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit through the Court's CM/ECF system. Service on counsel of record will be accomplished through the Court's CM/ECF system.

*/s/ Ezekiel L. Hill*
Ezekiel L. Hill

Dated: May 10, 2023