# In the United States Court of Appeals for the Eleventh Circuit

United States Securities and Exchange Commission and
Jonathan E. Perlman, Court-Appointed Receiver,
*Plaintiff and Appellees*,

v.

Eleanor Fisher and Tammy Wu, in their capacities as Foreign Representatives of
Relief Defendant, TCA Global Credit Fund, Ltd.,
*Petitioners/Appellants*

Appeal from the United States District Court for the
Southern District of Florida
No. 20-21964-Altonaga/Goodman

## APPELLEE JONATHAN E. PERLMAN'S RESPONSE TO APPELLANTS' INITIAL MERITS BRIEFING

Gregory Garno, Esq. (FBN 87505)
W. Barry Blum, Esq. (FBN 379301)
Thaddeus R. Kleckley (NYBN 5346945)
Venable LLP
100 S.E. Second Street, 44th Floor
Miami, Florida 33131
Tel.: (305) 349-2300
Fax: (305) 349-2310

*Counsel for Appellee Jonathan E. Perlman, Court-Appointed Receiver*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Eleventh Circuit Rule 26.1-1, Appellee, Jonathan E. Perlman, as Receiver (the "Receiver"), submits the following list of all persons and entities known to the Receiver to have an interest in the outcome of this appeal:

1.   Altonaga, Hon. Cecilia M., United States District Judge (S.D. Fla)

2.   Avila, Rodriguez, Hernandez, Mena & Ferri, Attorneys for Respondent, Ocean Bank

3.   AW Exports Pty Ltd, Claimant

4.   Baker & McKenzie LLP, Attorneys for Appellants

5.   Banque Pictet & CIE S.A., Petitioner in Cayman Islands Liquidation Proceeding

6.   Bast Amron LLP, Attorneys for Armand Zohari, Tritium Fund,Hsueh-Feng Tseng, and Fide Funds Growth

7.   Bast, Jeffrey P., Esq., Attorney for Armand Zohari, Tritium Fund, Hsueh-Feng Tseng, and Fide Funds Growth

8.   Battista, Paul J., Esq., Attorney for Appellee Jonathan E. Perlman, Receiver

9.   Benjamin, Todd, Claimant

10.  Berger, Evan B., Counsel for claimants David Manning, Paycation Travel, Inc., and Xstream Travel, Inc.

11.  Berger & Poliakoff, P.A., Counsel for Claimants David Manning, Paycation Travel, Inc., and Xstream Travel, Inc.

12.  Berkovitz, Dan M., Counsel for Appellee Securities and Exchange Commission

13. Bloom, Mark D., Esq., Attorney for Appellants

14. Blum, W. Barry, Esq., Attorney for Appellee Jonathan E. Perlman, Receiver

15. Bradylyons, Morgan, Counsel for Appellee Securities and Exchange Commission

16. Broxom, Warwick, Claimant

17. Caesarea Medical Electronics Holding (2000) Ltd., Claimant

18. Cahill Gordon & Reindel LLP, Attorneys for Credit Suisse Claritas, LLC, Cayman Islands Counsel for Appellants Clearstream Banking S.A., Limited Objector

19. Clearstream Banking S.A., Objector

20. Claritas, LLC, Counsel for Appellants

21. Conley, Michael A., Counsel for Appellee Securities and Exchange Commission

22. Credit Suisse, Limited Objector

23. Cuccia II, Richard A., Esq., Attorney for Paycation Travel, Inc., Xstream Travel, Inc., and David Manning

24. Cuccia Wilson, PLLC, Attorneys for Paycation Travel, Inc., Xstream Travel, Inc., and David Manning

25. Dodd, John R., Esq., Attorney for Appellants

26. Dorchak, Joshua, Esq., Attorney for Clearstream Banking S.A. EY Cayman Ltd.

27. EY Cayman Ltd.

28. Fide Funds Growth

29. Fisher, Eleanor, Foreign Representative of Relief Defendant TCA Global Credit Fund, Ltd.

30. Friedman, Michael A., Esq., Counsel for Appellee Jonathan E. Perlman

31. Fu, Tammy, Foreign Representative of Relief Defendant TCA Global Credit Fund, Ltd.

32. Fulton, Andrew, IV, Esq., Attorney for Lease Corporation of America

33. Garno, Gregory M., Esq., Attorney for Appellee Jonathan E. Perlman, Receiver

34. Venable LLP, Attorneys for Appellee Jonathan E. Perlman, Receiver

35. Genovese, John H., Esq., Attorney for Appellee Jonathan E. Perlman, Receiver

36. Hall, Jason, Esq. Attorney for Credit Suisse

37. Halsey, Brett M., Esq., Counsel for Appellee Jonathan E. Perlman

38. Harmon, Heather L., Esq., Counsel for Appellee Jonathan E. Perlman

39. Hill, Ezekiel L., Esq., Counsel for Appellee Securities and Exchange Commission

40. Jacobs, Eric D., Esq,, Counsel for Appellee Jonathan E. Perlman

41. Kaplan Saunders Valente & Beninati, LLP, Attorneys for AW Exports Pty Ltd, Warwick Broxom, and Jonathan James Kaufman

42. Kaufman, Jonathan James, Claimant

43. Kellogg, Jason Kenneth, Esq., Attorney for Todd Benjamin International, Ltd. and Todd Benjamin

44. Kelley & Fulton, P.A., Attorneys for Claimant, Lease Corporation of America Lease Corporation of America, Claimant

45. Kleckley, Thaddeus R., Esq., Counsel for Appellee Jonathan E. Perlman

46. Leggett, Jaime B., Esq., Attorney for Armand Zohari, Tritium Fund, Hsueh-Feng Tseng, and Fide Funds Growth

47. Levine Kellogg Lehman Schneider & Grossman, Counsel for Todd Benjamin International, Ltd. and Todd Benjamin

48. Manning, David, Claimant

49. McIntosh, Elizabeth G., Esq., Attorney for Appellee Jonathan E. Perlman, Receiver

50. Moot, Stephanie N., Esq., Attorney for Securities and Exchange Commission

51. Mora, Martha Rose, Esq., Attorney for Respondent, Ocean Bank

52. Morgan, Lewis & Bockius LLP, Attorneys for Clearstream Banking S.A.

53. Ocean Bank, Non-Party Respondent

54. Paycation Travel, Inc., Claimant

55. Pearson, Katharine Lucy Bladen, Esq., Cayman Islands Attorney for Appellants

56. Perlman, Jonathan, E., Receiver, Appellee

57. Roldan Cora, Javier A., Esq., Attorney for Clearstream Banking S.A.

58. TCA Fund Management Group Corp., Defendant, Receivership Entity

59. TCA Global Credit Fund GP, Ltd., Defendant, Receivership Entity

60. TCA Global Credit Fund, L.P., Relief Defendant, Receivership Entity

61. TCA Global Credit Fund, Ltd., Relief Defendant, Receivership Entity

62. TCA Global Credit Master Fund, L.P., Relief Defendant, Receivership Entity

63. TCA Global Lending Corp., Receivership Entity

64. Todd Benjamin International, Ltd., Claimant

65. Tritium Fund, Claimant

66. Tseng, Hsueh-Feng, Claimant

67. Todd Benjamin International, Ltd., Claimant

68. United States Securities and Exchange Commission, Plaintiff

69. Valente, Charles A., Esq., Attorney for AW Exports Pty Ltd, Warwick Broxom, and Jonathan James Kaufman

70. van de Linde, Peter, Claimant

71. Xstream Travel, Inc., Claimant

72. Zohari, Armand, Claimant

This Certificate of Interested Persons does not include all persons and entities who may be claimants or trade creditors in the receivership proceeding.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rule 26.1-3(b), the Receiver certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...............................................ix

JURISDICTIONAL STATEMENT ......................................................................ix

STATEMENT OF THE ISSUE.............................................................................x

STATEMENT OF THE CASE AND FACTS .........................................................1

    I.     SEC's Complaint Against the Receivership Entities ...........................1

    II.    The Southern District of Florida Appoints the Receiver of the
          Receivership Entities' Assets .............................................................3

    III.   The JOLs are Appointed Liquidators in the Cayman Islands of
          Receivership Entity Feeder Fund Ltd After the District Court
          Took Exclusive Jurisdiction Over Receivership Entity Assets.............3

    IV.   The Receiver's Distribution Plan ........................................................5

    V.    The JOLs Objection to the Distribution Plan and Arguments
          Below.................................................................................................6

    VI.   The Trial Court Overrules the JOLs Objection and Approves
          the Receiver's Distribution Plan as "Fair and Reasonable".................8

    VII.  The JOLs Fail to File a Timely Notice of Appeal of the
          August 4 Order .................................................................................8

STANDARD OF REVIEW ...............................................................................10

SUMMARY OF THE ARGUMENT ..................................................................11

ARGUMENT ...................................................................................................13

    I.     The JOLs' Principal Argument Based on "Mandatory Comity"
          Under  11 U.S.C. §1509(b)(3) Was Not Raised Below and
          Cannot be Considered .....................................................................13

    II.    The JOLs Interpretation of §1509(b)(3) is Inconsistent with the
          Express Language of 1509(b), the Structure of Chapter 15,
          and the Express Language of Several Other Provisions in
          Chapter 15 ......................................................................................16

          A.    Section 1509(b)(3) Provides Only For a Foreign
                Representative's Access to U.S. Courts, Not a Right to
                 Obtain Relief In Derogation of U.S. Law.................................17

i

B.     The JOLs Ignore an Entire Line of Cases Applying U.S. Law to a Foreign Representative's Claims After Recognition of a Foreign Proceeding ........................................23

C.     The JOLs Argument That §1509(b)(3) Mandates the Application of Foreign Law to Afford Relief Inimical to U.S. Law and Public Policy Impermissibly Renders Much of Chapter 15 Meaningless................................24

III.     The District Court Did Not Abuse Its Discretion in Applying U.S. Law to Approve the Receiver's Distribution Plan Over the JOLs' Objection................................................29

A.     The District Court's Decision Not to Apply Cayman Law as a Matter of International Comity Was Not an Abuse of Discretion ................................................29

B.     The District Court's Determination That the Receiver's Distribution Plan was Fair and Reasonable was not An Abuse of Discretion ................................................33

C.     The District Court's Decision Not to Apply Cayman Law to Sanction the JOLs' Statutory Distribution Scheme Was Not an Abuse of Discretion ................................................35

D.     Comity Did Not Compel Application of Cayman Substantive Law Where Judge Altonaga Granted the JOLs a "Limited" Right to "Participate in the Proceedings" .............38

E.     Application of Comity Here Would Violate American Laws and Harm American Citizens ........................40

IV.     The Cases Relied Upon by the JOLs to Support International Comity are Distinguishable or Inapplicable to the Facts of this Case................................................41

V.     The Powers of a District Court in a Federal Equity Receivership Do Not Come from General Common Law, All Decisions Made Therein Are Not "Common Lawmaking"................................46

A.     Courts in America Can Impose Equitable Remedies Using Powers that Predate the Country's Founding................46

B.     The Power of the District Court Exercised Here Was Not Common Rulemaking, but an Appropriate Use of Discretion................................................48

VI.     Conclusion................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atherton v. FDIC*,
   519 U.S. 213 (1997)...........................................................................48

*In re Atlas Shipping A/S*,
   404 B.R. 726 (Bankr. S.D.N.Y. 2009)..................................22, 23, 24

*Banque de Financement, S.A. v. First Nat'l Bank*,
   568 F.2d 911 (2d Cir. 1977) ...........................................................31

*In re Bear Stearns High-Grade Structured Credit Strategies Master
   Fund, Ltd.*,
   389 B.R. 325 (S.D.N.Y. 2008) .................................................21, 29

*Belize Telecom, Ltd. v. Gov't of Belize*,
   528 F.3d 1298 (11th Cir. 2008) ......................................................10

*Bendall v. Lancer Mgmt. Grp., LLC*,
   523 F. App'x 554 (11th Cir. 2013) ............................................10, 33

*In re Bernard L. Madoff Inv. Sec. LLC*,
   654 F.3d 229 (2d Cir. 2011) ...........................................................36

*In re Black Gold S.A.R.L.*,
   635 B.R. 517 (B.A.P. 9th Cir. 2022) ...............................................18

*In re Board of Directors of Telecom Argentina, S.A.*,
   528 F.3d 162 (2d Cir. 2008) .....................................................45, 46

*Broadbent v. Advantage Software, Inc.*,
   415 F. App'x 73 (10th Cir. 2011)....................................................33

*Canada Southern Railway Co. v. Gebhard*,
   109 U.S. 527 (1883)...............................................................42, 43

*CFTC v. Walsh*,
   712 F.3d 735 (2d Cir. 2013) ...........................................................34

*Corley v. United States*,
   556 U.S. 303 (2009)........................................................................25

*Cox Enters., Inc. v. Pension Ben. Guar. Corp.*,
   666 F.3d 697 (11th Cir. 2012) ...............................................10, 33

*In re Cozumel Caribe, S.A. de C.V.*,
   482 B.R. 96 (Bankr. S.D.N.Y. 2012).......................................*passim*

*Cunard S.S. Co. v. Salen Reefer Serv. AB*,
   773 F.2d 452 (2d Cir. 1985) .............................................................30

*Cunningham v. Brown*,
   265 U.S. 1 (1924)...............................................................11, 34, 37

*EGI-VSR, LLC v. Coderch*,
   963 F.3d 1112 (11th Cir. 2020) .......................................................40

*In re Egidi*,
   571 F.3d 1156 (11th Cir. 2009) .......................................................15

*In re Elpida Memory, Inc.*,
   2012 WL 6090194 (Bankr. D. Del. Nov. 20, 2012) .........18, 24, 25, 26

*EMA Garp Fund, L.P. v. Banro Corp.*,
   783 F. App'x 82 (2d Cir. 2019) .......................................................45

*Flanigan's Enters. of Ga., Inc. v. City of Sandy Springs*,
   703 F. App'x 929 (11th Cir. 2017)....................................................13

*GDG Acquisitions, LLC v. Gov't of Belize*,
   749 F.3d 1024 (11th Cir. 2014) ........................................10, 29, 30

*Goodyear v. Brown*,
   26 A. 665 (Pa. 1893)........................................................................40

*Grupo Mexicano De Desarrollo v. All. Bond Fund*,
   527 U.S. 308 (1999)..........................................................................48

*Hilton v. Guyot*,
   159 U.S. 113 (1895)......................................................................*passim*

iv

*Huff v. DeKalb County*,
516 F.3d 1273 (11th Cir. 2008) ..........................................................25

*In re Int'l Banking Corp. B.S.C.*,
439 B.R. 614 (Bankr. S.D.N.Y. 2010)................................................24

*Irving v. Mazda Motor Corp.*,
136 F.3d 764 (11th Cir. 1998) ......................................................13, 15

*Jaffee v. Samsung Electronic Co.*,
737 F. 3d 14 (4th Cir. 2013) ..............................................................23

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
731 F.2d 909 (D.C. Cir. 1984)............................................................30

*Leader Glob. Sols. LLC v. Yankelewitz*,
762 F. App'x 629 (11th Cir. 2019) ................................................10, 30

*Leadville Coal Co. v. McCreery*,
141 U.S. 475 (1891)............................................................................47

*Link v. Powell*,
57 F.2d 591 (W.D.S.C. 1932) ............................................................47

*Liu v. SEC*,
140 S. Ct. 1936 (2020)..................................................................31, 32

*Loucks v. Standard Oil Co.*,
224 N.Y. 99 (1918) (Cardozo, J.) ......................................................40

*Macon & W. R.R. Co. v. Parker*,
9 Ga. 377 (Ga. 1851) .........................................................................46

*Mast, Foos & Co. v. Stover Mfg. Co.*,
177 U.S. 485 (1900)............................................................................29

*Mohamed v. Uber Techs., Inc.*,
848 F.3d 1201 (9th Cir. 2016) ...........................................................15

*In re OneTRADEx, Ltd.*,
645 B.R. 184 (Bankr. S.D.N.Y. 2022)................................................38

*In re Osterman*,
296 F. App'x 900 (11th Cir. 2008) ....................................................................15

*Overseas Inns S.A. P.A. v. United States*,
911 F.2d 1146 (5th Cir. 1990) ...........................................................................30

*Perkins v. Haines*,
661 F.3d 623 (11th Cir. 2011) ............................................................................37

*Reider v. Philip Morris USA, Inc.*,
793 F.3d 1254 (11th Cir. 2015) ...........................................................13, 14, 15

*Rodriguez v. FDIC*,
140 S. Ct. 713 (2020).....................................................................................48, 49

*SEC v. Alleca*,
2017 WL 5494434 (N.D. Ga. Nov. 16, 2017) ..................................................34

*SEC v. Carriba Air, Inc.*,
681 F.2d 1318 (11th Cir. 1982) .....................................................................31, 49

*SEC v. Elliott*,
953 F.2d 1560 (11th Cir. 1992) ......................................................10, 33, 34, 36

*SEC v. Quan*,
2015 WL 8328050 (D. Minn. Dec. 8, 2015) ....................................................34

*SEC v. Quan*,
870 F.3d 754 (8th Cir. 2017) .............................................................................34

*SEC v. Wealth Mgmt.*,
628 F.3d at 332–33 ...............................................................................33, 34, 41

*SEC v. Wencke*,
622 F.2d 1363 (9th Cir. 1980) .....................................................................32, 49

*Showan v. Pressdee*,
922 F.3d 1211 (11th Cir. 2019) .........................................................................22

*In re Sivec SRL*,
476 B.R. 310 (Bankr. E.D. Okla. 2012) ......................................................18, 23

*Somportex v. Phila. Chewing Gum*,
 453 F.2d 435 (3d Cir. 1971) ............................................................. 40

*In re Treco*,
 240 F.3d 148 (2d Cir. 2001) .......................................................... 24, 48

*TRW Inc. v. Andrews*,
 534 U.S. 19 (2001) ............................................................................ 26

*U.S. v. Wilson*,
 659 F.3d 947 (9th Cir. 2011) ............................................................ 37

*United States v. Campbell*,
 26 F.4th 860 (11th Cir. 2022) ..................................................... 25, 27

*United States v. Garza-Mendez*,
 735 F.3d 1284 (11th Cir. 2013) ........................................................ 30

*United States v. Gillock*,
 445 U.S. 360 (1980) ..................................................................... 31, 32

*Vestis, LLC v. Caramel Sales, Ltd.*,
 2019 WL 11542354 (C.D. Cal. Nov. 5, 2019) .................................. 48

*Victrix Steamship Co., S.A. v. Salen Dry Cargo A.B.*,
 825 F.2d 709 (2d Cir. 1987) ............................................................. 44

*In re Vitro S.A.B. de CV*,
 701 F.3d 1031 (5th Cir. 2012) ................................................... *passim*

*Zacarias v. Stanford Int'l Bank, Ltd.*,
 945 F.3d 883 (5th Cir. 2019) ............................................................ 46

**Statutes**

11 U.S.C. §304 ................................................................................. 45

11 U.S.C. §§ 1501 ....................................................... 17, 18, 28, 34

11 U.S.C. §§ 1501(a)(3) .............................................................. 17, 34

11 U.S.C. §1507 ......................................................... 22, 25, 27, 28

11 U.S.C. §1509(b) ................................................................... *passim*

11 U.S.C §1517 ......................................................................................*passim*

11 U.S.C. §1520 .............................................................................18, 20

11 U.S.C. §1521 ....................................................................................*passim*

11 U.S.C. §1522 ....................................................................................*passim*

15 U.S.C. §77a *et seq.* ...............................................................................31

15 U.S.C. §78a *et seq.* ...............................................................................31

**Other Authorities**

17 C.F.R § 240 ..............................................................................................1

17 C.F.R. §§ 275.206(4)-7, 275.206(4)-8 .................................................1

FED. R. APP. P. 4(a)(1)(B) ...........................................................................9

FED. R. APP. P. 32(a) ...............................................................................51

Fed. R. Civ. P. 17(b) ..............................................................................47

Fed. R. Civ. P. 66 .............................................................................12, 47

Fed. R. Civ. P. 83 ..............................................................................47

U.S. Constitution Article III.............................................................12, 46

**Lower Court Cases**

*SEC v. TCA Fund Management Group Corp. et al*, 20-cv-21964 (S.D. Fla.)

*In re TCA Global Credit Fund Ltd.*, 21-11513 (Bankr. S.D. Fla).

*In re TCA Global Credit Fund Ltd.*, 21-cv-21905 (S.D. Fla.)

## STATEMENT REGARDING ORAL ARGUMENT

Under Fed. R. App. P. 34(a)(2) and 11th Cir. R. 28-1(c), Appellee Jonathan E. Perlman respectfully submits that oral argument is unnecessary to the just resolution of this appeal. As argued in his Motion to Dismiss this Appeal for Lack of Jurisdiction, Dkt. 21, Appellants failed to file a timely notice of appeal and this Court lacks jurisdiction to hear the appeal. Moreover, if the Court were to reach the merits, this appeal presents a general challenge to long-upheld tenets and standards underpinning equity receiverships in statutorily authorized actions brought by the SEC supported by Supreme Court and Eleventh Circuit precedent. Oral argument is unnecessary.

## JURISDICTIONAL STATEMENT

Had Appellants filed a notice of appeal from the district court's August 4, 2022 Order within sixty days, by October 3, 2022, this Court would have had jurisdiction to hear that appeal under 28 U.S.C. § 1291 and the collateral order doctrine. *See SEC v. Torchia*, 922 F.3d 1307, 1315-16 (11th Cir. 2019); FED. R. APP. P. 4(a)(1)(B). Appellants, however, did not file their notice of appeal until October 12, 2022. Because Appellants failed to file a timely notice of appeal, this Court lacks jurisdiction to hear this appeal.[1]

---

[1] Appellee submitted his Motion to Dismiss this Appeal for Lack of Jurisdiction, Dkt. 21, which this Court carried with the case. Dkt. 36.

# STATEMENT OF THE ISSUE

Whether the District Court, in a securities fraud action under federal law brought by the SEC, abused its discretion, when it approved the Receiver's pro rata rising tide distribution plan over the objection of foreign fiduciaries, with limited recognition under Chapter 15, who sought to apply the law of the Cayman Islands, which would itself violate sovereign American laws and public policies including treating similarly situated investors differently and the creation of approximately $26 million of dollars in fraudulent transfers.

# STATEMENT OF THE CASE AND FACTS

## I.  SEC's Complaint Against the Receivership Entities

The United States Securities and Exchange Commission ("SEC"), on May 11, 2020, initiated in the Southern District of Florida a civil law enforcement action against Defendants TCA Fund Management Group Corp. ("FMGC") and TCA Global Credit Fund GP, Ltd. and designated as relief defendants TCA Global Credit Fund, LP ("Feeder Fund LP"), TCA Global Credit Fund, Ltd. ("Feeder Fund Ltd"), and TCA Global Credit Master Fund, LP ("Master Fund") (collectively, "TCA" or "Receivership Entities").[2]  Doc. 1.[3]  The SEC's Complaint alleged that, between 2010 and at least November 2019, FMGC, a Florida corporation located in Aventura, Florida, engaged in fraudulent revenue recognition practices that artificially inflated the revenues and net asset values of Master Fund, Feeder Fund LP, and Feeder Fund Ltd. (collectively, the "Funds").[4]  *Id.* ¶¶3-5.  The misconduct resulted in the Funds

---

[2] The term "Receivership Entities" also includes a non-defendant TCA Global Lending Corp. ("Lending Corp."), a Nevada corporation formed as a "tax blocker" for Feeder Fund Ltd investors.  Doc. 208 at 6.

[3] The documents of record are included within Appellants' Appendix (Dkt. 35-1 to 35-6).  The Appendix includes an index to page numbers but the documents contained in the index are not consecutively paginated.  The Receiver thus is unable to pincite to any specific pages of the Appendix.

[4] The Complaint alleged Defendants violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Exchange Act Rules 10b-5, 17 C.F.R § 240.10b-5, and FMGC violated Sections 206(1), (2), and (4), and 207 of the Investment Advisers Act of

reporting to investors profits—and ever-increasing net asset values—enabling Defendants to raise over $500 million from investors. *Id*. ¶¶6-7. When TCA collapsed in 2020, American and foreign investors sustained losses of more than $300 million. Doc. 208 at 24.

TCA was controlled by FMGC, headquartered in Florida with offices in New York, Las Vegas, London, and Australia. Doc. 1 ¶10; Doc. 208 at 4. All Receivership Entities were managed and operated out of Florida and other U.S.-based offices. *See* Doc. 48 at 6-8, 15, 17. Personnel in Orlando, Florida handled all accounting and fund administration activity, including NAV calculations and communications, via Circle Investment Support Services (USA) LLC, a Florida LLC. *See* Doc. 48 at 22, 25; Doc. 241-2 at 68, 93.

Moreover, as an "exempted company" under Part VII, §§ 163 and 174 of the Cayman Islands Companies Law (2020 Rev.), Feeder Fund Ltd was prohibited from "engag[ing] in business inside the Cayman Islands with citizens or residents, except to obtain internet, water, electricity, and other necessary services to run an office location." Accordingly, as disclosed to investors, Doc. 241-2 at 70, 79-80, 93-94, Feeder Fund Ltd always intended to carry out operations, management, administration, and economic activity in the U.S. Moreover, Feeder Fund Ltd did

---

1940, 15 U.S.C. §§ 80b-6(1), 80(b)-6(4), and 80b-7, and Advisers Act Rules 206(4)-7 and 206(4)-8, 17 C.F.R. §§ 275.206(4)-7, 275.206(4)-8. Doc. 1 ¶9.

not invest or hold shares in Master Fund. Instead, Feeder Fund Ltd's assets were "limited to only owning stock . . . and debt securities of" the Nevada corporation Lending Corp. *See* Doc. 48 at 8; Doc. 241-2 at 79, 148.

## II. The Southern District of Florida Appoints the Receiver of the Receivership Entities' Assets

The SEC's Complaint sought civil penalties, temporary and permanent injunctive relief, disgorgement, and the appointment of a receiver. Docs. 1, 3. The Defendants consented to the appointment of a receiver; and, on May 11, 2020, Judge Cecilia M. Altonaga granted the SEC's motion and appointed Jonathan E. Perlman, Esq., as Receiver. Doc. 5. In this order, the district court took "exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the Receivership Entities." *Id*. at 2. The court separately appointed the Receiver to serve as receiver "for the estates of the Receivership Entities," and charged him to, among other things, "develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property." *Id*. ¶¶4-46.

## III. The JOLs are Appointed Liquidators in the Cayman Islands of Receivership Entity Feeder Fund Ltd After the District Court Took Exclusive Jurisdiction Over Receivership Entity Assets

Notwithstanding the court's May 11 Order, on May 13, 2020, a Cayman Court appointed Appellants as Joint Official Liquidators ("JOLs") over Feeder Fund Ltd, *see* Doc. 1 (21-21905) at 39-41, authorizing the JOLs to wind up Feeder Fund Ltd

under Cayman law. Nine months later, on February 16, 2021—after the Receiver had marshaled millions of dollars in Receivership Entity assets—the JOLs filed a Chapter 15 petition in U.S. bankruptcy court seeking recognition of the Cayman Islands proceeding as a "foreign proceeding." Doc. 7 (21-11513). Three months later, more than a year after the SEC filed its Complaint, the Receiver and JOLs in a stipulated motion agreed to the district court withdrawing the bankruptcy reference of the Chapter 15 petition and entering an order granting the JOLs limited rights to appear in the district court receivership action. *See* Doc. 8 (21-21905). The stipulated motion and "Agreed Recognition Order" entered June 4, 2021, recognized the Cayman proceeding as a "foreign nonmain proceeding" under 11 U.S.C. §1517(b)(2) and the JOLS as the "duly appointed foreign representatives of the Debtor" in the foreign nonmain proceeding. *Id.* at 5. The district court allowed the JOLs to "intervene" in the pending receivership action in a manner "consistent with the Agreed Recognition Order," and specifically stated that "[t]he relief granted here is specifically tailored to . . . avoid any interference with the rights, powers and duties granted to the Receiver under the Receivership Order with respect to assets and liabilities of the Debtor within the territorial jurisdiction of the United States." *Id.* at 2-4.

## IV. The Receiver's Distribution Plan

When the Receiver was appointed in May 2020, the Receivership Entities' condition was "grim," and they had only $287,683 in cash. Doc. 284 at 10. By February 2022, however, because of the Receiver's efforts in marshaling assets, liquidating non-cash assets, and filing and resolving litigation matters, the Receivership Entities had more than $67 million dollars in the bank. *Id*.

By early 2022, the Receiver identified 1,485 investors in the Receivership Entities that had invested $1.16 billion into the Funds. A total of 565 investors ("Net Winners") withdrew more money from the Receivership Entities than they invested. The remaining 920 investors ("Net Losers") invested more money ($675.6 million) than they withdrew ($296.2 million), for an aggregate loss of $379.4 million. *Id*. at 9. Of the 920 Net Losers, forty-eight investors ("Subordinated Net Losers") that invested through nominees failed to substantiate their claims because the nominees were "either unwilling or unable to provide 'complete information' about their customers, rendering it impossible to reconcile their reported transactions with the underlying investors." *Id*. at 9, 11 n.10. The Receiver classified the remaining 872 investors as "Unsubordinated Net Losers."

On February 28, 2022, the Receiver filed a Motion for Approval of Distribution Plan and First Interim Distribution (the "Distribution Plan"). Doc. 208. The Distribution Plan provides for an "Initial Distribution" of $55,452,651 on a *pro*

*rata* basis to 764 (out of a total of 872) Unsubordinated Net Losers that received less than 23.05% of their actual cash loss with 589 of these investors that received nothing receiving a distribution equal to 23.05% of their actual loss.  Thus, after the proposed Initial Distribution, <u>all</u> unsubordinated investors will have recovered <u>at least 23.05%</u> of their investments in the Receivership Entities.  Unsubordinated investors that were already paid back pre-Receivership more than 23.05% of their actual investment would not receive anything from the Initial Distribution; but they are eligible for future distributions.  Doc. 284 at 11-12.  Seven objections were filed to the Distribution Plan, including one by Appellants, who claim to represent approximately 100 investors.[5]

## V.     The JOLs Objection to the Distribution Plan and Arguments Below

In their Memorandum of Law in Opposition to Receiver's Motion for Approval of Distribution Plan an First Interim Distribution, and Request for Hearing [Doc. 240] ("Objection"), Appellants argued that Judge Altonaga should reject the Receiver's Distribution Plan and apply a proposed distribution scheme based on Cayman law that would:  (1) pay the JOLs millions of dollars to cover their own administrative expenses in full; (2) pay an unknown litigation funding entity;[6] (3)

---

[5]   Some of the investors represented by the JOLs will participate in the Initial Distribution.

[6] The JOLs acknowledged in lower court filings that they have secured a litigation funder to advance their legal fees.  Doc. 7 ¶ 50(e) (21-11513).

pay in full fifty investors who made redemption requests before TCA failed; (4) pay in full all unpaid subscribers regardless of whether those investments could be traced; and (5) pay in full 27 trade creditors. *See* Doc. 263 at 12-16.

Under Appellants' proposed Cayman law distribution scheme, approximately 640 investors—including every American investor in TCA—would receive nothing, while eighty-one investors would be paid in full, including fifty "redemption creditors" who would take $44,951,902, or 81% of the proposed Initial Distribution. Doc. 208 at Ex. E, Doc. 263 at 14. It would also result in creating net winners receiving $26 million in fictitious profits with very limited "claw back" relief available under Cayman law. Doc. 241 ¶39.

In its Objection, the JOLs raised "four arguments for deferring to Cayman statutes." Doc. 284 at 15. The JOLs first argued that "international comity" required the application of Cayman law and the Cayman statutory scheme to any distribution of Receivership entity assets. *Id.* at 15-19. The JOLs also argued the "internal affairs doctrine" required the Court to apply Cayman law. *Id.* at 19-21.[7] Third, the JOLs argued the Receiver improperly sought to apply "federal common law" in the absence of a "unique federal interest." *Id.* at 21-24. Finally, the JOLs argued that

---

[7] Appellants do not raise the "internal affairs doctrine" on this appeal.

applying federal equity principles "would upset foreign investors' contractual rights and reasonable expectations." *Id.* at 24-25.

## VI. The Trial Court Overrules the JOLs Objection and Approves the Receiver's Distribution Plan as "Fair and Reasonable"

After extensive briefing and oral argument, the district court, on August 4, 2022, issued a thorough 34-page opinion applying U.S. law and overruled the JOLs' Objection ("August 4 Order"). *Id.* The court fully considered the JOLs' arguments and, exercising its discretion, ruled that the JOLs Objection "[did] not persuade the Court to adopt Cayman law" and that "[a]pplying Cayman law would produce a harsh and unequal result without a proper basis." *Id.* at 25. The district court found that "foreign law [was] particularly inappropriate [because] it would cause undue injury to American citizens or hamper domestic public policy," and noted specifically that under Cayman law "a small number of foreign investors would siphon much of the Receivership Assets, leaving far less for the remaining Net Losers, the bulk of whom are based in the United States." *Id.* at 17-18. The court thereafter applied well-settled and binding Eleventh Circuit precedent as to federal equity receiverships and adopted the Receiver's Distribution Plan, finding it was "fair and reasonable" *Id.* at 34.

## VII. The JOLs Fail to File a Timely Notice of Appeal of the August 4 Order

Judge Altonaga, correctly anticipating the JOLs would appeal the August 4 Order, *sua sponte* stayed the August 4 Order until September 6, 2022, to allow for

the filing of an interlocutory appeal. *Id.* Because the SEC is a party to the action, the JOLs had sixty days—until October 3, 2022—to file a notice of appeal under FED. R. APP. P. 4(a)(1)(B). Appellants did not file a notice of appeal until October 12, nine days after the 60-day appeal deadline. Doc. 307. In the interim, the JOLs filed on September 1, 2022, an uncontested motion that sought only an extension of the stay pending appeal to "maintain the status quo . . . to pursue and perfect an interlocutory appeal." Doc. 298 ¶¶6-7. That motion did not request the district court to substantively alter or amend the August 4 Order. *Id.*; *see* Dkt. 21 at 9-17. Thus, the JOLs' deadline to appeal was October 3, 2022, and their notice of appeal filed on October 12, 2022, was untimely.

## STANDARD OF REVIEW

District courts have "broad powers and wide discretion to determine relief in an equity receivership. This discretion derives from the inherent powers of an equity court to fashion relief." *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992). Thus, a "district court's distribution of assets in a receivership is an equitable decision that [this Court] review[s] for abuse of discretion." *Cox Enters., Inc. v. Pension Ben. Guar. Corp.*, 666 F.3d 697, 701 (11th Cir. 2012); *see Bendall v. Lancer Mgmt. Grp., LLC*, 523 F. App'x 554, 557 (11th Cir. 2013) ("[A]ny action by a trial court in supervising an equity receivership is committed to his sound discretion and will not be disturbed unless there is a clear showing of abuse.") (citations omitted).

A district court's decision to grant or deny comity to apply foreign law is also reviewed for abuse of discretion. *Leader Glob. Sols. LLC v. Yankelewitz*, 762 F. App'x 629, 634 (11th Cir. 2019) ("We review the denial of international comity for abuse of discretion."); *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1030 (11th Cir. 2014); *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1303 (11th Cir. 2008).

# SUMMARY OF THE ARGUMENT

There is no dispute that the Receiver's proposed distribution plan is fair and reasonable. A "fair and reasonable plan" is one that treats similarly situated investors alike, because as the Supreme Court explained and the district court observed: "Equality is equity." *See Cunningham v. Brown*, 265 U.S. 1, 13 (1924). The district court did not abuse its discretion when it refused the JOL's invitation to apply a Cayman statutory scheme to the distributions made to investors in a federal equity receivership. The application of Cayman law would treat similarly situated investors differently while commanding the payment of more than $26 million of fraudulent transfers, without recourse, while approximately 640 investors— including every American investor in TCA—would receive nothing. Thus, a distribution plan under Cayman law would not, as the district court explained, result in a "fair and reasonable" or "equitable" result. Doc. 284 at 14. To avoid the clear inequities of Cayman law, Appellants futilely and belatedly turn to Chapter 15.

Appellants' primary argument is that, upon recognition by the district court, Chapter 15 requires mandatory comity. Appellants do not cite any case where a district court or circuit court held in a federal equity receivership that application of comity was mandatory. Nor do they cite even one case where an American court was bound by "mandatory international comity" under §1509(b)(3) to apply foreign law, let alone to reach a result clearly repugnant to U.S. law by treating all U.S.

nationals unfavorably compared to the foreign investors invoking foreign law. Nothing in the language or purpose of §1509(b) requires a court, upon recognition of a foreign proceeding under 11 U.S.C §1517, to ministerially apply foreign law to afford the foreign representative whatever relief it seeks. Such an argument ignores an entire line of cases where courts applied US law even after recognition of foreign representatives and would render multiple provisions of Chapter 15 as meaningless. The JOLs mandatory international comity argument is baseless.

The district court's order is not an improper exercise of federal common law but an example of the discretion afforded it by Article III of the U.S. Constitution, Fed. R. Civ. P. 66, and federal statutes which embody U.S. federal interests in protecting investors, creating, and empowering the SEC to investigate fraud, and pursuing in federal courts equitable relief for the benefit of investors and against bad actors seeking to misuse American financial markets. Remarkably, the comity that the JOLs seek is a creature of federal common law and if Appellants are correct in this argument (they are not), then comity has no place and Appellants' request for application of Cayman law must fail.

# **ARGUMENT**

### I. The JOLs' Principal Argument Based on "Mandatory Comity" Under 11 U.S.C. §1509(b)(3) Was Not Raised Below and Cannot be Considered

Appellants' principal argument on appeal is that, upon recognition of the foreign nonmain proceeding, the "comity" granted to the "foreign representative[s]" under 11 U.S.C. §1509(b)(3) gave the JOLs a "statutory right" to have Cayman law applied to any claim for relief they made. Init. Br. at 16. The JOLs never made an argument below that §1509(b)(3) required, "as matter of statutory right," the district court to apply Cayman law. The "mandatory comity" argument is raised for the first time on this appeal, and it is not properly before this Court.

This Court has long held that "[i]ssues raised for the first time on appeal are forfeited because the district court did not have the opportunity to consider them." *Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1258 (11th Cir. 2015). A "party seeking to raise the issue must first present it to the district court in a manner that allows the court an opportunity to recognize and rule on it, and then the party may properly present it to this Court on appeal." *Flanigan's Enters. of Ga., Inc. v. City of Sandy Springs*, 703 F. App'x 929, 938 (11th Cir. 2017). The Court "cannot allow [an appellant] to argue a different case from the case . . . presented to the district court." *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir. 1998). "Therefore, when an appellant replaces an argument it presented to the district court

with an entirely new theory on appeal, we are unable to reach the merits of that new theory." *Reider*, 793 F.3d at 1258.

In their Objection, the JOLs correctly quoted *Hilton v. Guyot*, 159 U.S. 113, 164 (1895), for the proposition that "comity is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." Doc. 240 at 11-12. Appellants then argued: (1) "principles of equity <u>should</u> not . . . sweep away [the Cayman] statutory distribution scheme . . . that governed Feeder Fund Ltd.;" (2) "[t]here is no doubt that federal courts have the ability and authority to apply foreign law . . . the court <u>should</u> grant comity to principles of foreign law;" and (3) "the policy considerations attendant to Chapter 15 <u>firmly support the grant of comity</u> to the Cayman Islands." *Id.* at 10-12 (emphases added). Below, the JOLs only argued that the court should choose to apply comity, not that it was statutorily bound to do so. Nor did the JOLs argue at the hearing below that 11 U.S.C. §1509(b)(3) bound the district court to apply foreign law. *See generally* Dkt. 28 (Hearing Tr., July 11, 2022). While the JOLs mentioned §1509(b)(3) in their Objection, they have "replace[d] an argument [] presented to the district court with an entirely new theory on appeal"—mandatory application of foreign law under

§1509(b)(3)—and that new argument is not properly raised for the first time on appeal. *Reider*, 793 F.3d at 1258.[8]

Below the JOLs argued only that the district court "should" apply international comity under *Hilton* and its progeny; they never argued, as they do for the first time to this Court, that §1509(b)(3) supplanted *Hilton* and afforded them a "statutory right" to have Cayman law apply. Thus, the district court had no opportunity to and did not address the "mandatory comity" argument, and that argument has been "forfeited." *Reider*, 793 F.3d at 1258. "Because [Appellants] failed to make this argument in the district court, [this Court must] decline to consider it here." *Irving*, 136 F.3d at 769.

---

[8] The JOLs reference to §1509(b)(3) in a footnote in a sur-reply, Doc. 268 at 5 n.5, in response to the Receiver's argument regarding "reciprocity," did not preserve the "mandatory application of Cayman law" issue for appeal. *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1212 (9th Cir. 2016) (argument raised "for the first time in a sur-reply" in district court is an "untimely submission [that] waived the argument."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) (argument "not raised before the Bankruptcy Court and [] mentioned in a single sentence in the conclusion section" of district court brief was not preserved for appeal to circuit court); *In re Osterman*, 296 F. App'x 900, 903 (11th Cir. 2008) (a passing reference to an issue in a reply brief [filed below], offered without substantive argument in support, is insufficient to constitute raising the issue).

**II.** **The JOLs Interpretation of §1509(b)(3) is Inconsistent with the Express Language of 1509(b), the Structure of Chapter 15, and the Express Language of Several Other Provisions in Chapter 15**

Even if this Court were to address the merits of this appeal—despite the lack of jurisdiction and Appellants' failure to preserve its core argument below—the JOLs' mandatory comity under 11 U.S.C. §1509(b)(3) argument still fails. Section 1509(b) requires a U.S. court to provide a foreign representative access to U.S. courts, but any relief, including the law applicable to any issue, is a matter within the court's discretion.

The JOLs principal argument is that when a U.S. court merely "recognizes" a foreign proceeding as a nonmain proceeding under 11 U.S.C. §1517, the requirement in §1509(b)(3) to "grant comity or cooperation <u>to the foreign representative</u>" statutorily mandates a U.S. court to afford comity to foreign substantive law without regard to traditional principles of international comity. Thus, according to Appellants, recognition of a foreign proceeding is more than "the key that opens the door for the foreign representative" to U.S. courts, *see* Init. Br. at 15; "recognition" instead gives any foreign representative the right to force the U.S. courts to subrogate U.S. law to whatever foreign law the representative puts forth, even if the relief sought is inconsistent with other provisions of Chapter 15, U.S. public policy, or any other U.S. law providing for fair and equitable treatment of similarly-situated claim holders. But nothing in the language or the underlying purpose of §1509(b)(3)

supports the JOLs position.  Instead, §1509(b)(3) provides only for access to U.S. courts; it is not a license to obtain any relief the foreign representative demands under its chosen foreign law.

A.    Section 1509(b)(3) Provides Only For a Foreign Representative's Access to U.S. Courts, Not a Right to Obtain Relief In Derogation of U.S. Law

Although §1509(b)(3) requires a court, after recognition of a foreign nonmain proceeding under §1517, to "grant comity or cooperation <u>to the foreign representative</u>" (with no reference to foreign law or court orders), any grant of "comity or cooperation" expressly is "subject to any limitations that the court may impose consistent with the policy of this chapter."  11 U.S.C. §1509(b).[9]  Those limiting policies include: protecting "the interests of all creditors," *id.* §1501(a)(3); preventing a result "manifestly contrary to" U.S. public policy, *id.* §1506; "just treatment of all holders of claims," protecting "claim holders in the United States against prejudice," and preventing "preferential or fraudulent dispositions" of property, *id*. §1507(b)(1)-(3); and assuring "the interests of the creditors and other interested entities . . . are sufficiently protected, *id.* §1522(a).  Moreover, "section 1509 is not a self-executing relief section;" while it "mandates courtesy and respect for the foreign proceeding, . . . it does not mandate relief."  *In re Cozumel Caribe,*

---

[9] Section 1509 is titled "*Right of direct access*," and it is part of Subchapter II of Chapter 15, which is titled "*ACCESS OF FOREIGN REPRESENTATIVES AND CREDITORS TO THE COURT*."  *See* 11 U.S.C. §§1509-1514.

*S.A. de C.V.*, 482 B.R. 96, 109 (Bankr. S.D.N.Y. 2012) (internal citations omitted).

Instead, "[r]elief to a foreign representative must be based on sections 1507, 1519,

1520, and 1521, subject to limitations that may be imposed under section 1522."

*Id.*[10]

Nothing in §1509(b) or elsewhere in Chapter 15 requires a U.S. court to apply

foreign law without regard to the other provisions in Chapter 15 or the established

common law considerations applicable to international comity. "Chapter 15 . . . does

not address issues such as choice of law [or] conflict of laws. . . . Instead, it leaves

such decisions to the discretion of courts. In determining whether comity should be

extended, a bankruptcy court's authority to grant 'any appropriate relief' under

§1521 is 'exceedingly broad.'" *In re Sivec SRL*, 476 B.R. 310, 323 (Bankr. E.D.

Okla. 2012) (court's footnote citations omitted). Thus, as the district court correctly

noted, after recognition, the court retains a "considerable amount of discretion" as

to the relief granted that includes the substantive law to be applied. Doc. 284 at 16

(citing *In re Black Gold S.A.R.L.*, 635 B.R. 517, 532 (B.A.P. 9th Cir. 2022)).

Thus, even when there is a foreign <u>main</u> proceeding, §1509(b)(3) mandates

"only that a court grant comity to the *foreign representative*"—not to any foreign

---

[10] Section 1507, titled "*Additional Assistance*," is part of the *GENERAL PROVISIONS* in Subchapter I of Chapter 15. *See* 11 U.S.C. §§1501-1508. Section 1520 provides for relief available only to a foreign representative in a foreign main proceeding and is inapplicable here.

court, foreign court order, or foreign substantive law. *In re Elpida Memory, Inc.*, 2012 WL 6090194, at *8 (Bankr. D. Del. Nov. 20, 2012). When "read in the context of the remainder of section 1509," §1509(b)(3) "is meant only to streamline the foreign representatives' access to, and cooperation from, other, non-bankruptcy courts in the United States following recognition." *Id.*

However, "[t]he principle of direct access does not dictate the relief that must be accorded to the foreign representative." *Cozumel*, 482 B.R. at 109. While Section 1509(b)(3) "mandates courtesy and respect for the foreign proceeding . . . [t]he foreign representative must still make a case that the relief it seeks is warranted." *Id.* (quoting 8 COLLIER ON BANKRUPTCY ¶1509.02). Instead, any right to relief (including any argument that Cayman law governs the merits of the Receiver's Distribution Plan as a matter of international comity) must be grounded in other provisions of Chapter 15, including 11 U.S.C. §§1515-1524 that compose Subchapter III of Title 15, titled "*RECOGNITION OF A FOREIGN PROCEEDING AND RELIEF*." Those sections make relief available to a foreign representative and set forth the standards the U.S. court must apply in determining whether to grant any specific discretionary relief.

Subchapter III includes 11 U.S.C. §1521, the specific section under which the district court's Recognition Order ruled the JOLs could seek "discretionary relief." Doc. 8 at 5 (21-21905). It is titled "*Relief that may be granted upon recognition*,"

and it is qualified by §1522(a) that provides the court may grant relief under §1521 "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. §1522(a) (emphasis added). *See In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1055 (5th Cir. 2012) ("Section 1522 provides an important limiting factor: relief under § 1521 may be granted 'only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected,' and a court may impose appropriate conditions on relief."); *Cozumel*, 482 B.R. at 109–10 ("Article 20 of the Model Law, implemented in [11 U.S.C. §1520] provides for certain "mandatory relief" [respecting] a foreign main proceeding, but any further relief is discretionary. . . . [T]he Model Law authorizes the court to grant 'discretionary' relief for the benefit of any foreign proceeding, whether it is a 'main' proceeding or not (article 21 [implemented in 11 U.S.C. §1521]").

Without acknowledging any of this authority, the JOLs accuse the district court of "strangling the concept of comity as granting no more than the right to appear and be heard rather than 'recognition . . . to the legislative, executive or judicial acts of another nation as comity is defined in *Hilton*, 159 U.S. at 163-64.'" Init. Br. 25-26.

But the district court's analysis is consistent with the specific language of §1509(b)(3) requiring the court only to "grant comity and cooperation to the foreign representative," with no mention of the law of judicial acts of a foreign state.

"'Recognition,' the statutory parlance for such access, is distinct from the relief that may be granted post-recognition. Recognition turns on the strict application of objective criteria. Conversely, relief is largely discretionary and turns on subjective factors that embody principles of comity." *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008) (internal citations omitted).

The JOLs simply overlook that "[g]ranting comity to a <u>foreign representative</u> by providing access to courts in the United States is very different from granting <u>the request</u> by the foreign representative to extend comity to a foreign law, court order or judgment." *Cozumel*, 482 B.R. at 110 (emphasis in original).[11] Nothing in the language or purpose of §1509(b) requires a court, upon recognition of a foreign proceeding under 11 U.S.C §1517, to ministerially apply foreign law to afford the foreign representative whatever relief it seeks. The question of "whether any relief under Chapter 15 will be granted is a separate question from whether a foreign proceeding will be recognized by a United States bankruptcy court." *In re Vitro S.A.B.*, 701 F.3d at 1045. The JOLs interpretation of §1509(b)(3) fails to consider the actual language of the statute and rests on a false equivalency of "recognition" and a "right to relief."

---

[11] Appellants' invocation of the Chapter 15 is curious in light of the fact that the Cayman Islands has not adopted the Model Law.

21

In arguing that the "plain language of Chapter 15 required" the court to apply Cayman law, the JOLs cite *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009), a case that actually supports the district court's reasoning. In *Atlas Shipping*, the court recognized a Danish proceeding as a foreign <u>main</u> proceeding and explained that, upon recognition of the foreign proceeding under the objective standards of §1517, §1509(b)(3) required the court to grant the foreign representative comity—in the form of access to the U.S. courts. But the court explained that "relief [post-recognition] is largely discretionary and turns on the subjective factors that embody the principles of international comity." *Id*. at 738. *Atlas Shipping* does not support an argument that comity "to the foreign representative" under §1509(b)(3) is a mandate to apply foreign law to whatever relief the foreign representative seeks post-recognition.[12] Indeed, while the *Atlas Shipping* court granted the foreign representative's request to dissolve certain attachments and turnover assets to the foreign representative its application of Danish law was not based on any mandate in §1509(b)(3). Rather, the court's decision was made after a comprehensive review and consideration of 11 U.S.C. §§ 1507, 1521, and 1522, *id.* at 739-45, provisions

---

[12] *Showan v. Pressdee*, 922 F.3d 1211 (11th Cir. 2019), cited by the JOLs, is not an insolvency case, let alone a Chapter 15 case. The case addressed use of the word "shall" in Georgia statutes and is inapplicable. *Id.* at 1223-27.

that "allow the Court, in its discretion, to grant further relief to the foreign representative." *Id.* at 739. !

B. The JOLs Ignore an Entire Line of Cases Applying U.S. Law to a Foreign Representative's Claims After Recognition of a Foreign Proceeding

The JOLs argue that recognition of a foreign proceeding under §1517 mandates that the U.S. court apply foreign law to any request for relief by a foreign representative. Setting aside that the statutory language and legislative purpose provide otherwise, the JOLs' argument would render an entire line of cases meaningless (or are all wrongly decided). Specifically, federal courts regularly have recognized a foreign proceeding and then, in the context of relief or assistance sought by granted to the foreign representative, have decided whether U.S. or foreign law applies. *See, e.g.*, *Jaffee v. Samsung Electronic Co.*, 737 F. 3d 14, 29 (4th Cir. 2013) (after recognizing German foreign main proceeding, court applied U.S. law to grant protections to U.S. patent licensees over foreign representative's objection that doing so conflicted with the German Insolvency code); *In re Vitro S.A.B.*, 701 F.3d at 1069 (after recognizing Mexican foreign main proceeding, court refused to grant foreign representative relief under §1507(b)(4) because Mexican insolvency plan did not provide for distribution of debtor's property in accordance with U.S. law); *In re Sivec SRL*, 476 B.R. at 323-24 (after recognizing Italian foreign main proceeding, court denied foreign representatives request for asset turnover based on comity because court was "unconvinced that the interests of U.S. creditors have been or will be

protected in the Italian proceeding" and the relief requested "would have left [an American company's] interests unprotected."); *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 616 (Bankr. S.D.N.Y. 2010) (despite recognition of later-filed foreign <u>main</u> proceeding in Bahrain, court applied New York law in denying request to vacate attachments that were "void under Bahraini law."); *Elpida*, 2012 WL 5828748 at *8 (after recognizing Japanese foreign <u>main</u> proceeding, court found "section 1509(b)(3) does not require this Court to grant comity to [Japanese law]."); *cf. In re Treco*, 240 F.3d 148, 159 (2d Cir. 2001) (reversing order requiring turnover of assets to Bahamian liquidators under pre-Model Law, 11 U.S.C. 304, where because Bahamian law would have a substantial impact on an American creditor's claims); *see also Atlas Shipping*, 404 B.R. at 738-45. To be clear, if the JOLs "mandatory comity under §1509(b)(3)" argument were correct, every one of those cases and more were unnecessarily (and wrongly) decided. In reality, no court endorses the JOLs' absurd argument that recognition of a foreign proceeding requires the application of foreign law and precludes a U.S. court from exercising any discretion in determining whether to grant relief to a foreign representative.

      C.    <u>The JOLs Argument That §1509(b)(3) Mandates the Application of Foreign Law to Afford Relief Inimical to U.S. Law and Public Policy Impermissibly Renders Much of Chapter 15 Meaningless</u>

As a statute dealing with cross-border insolvency matters, Chapter 15 surely makes comity "an important fact in determining whether relief will be granted."

*In re Vitro S.A.B.*, 701 F.3d at 1054.  "Nevertheless, Chapter 15 does impose certain requirements and considerations that act as a brake or limitation on comity," *id.*, such that comity "is not the end all be all of the statute."  *Elpida*, 2012 WL 6090194, at *8.  Chapter 15, read as a whole, permits a U.S. court upon recognition of a foreign proceeding to grant relief or assistance to a foreign representative in the court's discretion based on specific determinations of fairness to interested parties, avoiding prejudice to U.S. investors, and protecting U.S. public policy.  *See* 11 U.S.C. §§1507, 1509, 1522.  The JOLs' reading of §1509(b)(3) is untenable because it cannot be reconciled with the rest of Chapter 15.

"One of the most basic [statutory] interpretive canons . . . [is] a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Corley v. United States*, 556 U.S. 303, 314 (2009); *accord United States v. Campbell*, 26 F.4th 860, 881 (11th Cir. 2022) ("[I]t is canonical that courts must read a statute to give effect to all provisions."); *Huff v. DeKalb County*, 516 F.3d 1273, 1280 (11th Cir. 2008) (referring to "the longstanding general principle that courts must not interpret one provision of a statute to render another provision meaningless.").  As Appellants concede at page 26 of their brief: "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *TRW Inc.*

*v. Andrews*, 534 U.S. 19, 31 (2001).  The JOLs, however, proceed to ignore this canon by arguing that §1509(b)(3) requires, by its terms, a U.S. court to relinquish any discretion and merely defer in all cases to foreign law, making much of Chapter 15 meaningless.

For example, "[s]ections 1507, 1519, 1521, and 1522 provide the [U.S.] Court with broad discretion to 'grant any appropriate relief.'"  *Elpida*, 2012 WL 6090194, at *8.  Section 1521 authorizes the U.S. court to grant a foreign representative relief subject to the court's determination under §1522 that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. §1522; *In re Vitro S.A.B.*, 701 F.3d at 1055.  The JOLs interpretation of §1509(b)(3), however, necessarily reads §1522(a) (and other portions of Chapter 15) out of existence, because the same "recognition" of a foreign proceeding triggers both §1509(b)(3) and §§1521 and 1522.  Under the JOLs interpretation, that "recognition" both requires the court to inquire under §1522 whether the parties' interests are "sufficiently protected" and mandates the application of Cayman law that precludes the court from making the inquiry required by §1522.  The JOLs argument that §1509(b)(3) requires a court, upon recognition of a foreign proceeding, to apply foreign law "as a matter of statutory right," leaves no room for the U.S. court to determine, as §1522(a) requires, whether the interested parties' rights "are sufficiently protected."  Instead, the JOLs position is that foreign law, not

the U.S. court, determines what relief may be available under §1521. That position renders §1522(a) meaningless because the "recognition" that makes §§1521 and 1522(a) operative also requires the court to apply foreign law that negates the two sections. It is an absurd construction of §1509 that violates the interpretive canon that a court must "give effect to all provisions" of a statute. *Campbell*, 26 F.4th at 881. The district court properly rejected that contention.

The JOLs interpretation of §1509(b)(3) would also make 11 U.S.C. §1507(a) meaningless. That section provides: "Subject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States." 15 U.S.C. §1507(a) (emphasis added). But "additional assistance" available post-recognition to a foreign representative under §1507 expressly requires that:

> the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—
>
> **(1)** just treatment of all holders of claims against or interests in the debtor's property;
>
> **(2)** protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> **(3)** prevention of preferential or fraudulent dispositions of property of the debtor; [and]
>
> **(4)** distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by [Title 11.]

11 U.S.C. §1507(b) (emphases added). As with §1521 and §1522, the same "recognition" that requires the U.S. court to consider the "just treatment of all" claim

holders, the protection of U.S. claim holders, and preventing fraudulent transfers also, according to the JOLs, requires the U.S. court to abdicate that obligation by blindly applying foreign law (here Cayman law). Thus, the JOLs are also asking this Court to write §1507(b) out of existence.

Moreover, while the JOLs pay lip service to 11 U.S.C. §1509(b), which conditions the grant of comity "to the foreign representative" on "limitations that the court may impose consistent with the policy of this chapter," the JOLs' position writes that limiting provision out of existence. If recognition under §1517 statutorily obligates the court under §1509(b)(3) to apply foreign law, the U.S. court has no authority to actually implement the "policies" of Chapter 15, other than perhaps those that might fortuitously be embedded in foreign law. Thus, the JOLs' reading of §1509(b)(3) is at odds with the other language of the same section.

The only reasonable reading of §1509(b)(3), that gives effect to 11 U.S.C. §§ 1501, 1507, 1521, and 1522 is the one consistent with the Model Law guidelines. Upon recognition of a foreign proceeding, §1509(b)(3) requires the court to grant comity "to the foreign representative" by providing "to the foreign representative" full access to proceedings in all U.S. courts. Section 1509(3) does not, however, provide for any specific relief or require that the district court slavishly apply foreign law as put forth by the foreign representative. Instead, any relief afforded to the foreign representative is discretionary relief guided by the policies and standards set

forth elsewhere in Chapter 15 and the long-standing considerations of international comity.

## III. The District Court Did Not Abuse Its Discretion in Applying U.S. Law to Approve the Receiver's Distribution Plan Over the JOLs' Objection

### A. The District Court's Decision Not to Apply Cayman Law as a Matter of International Comity Was Not an Abuse of Discretion

Chapter 15 does not require the application of foreign law as a matter of "mandatory comity," but, after recognition of a foreign proceeding, a U.S. court may, in its discretion, consider providing a foreign representative relief or assistance consistent with comity.  Post-recognition relief is largely discretionary and turns on subjective factors that embody principles of comity." *Bear Stearns High-Grade*, 389 B.R. at 333.  While Section 1509(b)(3) "mandates courtesy and respect for the foreign proceeding," and provides the foreign representative access to U.S. court proceedings, the foreign representative seeking relief available under foreign law must "make a case that the relief it seeks is warranted." *Cozumel*, 462 B.R. at 109.

Long ago, the Supreme Court explained: "Comity is not a rule of law, but one of practice, convenience, and expediency.  It is something more than mere courtesy . . . But its obligation is not imperative." *Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488 (1900); *accord GDG Acquisitions*, 749 F.3d at 1030 ("comity does not achieve the force of an imperative or obligation.  Rather, it is a nation's expression of understanding . . . both to international duty and convenience and to

the rights of persons protected by its own laws."). Thus, any decision to grant or deny comity to apply foreign substantive law is soundly within a court's discretion. *Leader Glob. Sols.*, 762 F. App'x at 634.

International comity is an abstention doctrine reflecting "the extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation." *GDG Acquisitions*, 749 F.3d at 1030 (quoting *Hilton*, 159 U.S. at 163); *United States v. Garza-Mendez*, 735 F.3d 1284, 1288 n.2 (11th Cir. 2013) ("Comity is respect for the law of another jurisdiction, but not blind adherence!") (exclamation mark in original).

Comity will not prevail when legitimate U.S. federal interests, including the rights of U.S. nationals, would be compromised. *Hilton*, 159 U.S. at 164 ("[N]o nation will suffer the laws of another to interfere with her own to the injury of her citizens") (cleaned up); *accord Overseas Inns S.A. P.A. v. United States*, 911 F.2d 1146, 1149 (5th Cir. 1990) ("American courts have declined to accord comity to . . . decrees when it would prejudice American interests or policies"); *Cunard S.S. Co. v. Salen Reefer Serv. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("comity would not be granted if it would result in prejudice to United States citizens"); *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 915-16, 929-31, 937 (D.C. Cir. 1984) ("from the earliest times, authorities have recognized that the obligation of

comity expires when the strong public policies of the forum are vitiated by the foreign act."). *Cf. United States v. Gillock*, 445 U.S. 360, 373 (1980) (comity did not support the application of a U.S. state law when a "legitimate interest of the Federal Government" would be impaired). As the Second Circuit explained, "in exercising its discretion the district court is to guard against forcing American creditors to participate in foreign proceedings in which their claims will be treated in some manner inimical to this country's policy of equality." *Banque de Financement, S.A. v. First Nat'l Bank*, 568 F.2d 911, 921 (2d Cir. 1977).

The district court correctly found the United States has a strong and clear federal interest in this case. The Securities Act of 1933 and the Exchange Act of 1934 embody U.S. federal interests in protecting investors, creating, and empowering the SEC to investigate fraud, and pursuing in federal courts equitable relief for the benefit of investors and against bad actors seeking to misuse American financial markets. *See* 15 U.S.C. §77a *et seq.*, 15 U.S.C. §78a *et seq.*; *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020) ("Federal court may grant . . . any equitable relief that may be appropriate or necessary for the benefit of investors.'") (quoting 15 U.S.C §78u(d)(5)) (cleaned up)); *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982) ("The Securities Act of 1933 must be interpreted broadly by the courts in order to effectuate the Congressional intent to protect investors."); *SEC v. Wencke*, 622 F.2d 1363, 1372 (9th Cir. 1980) ("There is a strong federal interest in insuring

effective relief in SEC actions brought to enforce the securities laws.").[13]  The

district court found that applying Cayman law would disserve both U.S. law and

public policy by allowing a grossly inequitable distribution of assets among

similarly-situated investors in which "a small number of foreign investors would

siphon much of the Receivership Assets, leaving far less for the remaining Net

Losers, the bulk of whom are based in the United States."  Doc. 284 at 18.  That

finding is supported by the record and must be accepted by this Court.

When, as the district court found here, Doc. 284 at 17-18, the application of

foreign law would trample on U.S. policies and prejudice the rights and interests of

U.S. citizens, the Supreme Court mandates that foreign law must yield.  *See, e.g.,*

*Gillock*, 445 U.S. at 373 ("Where important federal interests are at stake, . . . comity

yields.").  Indeed, over a century ago, the Supreme Court made it clear that, when

application of foreign law would unjustly and particularly disadvantage American

interests, international comity must yield to domestic policy, including the protection

of U.S. citizens from prejudice and injury.  *Hilton*, 159 U.S. at 164-65.  Appellants

---

[13] The JOLs make a curious argument that the plain language of 78(u)(d)(5) applies
only to relief sought by the SEC and not a court-appointed receiver in an SEC civil
law enforcement action.  Here, the SEC sought appointment of a receiver to protect
investors' interests, and the district court granted that relief and appointed the
receiver, as an agent of the court, with directions to file a distribution plan for the
benefit of investors.  The Receiver is an arm of the court appointed to implement the
relief sought by the SEC; he has no authority or ability to seek relief outside of that
appointment.  This is all consistent with the plain language of the statute and *Liu*.

have failed to cite any authority authorizing—much less mandating—that a United States court apply foreign law in a manner that clearly tramples upon American law, public policy, and the interest of U.S. investors.

B.  The District Court's Determination That the Receiver's Distribution Plan was Fair and Reasonable was not An Abuse of Discretion

The JOLs do not deign to suggest the Receiver's Distribution Plan is not fair and reasonable, but the inherent equity of the Receiver's Distribution Plan supports the district court's discretionary decision to approve it over the JOLs' Objection. District courts have "broad powers and wide discretion to determine relief in an equity receivership" that "derives from the inherent powers of an equity court to fashion relief." *SEC v. Elliott*, 953 F.2d at 1566. A "district court's distribution of assets in a receivership is an equitable decision that" is left to the district court's discretion. *Cox Enters., Inc.*, 666 F.3d at 701; *Bendall*, 523 F. App'x at 557 ("any action by a trial court in supervising an equity receivership is committed to [its] sound discretion."

"In supervising an equitable receivership, the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable." *SEC v. Wealth Mgmt.*, 628 F.3d at 332–33; *Broadbent v. Advantage Software, Inc.*, 415 F. App'x 73, 78 (10th Cir. 2011) ("A primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of [all similarly situated investors]."); *SEC v. Quan*, 870 F.3d 754, 762 (8th

Cir. 2017) ("The court is not required to distribute the assets in accordance with the contractual rights of the parties.").  Moreover, as is the case here, "a distribution plan that is supported by both the SEC and the receiver is entitled to deference from the [district court]."  *E.g.*, *SEC v. Quan*, 2015 WL 8328050, at *6 (D. Minn. Dec. 8, 2015), *aff'd sub nom*. *SEC v. Quan*, 870 F.3d 754 (8th Cir. 2017); *SEC v. Alleca*, 2017 WL 5494434, at *4 (N.D. Ga. Nov. 16, 2017) (same).

A "fair and reasonable plan" is one that treats similarly situated investors alike, because as the Supreme Court explained and the district court observed: "Equality is equity."  *Cunningham v. Brown*, 265 U.S. 1, 13 (1924)); *Elliott*, 953 F.2d at 1570 (citing *Cunningham*); *Wealth Mgmt.*, 628 F.3d 323 at 333 ("[D]istrict courts supervising receiverships have the power to classify claims sensibly . . . includ[ing] the authority to subordinate the claims of certain investors to ensure equal treatment.").  Thus, "[a] district court, assessing a receiver's plan for compensation of victims of a fraudulent scheme has 'equitable authority . . . to treat all the fraud victims alike (in proportion to their investments), and order a pro-rata distribution." *CFTC v. Walsh*, 712 F.3d 735, 749 (2d Cir. 2013).  Those standards, of course, align with the determinations left to the district court in Chapter 15. *See* 11 U.S.C. §§ 1501(a)(3) (protecting the "the interests of all creditors"); 1506 (preventing a result "manifestly contrary to" U.S. public policy); 1507 (assuring "just treatment of all holders of claims," protecting "claim holders in the

United States against prejudice," and preventing "preferential or fraudulent dispositions" of property); and 1522 (assuring "the interests of the creditors and other interested entities . . . are sufficiently protected").

In its well-reasoned August 4 Order, the district court described its task as determining whether the Receiver's "proposed distribution plan [was] fair under the circumstances." Doc. 284 at 13. As noted above, the Receiver's Distribution Plan provides for $55,452,651 to be paid on a *pro rata* basis to 764 (out of a total of 872) Unsubordinated Net Losers that have to date received less than 23.05% of their actual cash loss, resulting in every unsubordinated investor having recovered <u>at least 23.05%</u> of their investments in the Receivership Entities. No investors that substantiated their investments will be left behind the 23.05% mile marker.

The district court fully considered the JOLs' Objection in light of the factual record and ruled that the Distribution Plan, which treated all investors equally under a "rising tide" *pro rata* plan, was "fair and reasonable under present circumstances." *Id*. at 34. The court overruled the JOLs' Objection, which the court found sought preferential treatment under Cayman law for "redemption" investors and "unpaid subscribers" and "would produce a harsh and unequal result." *Id*. at 14-26.

C. <u>The District Court's Decision Not to Apply Cayman Law to Sanction the JOLs' Statutory Distribution Scheme Was Not an Abuse of Discretion</u>

In stark contrast to returning every Unsubordinated Net Loser at least 23.05% of their losses, the JOLs' proposed distribution under Cayman law would, as the

district court explained, treat similarly-situated investors differently and would not result in a "fair and reasonable" or "equitable" result. Doc. 284 at 14. In addition to paying the JOLs and their litigation funder millions of dollars to cover their administrative expenses in full, fifty investors would be repaid in full, and a group of just eighty-one investors would receive approximately $45 million, including 20 investors that would actually receive more money that they invested in the Receivership Entities (realizing over $26 million in fictitious "profits") with very limited recourse to "claw back" those "profits."

This Court has recognized that allowing "any individual to elevate his position over that of other investors similarly 'victimized' by asserting claims" that Cayman law would impose "would create inequitable results, in that certain investors would recoup 100% of their investment while others should receive substantially less . . ." would in the context of a receivership be "an inappropriate equitable remedy." *Elliott*, 953 F.29 at 1569. That is precisely what Appellants seek to do here by applying Cayman law. Beyond being inequitable, allowing some investors to realize profits and then giving them legal protection against any "claw back" claims is inconsistent with U.S. law. *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 235 (2d Cir. 2011) (while investors are entitled to receive their principal back, fictitious profits are avoidable as fraudulent transfers because "[a]ny dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money

actually invested."); *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) ("Any transfers over and above the amount of principal—i.e. for fictitious profits—are not made for 'value' because they exceed the scope of the investor's fraud claim."). Moreover, those distributions would be despite that approximately 640 investors— including every American investor in TCA—would receive nothing.

The inequality that Cayman law would foist upon the district court and the Receiver in this case is staggering. In short, the JOLs asked the district court, and now ask this Court, to further victimize at least 640 investors, and every American investor, by elevating a select few investors over others, a result contrary to the court's charge. *See Cunningham*, 265 U.S. at 13 (money in fraudster's account belonged to all victims, barring "creditors" from asserting "rules" that would permit them to recovery at the exclusion of others); *U.S. v. Wilson*, 659 F.3d 947, 956 (9th Cir. 2011) (Supreme Court principles favor universal recovery). The district court did not abuse its discretion by declining to apply Cayman law and condone such an inequitable and unfair distribution plan that runs contrary to Chapter 15 and all other U.S. law and policy.

The JOLs also argue that *In re OneTRADEx, Ltd.*, 645 B.R. 184 (Bankr. S.D.N.Y. 2022), somehow reflects a "view adopted by the receivers and the SEC of permitting distribution to stakeholders in Cayman entities to be made in accordance with principles and priorities of applicable Cayman law." Init. Br. at 11. The case

does nothing of the sort, and it has no bearing on the issues before this Court. The Debtor in *OneTRADEx* "was a registered broker-dealer with operations conducted in the Cayman Islands." *OneTRADEx*, 645 B.R. at 186. Here, Feeder Fund Ltd conducted no operations in the Cayman Islands and, in fact, was prohibited from doing so under Cayman law. The Chapter 15 case in *OneTRADEx* was filed incident to "the Debtor's <u>foreign main proceeding</u> commenced by the Cayman Islands Monetary Authority," because a majority of the Debtor's assets were held by a U.S.-based custodian. *Id.* at 185. *OneTRADEx* does not in any way support the JOLs argument that their recognition as foreign representative in a foreign nonmain proceeding somehow requires that Cayman law be applied in derogation of U.S. federal law.

  D. <u>Comity Did Not Compel Application of Cayman Substantive Law Where Judge Altonaga Granted the JOLs a "Limited" Right to "Participate in the Proceedings"</u>

Judge Altonaga, on June 9, 2021, "granted leave" to the JOLs to "intervene and participate in the proceedings in this case for the <u>limited purposes</u> set forth in the Motion and the Recognition Order." Doc. 147 (emphasis added).

In her Recognition Order, Doc. 8 (21-21905), Judge Altonaga recognized the JOLs and Cayman Island action as a "foreign nonmain proceeding." But the "limited relief" in recognition came with caveats, merely providing the JOLs "a forum . . . to be heard on any matters that have the requisite effect on the Debtor in the Chapter

15 Case and/or the Receivership Case." *Id*. at 3-4. In fact, Judge Altonaga explicitly denied the JOLs the right to disturb the Receiver's "rights, duties and responsibilities imposed upon him by orders of the Court." *Id*. at 5. The JOLs therefore, by the plain language of their agreement memorialized in the Recognition Order, had only a limited right to voice their concerns about the Receiver's Distribution Plan; they did not have a right to control the proceedings by supplanting the Receiver's duties through advocating for an alternative distribution scheme. Doc. 284 at 19.

The JOLs cannot simply disregard the language of both their stipulated motion and Judge Altonaga's Recognition Order to defeat the Receiver's court-ordered duty to "develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property." Doc. 5. That is particularly true because the JOLs "alternative distribution scheme [] would produce a wildly unequal and unfair result."[14] Doc. 284 at 19.

---

[14] Moreover, the JOLs "Trojan Horse" effort to take over the proceedings by forcing the court to apply Cayman law also goes beyond the scope of rights provided to them under Chapter 15. Statutorily, the JOLs are limited to the type of relief they can seek upon recognition, and 11 U.S.C. § 1521(c) limits representatives in a nonmain foreign proceeding to relief that "relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding." *Id*. No such assets exist here.

E.    Application of Comity Here Would Violate American Laws and Harm American Citizens

In evaluating whether comity is appropriate, this circuit considers: "(1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (3) whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is <u>repugnant</u> to fundamental principles of <u>what is decent and just</u>." *EGI-VSR, LLC v. Coderch*, 963 F.3d 1112, 1120 (11th Cir. 2020) (emphasis added).

While the repugnancy exception is narrow, American courts continue to find foreign acts that undermine: (1) the American public interest; (2) American confidence in the administration of our laws; or (3) security for individual rights of Americans or of American private property, which any American citizen ought to feel is against our public policy, are indeed repugnant to American policies. *See, e.g.*, *Somportex v. Phila. Chewing Gum*, 453 F.2d 435, 443 (3d Cir. 1971) (quoting *Goodyear v. Brown*, 26 A. 665, 666 (Pa. 1893)); *Loucks v. Standard Oil Co.*, 224 N.Y. 99, 110 (1918) (Cardozo, J.) (vested rights may be withheld when "the cause of action in its nature offends our sense of justice or menaces the public welfare" . . . if foreign acts would "violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal," American courts should "close their doors").

40

Here, application of Cayman law violates all three of the above prongs. Applying Cayman law at this stage would undermine American public interest in providing a fair and equitable distribution of funds recovered from a fraudulent enterprise; undermine public confidence in the SEC to administer and enforce our securities laws and regulations; and would lead to a result (i.e., forcing approximately 640 investors—including every American investor—to receive nothing while international banks and corporations as well as a foreign litigation funders loot the Receivership Estate) that would violate American public policy and fundamental principles of justice.

## IV. The Cases Relied Upon by the JOLs to Support International Comity are Distinguishable or Inapplicable to the Facts of this Case

As stated above, Appellants devote twenty-five pages of their brief to the history of Chapter 15 in cross-border bankruptcy cases and the grant of comity therein. However, this is not a bankruptcy case but a federal equity receivership in an action brought by the United States federal agency congressionally authorized and charged with enforcing U.S. securities laws and protecting U.S. investors and markets. As such, the district court is charged with protecting investors and afforded wide latitude to determine what would be fair and reasonable. *Wealth Mgmt.*, 623 F.3d at 332-333 ("In supervising an equitable receivership, the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable.

The district court has broad equitable power in this area, so appellate scrutiny is narrow.").

Appellants must do more than show that Chapter 15 allowed them to participate in this federal equity receivership; they must establish they were entitled to relief under Chapter 15 based on Cayman law that divested the district court of its broad and discretionary federal equity receivership authority under U.S. law. As discussed above, the language of Chapter 15 does not support the JOLs argument. Moreover, the JOLs are unable to cite a single case where any court has so held.

The JOLs argument for international comity rest heavily on a principle stated in *Canada Southern Railway Co. v. Gebhard*, 109 U.S. 527 (1883), "that U.S. courts give effect to foreign insolvency laws arising from a foreign insolvency proceeding." Init. Br. at 20. The Receiver does not dispute that general statement, but it and the venerable *Gebhard* case (which, being 140 years old, was not a Chapter 15 case) are inapplicable. *Gebhard* involved a "scheme of arrangement" (akin to a bankruptcy) implement in chancery court authorized by the Canadian Parliament (upon the authority of British Parliament) that provided for the adjustment of the company's bonds." After the Canadian proceeding was initiated, bondholders filed claims against Canada Southern in New York, and the issue was whether the U.S. bondholders were bound by the effect of the Canadian "scheme of arrangement."

The Supreme Court held they were, noting the significant and near-exclusive Canadian public interests at stake. The Court explained:

> This corporation was created in Canada to build and work a railway in that dominion. Its principal business was to be done in Canada, and the bulk of its corporate property was permanently fixed there. All its powers to contract were derived from the Canadian government, and all the contracts it could make were such as related directly or indirectly to its business in Canada. That business affected the public interests, and the keeping of the railway open for traffic was of the utmost importance to the people of the dominion. The corporation had become financially embarrassed, and was and had been for a long time unable to meet its engagements in the ordinary way as they matured. There was an urgent necessity that something be done for the settlement of its affairs. In this the public, the creditors, and the shareholders were all interested.

*Id.* at 538. Nothing in this case invokes the compelling foreign interests discussed in *Gebhard*. There is no Cayman Islands legislative action or public resource involved, and surely the Cayman public have no compelling interest in protecting the interest of fraudsters operating out of Florida. Moreover, the JOLs, who were appointed <u>after</u> the district court took exclusive jurisdiction over all of the Receiver Entities' assets, are comparable to the U.S. bondholders in *Gebhard* who proceeded <u>after</u> the Canadian Parliament and court acted. Aside from it involving a foreign insolvency proceeding, *Gebhard* is nothing like this action. The case surely does not, as the JOLs insinuate, mandate that international comity be applied in all foreign insolvency actions.

*Victrix Steamship Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709 (2d Cir. 1987), is also not a Chapter 15 case, and it also does not aid the JOLs. There, a Swedish bankruptcy court asserted exclusive jurisdiction over a Swedish company, appointed an administrator, and suspended all lawsuits against the company. *Id*. at 711. In derogation of that court's exclusive jurisdiction, Victrix, a Panamanian entity, obtained an arbitration award by default in London and then attached assets of the debtor located in New York. The Second Circuit affirmed the district court's order vacating the attachments as being in violation of the Swedish court's exclusive jurisdiction. The Second Circuit noted that courts generally extend comity if a foreign court had proper jurisdiction "and enforcement <u>does not prejudice the rights of United States citizens or violate domestic public policy</u>." *Id*. at 713 (emphasis added). Given that no U.S. interests were at stake, the court cut to the chase and ruled: "We will not aid Victrix's effort to evade the writ of the Swedish bankruptcy court. *Id*. at 714.

Here, the JOLs obtained their appointment after the U.S. district court, at the request of an U.S. enforcement agency, asserted exclusive jurisdiction over the assets of Feeder Fund Ltd. Doc. 5 ¶1. Applying Cayman law to force the U.S. court to order distribution of U.S.-based assets to the JOLs and a small group of non-U.S. investors to the extreme prejudice of every American claim holder would, if anything, "aid [the JOLs] effort to evade" the authority of the U.S. district court.

44

There is no application of comity that requires a U.S. court to abdicate its jurisdiction at the request of a foreign party that acted in derogation of the U.S. court's pre-existing jurisdiction and authority.

*EMA Garp Fund, L.P. v. Banro Corp.*, 783 F. App'x 82, 83 (2d Cir. 2019), and *In re Board of Directors of Telecom Argentina, S.A.*, 528 F.3d 162 (2d Cir. 2008) are also inapposite. Neither are Chapter 15 cases, and they categorically do not support the JOLs' unprecedented view that comity "to the foreign representative" under §1509(3)(b) "means anything less than giving effect to the distributional priorities of Cayman Islands law." *See* Init. Br. 27.

*EMA Garp* involved dismissal of an action based on comity afforded to the defendant's ongoing Canadian reorganization proceedings. Far from mandating application of foreign law, the district court declined jurisdiction, and the Second Circuit found no abuse of discretion under the traditional standards of comity. *Id.* at 83-84 ("We have stated that the doctrine [of international comity] is not an imperative obligation of courts but rather is a discretionary rule of practice, convenience, and expediency.") (citation omitted).

*Telecom Argentina*, 528 F.3d 162, did not involve a foreign representative seeking to compel application of foreign law in a U.S. proceeding. It involved a petition under 11 U.S.C. §304 seeking recognition of a <u>concluded</u> Argentine insolvency proceeding in which an Argentine public utility "renegotiate[d] its

financial obligations with multinational investors in the wake of a national economic crisis." *Id.* at 164. One investor that did not participate in that proceeding opposed the company's petition to have the Argentine proceeding recognized by a U.S. court. The recognition sought was for the concluded foreign insolvency proceeding that resulted in a court-approved reorganization plan. *Id.* at 165. The case has nothing to do with applying substantive foreign law to relief sought by a foreign representative in a U.S. proceeding.

## V. The Powers of a District Court in a Federal Equity Receivership Do Not Come from General Common Law, All Decisions Made Therein Are Not "Common Lawmaking"

### A. Courts in America Can Impose Equitable Remedies Using Powers that Predate the Country's Founding

Equity receiverships "are older than [the United States of America]." *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 895 (5th Cir. 2019). The federal equity receivership, despite the name, both has a federal statutory framework and can trace its underlying powers for hundreds of years–to explicit provisions of Article III of the U.S. Constitution and beyond that to England's Chancery Court. *Id.*; U.S. Const. Art. III, Sec. 2 ("The judicial power" of federal courts "extend to all cases[] in . . . equity.").

By the late 1800s, federal courts regularly exercised their general equity powers to appoint receivers to operate distressed corporations. *See, e.g.*, *Leadville Coal Co. v. McCreery*, 141 U.S. 475, 477-78 (1891). Congress began codifying the

authority of federal court-appointed receivers as early as 1911. *See Link v. Powell*, 57 F.2d 591, 592 (W.D.S.C. 1932) ("The statute under which the receivers were appointed was enacted on March 3, 1911, 36 Stat. 1102, Judicial Code, § 56, 28 U.S.C. § 117."). Those efforts continued when the Federal Rules of Civil Procedure merged "courts of law" and "courts of equity" in 1938. *See, e.g.*, Fed. R. Civ. P. 17(b); Fed. R. Civ. P. 66; Fed. R. Civ. P. 83. Critically, Congress, in approving the Federal Rules of Civil Procedure, did not overrule the historical practice and authority of equity receivers as they previously existed. *See* Fed. R. Civ. P. 66 (expressly authorizing and directing federal courts to use their "judicial power" to administer federal equity receiverships in "accord with the historical practice in federal courts . . .").

Congress continued to promulgate laws governing receiverships outside the Rules of Civil Procedure as well. *See, e.g.*, 18 U.S.C. § 1910; 28 U.S.C. § 957; 28 U.S.C. § 958; 28 U.S.C. § 959; 28 U.S.C. § 1292(a)(2); 28 U.S.C. § 1692. Congress has not once limited the authority or scope of a federal equity receiver nor restrained the broad discretion of a federal court overseeing a federal equity receivership. Indeed, the Supreme Court has repeatedly held that, absent express congressional intent to limit judicial authority, a federal court's equitable powers are limited only by the traditional powers exercised by the High Court of Chancery in England at

America's founding.  *See, e.g.*, *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 318 (1999).

B. The Power of the District Court Exercised Here Was Not Common Rulemaking, but an Appropriate Use of Discretion

Appellants contort themselves to recast the Supreme Court's perfunctory six-page opinion in *Rodriguez v. FDIC*, 140 S. Ct. 713 (2020), striking down a tax refund allocation rule, into a sweeping death-knell of "federal common law." Init. Br. 38-39.[15]  The JOLs news of the demise of federal common law is both unsupported and greatly exaggerated.  No case has applied *Rodriguez*, or *Atherton v. FDIC*, 519 U.S. 213, 218 (1997), as the JOLs argue here, to limit the broad discretion afforded to a district court overseeing a federal equity receivership.

Moreover, even if the JOLs were correct—and they are not—the district court here did not create any "rule of decision."  The court did not mandate any result under similar circumstances or state that her decision should be granted any precedential weight for other cases in the Southern District of Florida.  The court instead weighed two competing arguments presented, found the JOLs argument

---

[15] Ironically, the international comity that Appellants seek is a creature of Federal Common Law.  *In re Treco*, 240 F.3d 148, 158 (2d Cir. 2001) ("federal common law comity analysis conducted by courts pursuant to *Hilton*."); *Vestis, LLC v. Caramel Sales, Ltd*., 2019 WL 11542354, at *2 (C.D. Cal. Nov. 5, 2019) ("International comity is a federal common law doctrine . . . ").  Thus, if Appellants are correct in this argument, then comity has no place and Appellants' request for application of Cayman law must fail.

unpersuasive as inequitable and unfair, and exercised its discretion to overrule Appellants' objection. Doc. 284 at 25 ("In short, the JOLs' objection does not persuade the Court to adopt Cayman law."). No federal common law was created, and after 53 pages of argument, the JOLs never explain what federal common law or rule of decision the district court supposedly created.

Even if this Court were to find the district court engaged in "common rulemaking," *Rodriguez* would actually support the court's decision. The Supreme Court made clear that judges can engage in common lawmaking where, "in the absence of congressional authorization," it is "necessary to protect uniquely federal interests." *Rodriguez*, 140 S. Ct. at 717. The interests of the United States in general, and the SEC in particular, to protect American investors is a unique federal interest where common lawmaking would be appropriate. *See SEC v. Carriba Air*, 681 F.2d at 1324; *SEC v. Wencke*, 622 F.2d at 1372 ("There is a strong federal interest in insuring effective relief in SEC actions brought to enforce the securities laws.") (emphasis added).

## VI. Conclusion

For the forgoing reasons, and for the reasons in the Receiver's motion to dismiss this appeal, the Receiver requests that this Court: (1) dismiss this appeal for lack of jurisdiction; or (2) affirm the district court's order approving the Receiver's Distribution Plan.

Respectfully submitted this 17th day of May, 2023.

VENABLE LLP
Gregory M. Garno, Esq. (FBN 87505)
gmgarno@venable.com
W. Barry Blum, Esq. (FBN 379301)
bblum@venable.com
Thaddeus R. Kleckley, Esq. (NYBN 5346945)
trkleckley@venable.com
100 S.E. Second Street, 44th Floor
Miami, Florida 33131
Tel.: (305) 349-2300
Fax: (305) 349-2310
*Counsel for Appellee Jonathan E. Perlman,*
*Court-Appointed Receiver*

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this motion complies with the length limitations of FED. R. APP. P. 32(a), because it contains 12,204 words, excluding the parts of the motion exempted by FED. R. APP. P. 32(f); and this motion complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this computer-generated motion has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font size.

VENABLE LLP
*Attorneys for Receiver*
100 S.E. Second Street, 44th Floor
Miami, Florida 33131
Tel.: (305) 349-2300
Fax: (305) 349-2310

By: _____*/s/ Greg M. Garno*_____
     Gregory M. Garno, Esq. (FBN 87505)

## CERTIFICATE OF SERVICE

I certify that on May 17, 2023, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit through the Court's CM/ECF system. Service on counsel of record will be accomplished through the Court's CM/ECF system.

*/s/ Greg M. Garno*
Gregory M. Garno, Esq. (FBN 87505)